1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF CALIFORNIA

3

4    UNITED STATES OF AMERICA,    )
                                  )
5              PLAINTIFF,         )    CASE NO. 16CR2892-JAH
                                  )
6    VS.                          )    SAN DIEGO, CALIFORNIA
                                  )
7    TYRONE CEDRIC DUREN,         )    MONDAY,
                                  )    DECEMBER 10, 2018
8              DEFENDANT.         )    3:55 P.M.
     _____)

9

10

                REPORTER'S TRANSCRIPT OF PROCEEDINGS
11
                          MOTION HEARING
12
           BEFORE THE HONORABLE JOHN A. HOUSTON
13               UNITED STATES DISTRICT JUDGE

14

     APPEARANCES:
15

     FOR THE GOVERNMENT:   ADAM BRAVERMAN, U.S. ATTORNEY
16                         BY:  KEVIN M. RAPP, ESQ.
                                ABBIE MARSH, ESQ.
17                         ASSISTANT U.S. ATTORNEYS
                           880 FRONT STREET
18                         SAN DIEGO, CALIFORNIA  92101

19   FOR THE DEFENDANT:    JOHN DAVID KIRBY
                           L. MARCEL STEWART
20                         ATTORNEYS AT LAW
                           110 WEST A STREET
21                         SUITE 1100
                           SAN DIEGO, CALIFORNIA  92101

22

23   REPORTED BY:  CAMERON P. KIRCHER
                    CSR NO. 9427, RPR, CRR, RMR
24                  333 W. BROADWAY, SUITE 420
                    SAN DIEGO, CALIFORNIA  92101
25                  E-MAIL:  CPKIRCHER@GMAIL.COM

COMPUTER-AIDED TRANSCRIPTION

1       SAN DIEGO, CALIFORNIA - MONDAY, DECEMBER 10, 2018

2                            3:55 P.M.

3            THE CLERK:  NO. 24, IT'S 16CR2892, THE UNITED STATES

4    OF AMERICA VERSUS TYRONE CEDRIC DUREN.

5            MR. RAPP:  KEVIN RAPP AND ABBIE MARSH ON BEHALF OF

6    THE UNITED STATES.

7            THE COURT:  GOOD AFTERNOON.

8            MR. KIRBY:  GOOD AFTERNOON, YOUR HONOR.  JOHN KIRBY

9    AND MARCEL STEWART ON BEHALF OF MR. DUREN.  HE'S PRESENT.

10           THE COURT:  ALL RIGHT.  GOOD AFTERNOON, EVERYONE.

11           MR. STEWART:  GOOD AFTERNOON, YOUR HONOR.

12           THE COURT:  APPRECIATE EVERYONE'S PATIENCE THIS

13   AFTERNOON.

14           WE'RE HERE FOR A MOTION HEARING.  THE FIRST ORDER OF

15   BUSINESS, HOUSEKEEPING MATTER, IS THAT THE GOVERNMENT FILED

16   ON OCTOBER 5TH A MOTION FOR AN AMENDED ORDER OF CRIMINAL

17   FORFEITURE.  THE COURT EXECUTED IT.  AND I NOTICED OVER THE

18   WEEKEND THAT I HAD NOT GIVEN IT TO MR. MCDOWELL TO FILE.  SO

19   I'M GOING TO HAVE IT -- IT'S DATED IN OCTOBER.  I'LL LEAVE

20   THAT DATE THERE, BUT IT WILL BE FILED TODAY.

21           MR. RAPP:  THANK YOU, SIR.

22           THE COURT:  OKAY.  SECOND HOUSEKEEPING MATTER.

23           THE LAST TIME WE WERE HERE, WE DISCUSSED A TRIAL

24   DATE.  I WAS CONCERNED ABOUT THE TRIAL DATE THAT WE HAD, AS

25   IT MIGHT BRUSH UP AGAINST THE 4TH OF JULY WEEKEND.  AND YOU

MIGHT KNOW THAT IT HAS BEEN CHANGED TO MAY 7TH.  AND THAT

WAY, IF THE CASE IS EXTENDED, AS HAS BEEN PROJECTED, THERE IS

PLENTY OF TIME TO TRY IT BEFORE WE GET CLOSER TO THE 4TH OF

JULY WEEKEND.

SO MAY 7TH, MR. DUREN, 9:00 A.M. JURY TRIAL.

WE HAVE NOT GOTTEN TO THE QUESTIONNAIRE; RIGHT?

THERE HAS BEEN SOME MEET-AND-CONFER WITH RESPECT TO THE

QUESTIONNAIRE.  WE HAVE NOT GOTTEN THAT FAR; IS THAT CORRECT?

MR. RAPP:  I THINK WE HAVE, JUDGE.  AS YOU KNOW, WE

HAVE FINALIZED A QUESTIONNAIRE.  I THINK THERE WAS SOME VERY

MODEST DISAGREEMENTS.

MY RECOLLECTION IS OUR LAST CONVERSATION IN JULY

WITH MR. KIRBY, IS THAT I THINK WE'RE PRETTY CLOSE, BUT I

THINK THAT I CAN -- WE CAN EXCHANGE SOME E-MAILS ON THAT,

FINALIZE THAT AND PROVIDE A FINALIZED QUESTIONNAIRE TO THE

COURT.

THE COURT:  YEAH.  THAT'S MY RECOLLECTION,

MR. KIRBY.  BUT WE NEVER CIRCLED BACK TO MAKE SURE WE WERE --

BUT WE CONTINUED THE TRIAL DATE AND WE DID NOT FINISH THAT

PROCESS.

MR. KIRBY:  AND WE CAN PROBABLY FINISH THAT PROCESS

WITHIN A WEEK.

THE COURT:  ALL RIGHT, SIR.  ALL RIGHT.

MR. DUREN HAS FILED MOTIONS TO COMPEL DISCOVERY, TO

DISCLOSE CONFIDENTIAL INFORMANTS, POSSESSING RULE 16 AND

1   BRADY MATERIAL.  I'D LIKE TO START THERE.  I'D LIKE TO

2   HEAR -- I'VE REVIEWED THE PLEADINGS, THE DEFENDANT'S MOTION,

3   THE RESPONSE AND THE REPLY.

4        ANYTHING YOU'D LIKE TO ADD, MR. KIRBY, MR. STEWART?

5        MR. STEWART:  THANK YOU, YOUR HONOR.

6        YOUR HONOR, THE THRUST OF THE DEFENDANT'S MOTION

7   WITH REGARD TO BRADY IS THAT IN THIS CASE, MR. SANCHEZ, HE IS

8   A PARTICULARLY IMPORTANT WITNESS.  I WOULD GO AS FAR AS TO

9   SAY THAT HE IS THE GOVERNMENT'S PERHAPS KEY OR STAR WITNESS,

10  BECAUSE HE IS A PERCIPIENT WITNESS TO THE ALLEGED -- WAS IT

11  JULY, I BELIEVE, 18TH, 2013 STOLEN SEIZURE, SO TO SPEAK.

12       SO WE'VE MADE THE BIG POINT IN OUR PAPERS THAT THE

13  GOVERNMENT HAS CLEARLY ARTICULATED AND ALLEGED TWO ALLEGED

14  STOLEN SEIZURES OF SOME TYPE.  ONE BEING THE ONE WE'RE

15  TALKING ABOUT NOW.  AND THAT IS THE ONLY ONE WHERE THERE

16  REALLY IS A TRUE PERCIPIENT WITNESS.

17       NOW, THERE IS A SECOND WITNESS, A MR. ARAGON, AND

18  HE'S REFERRED TO IN OUR DISCOVERY AS WELL.  BUT THE ONE THAT

19  WE HAVE AND THAT THERE WAS A DEPOSITION OF AND THAT THERE IS

20  MORE INFORMATION WOULD BE MR. SANCHEZ.

21       NOW --

22       THE COURT:  THERE HAS BEEN A DEPOSITION.

23       MR. STEWART:  RIGHT.  NOW, LET ME INDICATE, YOUR

24  HONOR -- BUT THE TIME, THOUGH -- WELL, I'M AT A DISADVANTAGE

25  BECAUSE I ENDED UP COMING A LITTLE BIT LATER, SO I DON'T WANT

1    TO CONFUSE THE TIMING OF PRODUCTION.

2         LET ME INDICATE, SO WITH THIS PARTICULAR WITNESS,

3    HERE IS WHY HE'S SO IMPORTANT.  SO IN ADDITION TO BEING A

4    PERCIPIENT WITNESS, HE ALSO APPARENTLY -- AND I DON'T WANT TO

5    CONFUSE TERMS -- WAS A SOURCE OF INFORMATION THAT WAS PAID BY

6    THE GOVERNMENT.

7         SO WE HAVE THIS PERSON WHO IS A PERCIPIENT WITNESS

8    TO ONE OF THE TWO MAIN S.U.A.'S THAT ARE ALLEGED, AND THE

9    ONLY S.U.A. ALLEGED THAT ACTUALLY HAS BASICALLY A PERCIPIENT

10   WITNESS, THAT HAPPENS TO ALSO HAVE BEEN A SOURCE OF

11   INFORMATION THAT WAS PAID BY THE FEDERAL GOVERNMENT.

12        NOW, I UNDERSTAND THAT HE WAS PAID ULTIMATELY BY

13   D.E.A. AS OPPOSED TO I BELIEVE HSI.  BUT OUR POSITION IS, WE

14   REALLY DON'T CARE WHICH GOVERNMENTAL AGENCY PAID HIM FOR --

15   TO OPERATE AS A CONFIDENTIAL SOURCE OR A SOURCE OF

16   INFORMATION, BUT THAT NOW GIVES HIM EVEN A MORE PARTICULAR

17   RELEVANCE TO OUR CASE.  AND THAT DOES COME INTO PLAY.

18        NOW, BY --

19        THE COURT:  HOW SO?  HOW SO?

20        MR. STEWART:  OKAY.  SO BY HIM BEING A SOURCE OF

21   INFORMATION, IT DEFINITELY PLAYS INTO WHETHER OR NOT HE WAS

22   GETTING SOME TYPE OF DEFERENTIAL OR PREFERENTIAL TREATMENT.

23   HE'S BEEN ENGAGING IN DIFFERENT TYPES OF CRIMES AND

24   ACTIVITIES, AND WE WOULD ARGUE SOME OF WHICH HE WAS NOT -- HE

25   WAS NOT PROSECUTED FOR, WE WOULD ARGUE.  AND THEN TO SOME

1    EXTENT, HE MAY HAVE GOTTEN SOME LENIENCY FOR THOSE WHICH HE

2    WAS PROSECUTED FOR.

3            THE OTHER FACTOR THAT COMES INTO PLAY, YOUR HONOR,

4    IS WHETHER OR NOT THIS NOW CREATES SOME BIAS.  AS WE KNOW,

5    BIAS IS CERTAINLY BRADY AND RULE 16, AND WHETHER OR NOT HIM

6    BEING AN INFORMANT FOR THE GOVERNMENT CREATES A BIAS IN TERMS

7    OF HIS TESTIMONY.  NOW, WE DON'T NECESSARILY HAVE TO PROVE

8    THAT IT DOES CREATE A BIAS, BUT CERTAINLY THE POTENTIAL IS

9    THERE, AND THAT'S SOMETHING THAT NEEDS TO BE PRESENTED TO THE

10   JURY AS THE JURY DETERMINES AND WEIGHS THE CREDIBILITY OF

11   THIS PARTICULAR WITNESS.

12           ADDITIONALLY, YOUR HONOR, SO WE HAVE A WITNESS WHO

13   IS PERCIPIENT, EITHER A PAID GOVERNMENTAL SOURCE OR

14   INFORMANT, HOWEVER YOU WANT TO CALL IT.  AND HE WENT FURTHER.

15   I MEAN, HE ACTUALLY DID DO SOME TYPE OF TASKS.  SO WE

16   UNDERSTAND WITH REGARD TO ONE INDIVIDUAL, THAT HE REPORTED TO

17   THE GOVERNMENT AS HAVING PLACED A TRACKING DEVICE ON AN

18   INDIVIDUAL'S VEHICLE, AND THAT PERSON WAS ARRESTED AND

19   PROSECUTED.

20           AND SO THIS IS NOT JUST KIND OF YOUR STANDARD

21   PERCIPIENT WITNESS.  HE HAS ADDITIONAL TIES TO THE

22   GOVERNMENT.  AND IN TERMS OF DUE PROCESS, WE THINK THAT WE

23   HAVE A RIGHT, AND REALLY AN OBLIGATION FOR OUR CLIENT, TO

24   DEVELOP THAT.

25           SO THEN, YOUR HONOR, THE NEXT QUESTION REALLY

1  BECOMES, IF SOME OF THIS INFORMATION, YOU KNOW, IT IS BRADY,

2  THEN IT GETS TO REALLY RULE 16, AND SHOULD WE BE ABLE TO --

3  AND I WOULD ARGUE THAT WE SHOULD -- BE ABLE TO INVESTIGATE.

4  BECAUSE WE DO HAVE AN OBLIGATION AND MR. DUREN HAS A RIGHT TO

5  BE ABLE TO INVESTIGATE HIS CASE.

6       SO IF ONE OF THE GOVERNMENT'S, OR PERHAPS THE

7  GOVERNMENT'S KEY WITNESS IS A WITNESS THAT HAS, YOU KNOW --

8  HAS POTENTIAL BIAS, BECAUSE HE'S INVOLVED, YOU KNOW, IN DRUG

9  TRAFFICKING, BUT HE'S NOT BEING PROSECUTED AT THAT TIME BY

10 THE GOVERNMENT FOR IT, THAT SHOULD COME OUT TO THE JURY, AND

11 WE SHOULD BE ABLE TO INVESTIGATE FURTHER HIS TIES.

12      WE UNDERSTAND THAT THIS WITNESS HAS ALSO -- I

13 BELIEVE HE WAS ARRESTED A FEW TIMES FOR ALIEN TRANSPORTATION.

14 SO THE -- THERE IS EVIDENCE THAT HE WAS ENGAGED IN CRIMINAL

15 ACTIVITY, BUT AT TIMES NOT PROSECUTED.

16      NOW, WHETHER THAT RAISES AN INFERENCE OR WHETHER THE

17 JURY SHOULD BE ABLE TO CONSIDER THAT IN TERMS OF THIS

18 PERSON'S BIAS AND WHETHER IF HE TESTIFIED IN A WAY THAT WAS

19 NOT FAVORABLE TO THE GOVERNMENT, IF, YOU KNOW, HE WAS

20 CONCERNED WHETHER OR NOT THAT WOULD IMPACT HIM, I THINK THAT

21 THAT'S LEGITIMATE FOR US TO BE ABLE TO ARGUE AND FOR THE JURY

22 TO BE ABLE TO CONSIDER.

23      NOW, WE'RE TOLD THAT MR. SANCHEZ DURING HIS

24 DEPOSITION, HE INDICATED, IN FACT, THAT HE WAS NOT INVOLVED

25 IN DRUG TRAFFICKING.  OKAY.  THE REASON WHY THAT IS IMPORTANT

1    IS TO THE EXTENT THAT WE WANT TO BE ABLE TO IMPEACH ON THAT,

2    AND FURTHER GET INTO BIAS, WE WANT TO BE ABLE TO SHOW THAT HE

3    IS A LIAR.  HE TESTIFIED UNDER OATH AND HE LIED ABOUT THIS

4    VERY IMPORTANT ISSUE THAT IS CORE TO HIS TESTIMONY.

5         WE SEE THAT THERE IS AN INFORMANT SOMEWHERE OUT

6    THERE, BECAUSE THE GOVERNMENT PRODUCED CERTAINLY SOME

7    DOCUMENTATION, THAT IS ABLE TO SAY THAT -- AND I DON'T

8    KNOW -- WE DON'T KNOW THE BASIS OF THEIR INFORMATION, BECAUSE

9    WE HAVE VERY LIMITED INFORMATION, THAT MR. SANCHEZ BASICALLY

10   WAS PART OF A DRUG-TRAFFICKING ORGANIZATION.

11        AND SO THAT RIGHT THERE DIRECTLY, WOULD DIRECTLY

12   CONTRADICT MR. SANCHEZ'S, THE GOVERNMENT'S KEY WITNESS'

13   STATEMENT UNDER OATH.  AND WE THINK THAT THAT'S SIGNIFICANT,

14   IF WE HAVE A WITNESS WHO HAS INFORMATION THAT IS DIRECTLY

15   CONTRARY TO TESTIMONY GIVEN UNDER OATH BY MR. SANCHEZ, WHO,

16   AGAIN, HE'S NOT JUST A REGULAR WITNESS, HE'S A PERCIPIENT

17   WITNESS AND HE'S ALSO AN INFORMANT.

18        AND I WOULD ARGUE THAT EVERY LAYER YOU PUT ON

19   INCREASES HIS IMPORTANCE; RIGHT?  IF HE'S JUST A REGULAR

20   WITNESS AND JUST A PERCIPIENT WITNESS, MAYBE IT'S NOT AS

21   IMPORTANT.  BUT ONCE HE ALSO BECOMES A GOVERNMENT SOURCE OF

22   INFORMATION, I THINK THAT CERTAINLY AT THAT POINT, HIS

23   IMPORTANCE IS HEIGHTENED.  AND REALLY, YOU KNOW, THE CONCERN

24   THERE, THAT, IN FACT, HE DOES HAVE COMPETING INTERESTS

25   BECAUSE, ON ONE HAND, HE HAS BEEN PAID BY THE FEDERAL

1    GOVERNMENT, WHO NOW IS ASKING HIM TO TESTIFY FOR THEM.  OKAY,

2    YOUR HONOR.

3         OTHER ASPECTS I THINK OF THIS IS THAT UNDER RULE 16,

4    WE WANT TO BE ABLE TO THOROUGHLY INVESTIGATE SANCHEZ, AND

5    BECAUSE THAT'S -- HE'S GOING TO BE CENTRAL TO THEIR CASE, SO

6    WE WANT TO BE ABLE TO INVESTIGATE AND BRING IN INFORMATION,

7    YOUR HONOR, THAT WE BELIEVE IS BOTH MATERIAL.  WE BELIEVE

8    THAT IF THERE IS BIAS INFORMATION, WE BELIEVE THAT THAT CAN

9    COME IN.  AND THEN, DEPENDING ON THE SITUATION, THE COURT MAY

10   OR MAY NOT ALLOW CERTAIN INSTANCES OF CONDUCT IN TERMS OF

11   IMPEACHMENT, YOUR HONOR.

12        BUT IF WE CAN'T INVESTIGATE, WE DON'T EVEN KNOW WHO

13   THIS PERSON IS SO THAT WE CAN GO ASK THE PERSON, WELL, HOW DO

14   YOU KNOW THIS INFORMATION ABOUT SANCHEZ?  YOU KNOW, WHAT ELSE

15   DO YOU KNOW ABOUT HIS ACTIVITIES THAT CAN BEAR ON THIS CASE?

16        WE DO KNOW THAT THERE IS AN INFORMANT -- WE DON'T

17   KNOW IF IT'S A DIFFERENT INFORMANT -- WHO PROVIDED

18   CONTRADICTORY INFORMATION IN TERMS OF WHERE MR. SANCHEZ WAS

19   STOPPED.  I BELIEVE PERHAPS WHAT KIND OF CAR, YOU KNOW, HE

20   WAS IN.  AND SO THOSE TYPE ISSUES, WE BELIEVE, GO TO THE CORE

21   OF THE FACTS.

22        SO AS WE'RE TRYING TO INVESTIGATE OUR CASE FOR OUR

23   CLIENT, WE NEED ACCESS TO PEOPLE WHO APPEAR TO HAVE RELEVANT

24   INFORMATION, AND WE BELIEVE THAT RULE 16 GIVES US THAT

25   ABILITY, ALONG WITH BRADY.

1      NOW, I DO UNDERSTAND THAT THERE IS A BALANCING TEST

2   THAT THE COURT WILL DO, AND I WOULD JUST SIMPLY ARGUE THAT WE

3   HAVE NO OTHER WITNESSES WHO CAN GIVE US THIS INFORMATION.

4   IT'S NOT LIKE THE GOVERNMENT CAN POINT TO AND SAY, WELL, HERE

5   IS ANOTHER WITNESS THAT WE'VE, YOU KNOW, ALREADY DISCLOSED

6   THAT HAS THIS INFORMATION, THAT CAN SAY MR. SANCHEZ WAS

7   INVOLVED IN THIS DRUG-TRAFFICKING ACTIVITY OR WHO CAN

8   PROVIDE -- OR CAN SAY, WELL, HERE IS ANOTHER WITNESS THAT

9   CONTRADICTS MR. SANCHEZ'S STATEMENT IN TERMS OF WHERE THINGS

10  HAPPENED ON JULY 18TH, IN TERMS OF THE STOP, THE SEIZURE,

11  WHERE IT HAPPENED.

12      AND I BELIEVE THAT THE DIFFERENCE IN LOCATIONS, YOUR

13  HONOR, ARE PERHAPS, IF I RECALL CORRECTLY, AND I LOOKED AT MY

14  PAPERWORK, BUT I THINK THAT IN ONE INSTANCE, THERE IS A

15  DIFFERENCE BETWEEN IN THE MISSION VALLEY AREA, AS OPPOSED TO

16  DOWN IN THE SAN YSIDRO AREA.  THAT'S SOME PROBABLY 20 OR SO

17  MILES, A VERY BIG DIFFERENCE IN TERMS OF WHERE THINGS

18  HAPPENED AND WHO MAY HAVE BEEN INVOLVED.

19      ANOTHER PIECE OF THIS, YOUR HONOR, IS THAT THAT

20  PARTICULAR CONFIDENTIAL SOURCE WHO CAN SAY THAT SANCHEZ IS

21  INVOLVED IN THIS DRUG TRAFFICKING, SANCHEZ SAYS THAT HE WAS

22  IN THE CAR WITH MR. ARAGON; RIGHT.  BUT THIS CONFIDENTIAL

23  SOURCE SAYS, NO, HE WAS IN THE CAR WITH HIS BOSS -- IS IT

24  JUAN?  JUAN, HIS BOSS.

25      THAT'S ANOTHER IMPORTANT, YOU KNOW, KEY FACTOR IN

1    TERMS OF LYING, POSSIBLY LYING, AND US BEING ABLE TO

2    INVESTIGATE WHO REALLY WAS THERE.  IS THAT WHY MR. ARAGON

3    DECIDED NOT TO TESTIFY AND BOLTED, BECAUSE HE REALLY WASN'T

4    THE PERSON IN THE CAR IN THE FIRST PLACE?

5         SO THERE IS A LOT OF VERY IMPORTANT INFORMATION THAT

6    GOES TO ONE OF THE MAIN EVENTS OF THE GOVERNMENT'S CASE, YOU

7    KNOW, THE SEIZURE WHERE MR. DUREN IS ALLEGED TO HAVE ACTUALLY

8    STOLEN THE MONEY FROM SOMEONE.  AND SANCHEZ IS THE SOMEONE,

9    YOUR HONOR, THAT IS AT ISSUE HERE.

10        SO FOR A VARIETY OF REASONS -- AND I'LL JUST LAY ONE

11   OTHER FACT WITH MR. SANCHEZ.  IN HIS DEPOSITION TESTIMONY --

12   AND I DIDN'T ATTACH THIS PIECE; I BRIEFLY SPOKE WITH ONE OF

13   THE PROSECUTORS ABOUT IT -- BUT MR. SANCHEZ INDICATED THAT ON

14   ANOTHER OCCASION, THIS PERSON HAD GIVEN HIM A VEHICLE, AND HE

15   WAS SUPPOSED TO TRANSPORT DRUGS.  HE TOLD THE PERSON THAT HE

16   LOST THE VEHICLE, BUT HE SAYS, BUT THE PERSON FOUND OUT IT

17   WAS A LIE.

18        SO YOU HAVE ANOTHER SCENARIO WHERE SANCHEZ IS IN

19   POSSESSION OF A VEHICLE RELATED TO THIS WHOLE DRUG

20   TRAFFICKING THAT HE SAID THAT HE'S NOT A PART OF, BUT THAT

21   HE'S A PART OF, AND HE, ON THAT OCCASION, LIES AND TELLS

22   SOMEBODY THAT HE LOST THE VEHICLE.  ON THIS -- YOU KNOW, ON

23   THIS OCCASION, IS HE LYING IN SAYING THAT HE LOST THE MONEY,

24   THAT THE MONEY WAS TAKEN FROM HIM?

25        BUT YOU CAN SEE HOW CERTAINLY THAT'S PART OF OUR

1    THEORY, AND WE SHOULD BE ABLE TO INVESTIGATE IT AND TO ARGUE

2    IT.  BUT AT THIS POINT, WE SIMPLY JUST DON'T HAVE ACCESS.  WE

3    DON'T HAVE ACCESS TO -- I THINK THAT THERE ARE TWO

4    CONFIDENTIAL SOURCES, BUT WE DON'T HAVE ACCESS TO THE

5    CONFIDENTIAL SOURCE WHO INDICATED THAT MR. SANCHEZ WAS

6    INVOLVED WITH THESE GUYS IN DRUG TRAFFICKING, WHICH

7    CONTRADICTS HIS SWORN TESTIMONY.

8         WE ALSO DON'T HAVE ACCESS TO THE SOURCE OF

9    INFORMATION WHO SAYS THAT THIS PARTICULAR SEIZURE HAPPENED IN

10   MISSION VALLEY, AS OPPOSED TO -- WITH SANCHEZ, AS OPPOSED TO

11   DOWN BY THE PORT OF ENTRY.  AND SO WE DON'T KNOW, FOR

12   EXAMPLE, IS THIS INFORMATION COMING FROM SANCHEZ, BECAUSE WE

13   CAN'T INVESTIGATE IT, BECAUSE WE DON'T KNOW WHO THE PERSON

14   IS; RIGHT.

15        SO -- BUT THIS IS CERTAINLY ON ITS FACE, ON ITS FACE

16   RELEVANT INFORMATION THAT WARRANTS OUR INVESTIGATION AS WE'RE

17   TRYING TO UNDERMINE MR. SANCHEZ'S TESTIMONY, WHO IS A VERY

18   IMPORTANT WITNESS FOR THE GOVERNMENT, AS TO WHAT HAPPENED TO

19   THIS MONEY.

20        SO WE BELIEVE, YOUR HONOR, THAT -- ON ITS FACE, WE

21   BELIEVE THAT IT'S CLEAR HOW THE INFORMATION IS RULE 16

22   MATERIAL.  WE ALSO BELIEVE THAT IT'S CLEAR THAT PARTICULARLY

23   WITH REGARD TO IMPEACHMENT, WHICH IS BRADY, THAT IT'S -- THAT

24   WE'VE DEMONSTRATED THAT AT LEAST WITH REGARD TO THE

25   CONFIDENTIAL SOURCE WHO PROVIDES THE CONTRADICTORY STATEMENT

1  TO MR. SANCHEZ'S SWORN TESTIMONY, WE BELIEVE THAT THAT'S

2  IMPEACHMENT UNDER BRADY, CLEARLY.

3       AND THEN WE ALSO BELIEVE, YOUR HONOR, THAT, YOU

4  KNOW, KIND OF INTERTWINED WITHIN ALL OF THIS IS WHETHER

5  MR. SANCHEZ HAS BIAS AND MOTIVE TO LIE, WHICH CERTAINLY IS

6  BRADY AND RULE 16 AS WELL.

7       AND SO THE GOVERNMENT IS CHOOSING TO BRING THIS

8  CASE.  THE GOVERNMENT IS CHOOSING TO USE THIS PERSON AS A KEY

9  WITNESS.  SO TRUTHFULLY, IN FAIRNESS, WE SHOULD BE ABLE TO

10  GAIN ACCESS TO THE INFORMATION THAT WE NEED TO PRESENT OUR

11  CASE AND INVESTIGATE ONCE AT LEAST WE MAKE A GOOD-FAITH

12  SHOWING OF HOW IT'S RELEVANT.  AND I DO BELIEVE THAT WE'VE

13  MADE MORE THAN A GOOD-FAITH SHOWING OF HOW IT'S RELEVANT.

14       SO, YOUR HONOR, ESSENTIALLY WITH REGARD TO THE

15  BRADY, THE SOURCES OF INFORMATION, THAT ADDRESSES THAT.

16  UNLESS THERE IS ANY OTHER QUESTIONS, I'LL SUBMIT ON THAT

17  PIECE OF IT.

18       THE COURT:  ALL RIGHT.  LET'S STOP THERE.  I'D LIKE

19  TO TAKE IT IN SEGMENTS.  I'D LIKE TO HEAR FROM THE

20  GOVERNMENT.

21       MS. MARSH:  THANK YOU, YOUR HONOR.

22       SO FIRST I WANT TO REITERATE THE FACT THAT DEFENSE

23  COUNSEL OPPOSED HAVING THE DEPOSITION OF MR. SANCHEZ OR

24  MR. ARAGON, THAT IT WAS THE GOVERNMENT WHO MOVED TO HAVE

25  THESE DEPOSITIONS AND PRESERVE THIS TESTIMONY; AND THERE HAS

1   ALREADY BEEN A FULL OPPORTUNITY FOR DEFENSE COUNSEL TO

2   CROSS-EXAMINE MR. SANCHEZ.

3           AND THE INFORMATION THAT DEFENSE COUNSEL IS

4   REFERRING TO, SPECIFICALLY TO THIS CONFIDENTIAL INFORMANT WHO

5   IS FROM THE FBI, I THINK THERE HAS BEEN SOME CONFUSION OVER

6   ALL THE DIFFERENT NAMES THAT ARE GIVEN:  SOURCES OF

7   INFORMATION, CONFIDENTIAL INFORMANT.

8           THE GOVERNMENT WILL -- BY WAY OF EXPLANATION I

9   GUESS, MR. SANCHEZ WAS DESIGNATED AS A SOURCE OF INFORMATION

10  WHEN HE FIRST SPOKE TO BORDER PATROL, WHEN HE WAS CONTACTED

11  ON SUSPICION OF ALIEN SMUGGLING, AND HE CAME FORWARD WITH THE

12  INFORMATION ABOUT MR. DUREN RIPPING THE BULK CASH LOAD.  THAT

13  IS A PROTOCOL THAT IS DONE BY BORDER PATROL IN ORDER TO

14  ENGAGE IN THAT INTERVIEW.  HE WAS NOT PAID FOR THAT

15  INFORMATION OR FOR THAT INTERVIEW.

16          HE WAS LATER, MR. SANCHEZ AGAIN WAS LATER THEN

17  SIGNED UP WITH D.E.A., ANOTHER GOVERNMENT AGENCY, AS A SOURCE

18  OF INFORMATION AS WELL, AND HE WAS PAID BY D.E.A.

19              THE COURT:  D.E.A. OR FBI?

20              MS. MARSH:  D.E.A.

21              THE COURT:  ALL RIGHT.

22              MS. MARSH:  THE CONFIDENTIAL INFORMANT THAT DEFENSE

23  COUNSEL IS SEEKING ACCESS TO AT THIS POINT IS FBI, IS AN FBI

24  CONFIDENTIAL INFORMANT.

25              THE COURT:  WAS THE CONFIDENTIAL INFORMANT WITH

1   D.E.A. I ASSUME ON DRUG MATTERS, DRUG TRAFFICKING?

2           MS. MARSH:  MR. SANCHEZ WAS.  AND ACTUALLY TESTIFIED

3   ABOUT IT IN HIS DEPOSITION.  HE WAS PAID $500.  WE'VE

4   PRODUCED A LETTER SUMMARIZING THAT PAYMENT AND HIS SERVICE AS

5   A SOURCE OF INFORMATION WITH D.E.A.

6           HE ACTUALLY DID LITTLE OR NO WORK FOR THEM BECAUSE

7   TIME PASSED AND IT WAS NOT OPPORTUNE FOR HIM TO ACTUALLY DO

8   ADDITIONAL WORK.  AND THEN HE DID NOTHING FURTHER.  HE

9   RECEIVED THAT $500 PAYMENT AND NOTHING FURTHER OCCURRED.  HE

10  DID NOT WORK DIRECTLY FOR OR WITH HSI AT ANY POINT.

11          THE COURT:  WELL, WITH D.E.A. HE CERTAINLY HAD TO

12  MAKE A PROFFER AS TO QUALIFY FOR CONFIDENTIAL INFORMANT.

13  DEFENSE COUNSEL ASSERTS THAT HE CLAIMED IN HIS DEPOSITION

14  THAT HE WASN'T A DRUG TRAFFICKER, BUT HE GOES TO D.E.A. TO

15  BECOME AN S.O.I.

16          WHY WOULD D.E.A. USE HIM IF HE WASN'T INVOLVED IN A

17  DTO?

18          MS. MARSH:  SO I'LL ADDRESS DEFENSE COUNSEL'S

19  POSITION THAT HE'S DENIED BEING A DRUG TRAFFICKER.  THAT

20  STATEMENT IS TAKEN SOMEWHAT OUT OF CONTEXT.  IT WAS

21  ATTACHED -- ONE PAGE FROM THE DEPOSITION WAS ATTACHED TO

22  DEFENSE COUNSEL'S REPLY WHERE HE WAS ASKED, WHAT DO YOU DO

23  FOR A LIVING?  I'M AN UBER DRIVER.  AND THEN HE WAS

24  CONFRONTED, NO, AREN'T YOU A DRUG TRAFFICKER?  NO, NO, NO.

25  NO, I'M NOT.

1    THROUGHOUT HIS DEPOSITION, HE ADMITTED A NUMBER OF

2    ACTS THAT WERE ENGAGING IN BULK-CASH SMUGGLING OR DRUG

3    TRAFFICKING.  MR. SANCHEZ, IN FACT, SUFFERED A CONVICTION FOR

4    TRANSPORTING METHAMPHETAMINE.

5    THE COURT:  DOES THE COURT LIMIT THE EXTENT OF THE

6    CROSS-EXAMINATION FOR IMPEACHMENT TO JUST WHAT HE STATED IN

7    HIS DEPO?  IF THERE ARE OTHER INSTANCES OF DRUG TRAFFICKING,

8    SHOULDN'T THAT AT LEAST BE AVAILABLE FOR DISCOVERY AS

9    ADDITIONAL ARSENAL TO ATTACK HIS CREDIBILITY AT TRIAL AND NOT

10    LIMIT IT SIMPLY TO WHAT HE SAYS IN HIS DEPO?

11    MS. MARSH:  AND I UNDERSTAND THAT IT IS ALL -- I

12    THINK THAT IF IT LEADS TO RELEVANT IMPEACHMENT, IT IS

13    SOMETHING THAT COULD BE DISCOVERABLE.  AND I DON'T DISAGREE

14    WITH THE COURT IN THAT WAY.  HOWEVER, I THINK THAT THERE HAS

15    TO BE A LEGITIMATE SHOWING BY DEFENSE THAT IT WILL LEAD TO

16    IMPEACHABLE INFORMATION.

17    AND I WENT THROUGH, I WENT BACK THROUGH AFTER

18    RECEIVING DEFENSE COUNSEL'S REPLY TO POINT TO PLACES IN THE

19    DEPOSITION WHERE HE REALLY ADMITTED.  HE ADMITTED TO HIS

20    PRIOR DRUG-TRAFFICKING CONVICTION ON PAGE 7 AND HIS

21    EIGHT-MONTH PRISON SENTENCE THAT HE SERVED AS A RESULT OF

22    THAT.

23    HE ADMITTED TO RECEIVING THAT $500 PAYMENT AND

24    WORKING FOR D.E.A. ON PAGE 9.

25    ON PAGE 15 OF THE DEPOSITION TRANSCRIPT, HE ADMITTED

1  THAT HE WENT TO PICK UP MONEY.  HE DOES EXPLAIN IT BY SAYING

2  THAT HE OWED A GAMBLING DEBT TO THESE PEOPLE, BECAME INVOLVED

3  WITH THEM BECAUSE HE OWED A DEBT TO THEM, AND THEN BECAME

4  INVOLVED IN DOING THESE THINGS TO REPAY HIS DEBT.  SO HE DOES

5  EXPLAIN IT IN THAT WAY.

6          THE COURT:  REGARDING THE SAME COURSE OF

7  TRANSACTIONS INVOLVING THE TAKING CURRENCY BACK TO MEXICO?

8  OR IS IT PART --

9          MS. MARSH:  DIFFERENT TRANSACTIONS, TRANSACTIONS IN

10  ADDITION TO THE TRANSACTION AT ISSUE HERE.  SO HE ADMITS MORE

11  INCIDENTS THAN JUST THIS ONE.

12          HE ADMITTED ON PAGE 70 OF THE DEPOSITION TRANSCRIPT

13  THAT HIS ACTS -- THAT THE THINGS THAT HE WAS DOING WERE A

14  CRIME AND THEY WERE IN ORDER TO PAY OFF A DEBT, THAT HE HAD

15  HEADED SOUTH TO TIJUANA WITH CASH.  I THINK THAT IS REFERRING

16  TO THIS.

17          HE WAS CONFRONTED ABOUT INCIDENTS OF ALIEN

18  SMUGGLING.  DEFENSE COUNSEL IS INCORRECT.  HE WAS NEVER

19  ARRESTED FOR ALIEN SMUGGLING.  HE WAS SUSPECTED OF IT AND

20  CONTACTED AT THE BORDER.  AND THAT WAS THE INITIAL WAY HE WAS

21  CONTACTED BY BORDER PATROL, BUT HE DID NOT HAVE OTHER ARRESTS

22  FOR THAT.  AND HE WAS CROSS-EXAMINED THOROUGHLY ON THE CLAIMS

23  HE MADE INTO OTHER LOADS THAT WERE SEIZED.  CIVIL CLAIMS TO

24  MAKE -- MONETARY CLAIMS INTO THOSE SEIZURES AS WELL.

25          SO I THINK IT'S A MISCHARACTERIZATION TO SAY HE HAS

1   UNEQUIVOCALLY DENIED BEING A DRUG TRAFFICKER.  HE HAS, IN

2   FACT, ADMITTED MANY INSTANCES BEYOND JUST THE INCIDENT THAT'S

3   AT ISSUE HERE, WHERE HE WAS INVOLVED WITH OTHER PEOPLE

4   REGARDING THIS CONDUCT.

5           THE COURT:  AGAIN, COUNSEL, I HEAR WHAT YOU'RE

6   SAYING.  BUT IF THERE IS ADDITIONAL FODDER THAT MAY SUPPORT

7   THE DEFENSE'S IMPEACHMENT EFFORT, SHOULDN'T THAT BE

8   DISCLOSED?  AND THEN LATER AT A MOTION IN LIMINE, WE

9   DETERMINE WHAT COMES IN AND WHAT DOESN'T COME IN -- THIS IS

10  NOT A MOTION IN LIMINE -- OR WHAT ARE IS CUMULATIVE AND

11  WHAT'S NOT.

12          WE'RE TALKING ABOUT EVIDENCE THAT CAN REFLECT BIAS.

13  YOU KNOW, AFTER HE TALKS TO HERE, HSI, HE SIGNS UP WITH

14  D.E.A.  IN MY VIEW, THAT COULD BE ACCEPTED AS BIAS AND BE ON

15  THE GOOD SIDE OF LAW ENFORCEMENT AND TRY TO MAKE SURE HE'S

16  NOT ARRESTED FOR ATTEMPTED MONEY LAUNDERING OR DRIVING MONEY

17  BACK TO MEXICO.  AND APPARENTLY HE WASN'T CHARGED WITH THAT.

18  I MEAN, ALL THOSE THINGS ARE JUST FODDER FOR IMPEACHMENT.

19          THE QUESTION BECOMES LATER WHETHER IT COMES IN OR

20  NOT, BUT AS FAR AS THE INVESTIGATION AND THE RELEASE OF

21  INFORMATION, WHY SHOULDN'T THAT BE DISCLOSED NOW?

22          MS. MARSH:  WELL, BECAUSE -- SO WE HAVE DISCLOSED

23  NOTES FROM THE INTERVIEW OF THIS FBI CONFIDENTIAL INFORMANT.

24  SO WE'VE ALREADY MET THAT -- PRIOR TO THE DEPOSITION, THAT

25  INFORMATION WAS DISCLOSED.  THERE WASN'T A WRITTEN REPORT,

1  BUT BASED ON THE NOTES THAT OUR AGENTS HAD WRITTEN FROM THEIR

2  INTERVIEW WITH THIS CONFIDENTIAL INFORMANT, WE DID DISCLOSE

3  THAT INFORMATION.  AND THAT'S REALLY WHERE DEFENSE COUNSEL IS

4  GETTING THESE QUESTIONS.

5            THE COURT:  OKAY.

6            MS. MARSH:  SO WE ARE NOT WITHHOLDING THIS

7  INFORMATION IN ANY WAY.  WE ALREADY HAVE DISCLOSED IT TO A

8  CERTAIN EXTENT.

9            WHAT WE HAVE NOT DISCLOSED IS THE IDENTITY OF THIS

10  CONFIDENTIAL INFORMANT, AND THAT IS BASED ON THE FACT THAT

11  FBI HAS NOT DISCLOSED IT TO US YET.  I UNDERSTAND THAT WE ARE

12  THE GOVERNMENT AND THAT THAT IS NOT A REASON NOT TO DISCLOSE,

13  NECESSARILY.  BUT I DO WANT TO ASK THE COURT TO REALLY

14  WEIGH -- IN THE ROVIARO CASE, TO LOOK AT THOSE FACTORS IN

15  WEIGHING THE BURDEN ON THE GOVERNMENT TO DISCLOSE THIS

16  INFORMATION AND THE REASON THAT CONFIDENTIAL INFORMANTS'

17  IDENTITIES ARE OFTEN NOT DISCLOSED.

18            BECAUSE IN THIS INSTANCE, THIS CONFIDENTIAL

19  INFORMANT IS NOT A WITNESS IN OUR CASE.  HE IS NOT THE

20  PASSENGER IN THE VEHICLE.  HE IS NOT THE DRIVER OF THE

21  VEHICLE.  HE OR SHE.  I DON'T EVEN ACTUALLY KNOW THE

22  IDENTITY.

23            AND WHAT WE'RE TALKING ABOUT, WHAT DEFENSE COUNSEL

24  IS TALKING ABOUT IS POTENTIAL IMPEACHMENT THROUGH PRIMARILY

25  EXTRINSIC ACTS, WHICH ARE NOT LIKELY TO BE ADMISSIBLE.  AND

1   WHILE I UNDERSTAND WE'RE NOT LITIGATING THE ENTIRE MOTION IN

2   LIMINE, I THINK THAT IS A FACTOR IN THE COURT'S BALANCING OF

3   COMPELLING THE GOVERNMENT TO DISCLOSE A CONFIDENTIAL

4   INFORMANT VERSUS THE ACTUAL POTENTIAL VALUE FOR IMPEACHMENT

5   OF THIS WITNESS.

6           AND IN BALANCING THOSE TWO THINGS, IT'S THE

7   GOVERNMENT'S POSITION THAT WE HAVE PROVIDED WHAT WE HAVE

8   BASED ON THE NOTES AND THE INTERVIEW THAT PROVIDES

9   INFORMATION THAT DEFENSE COUNSEL CAN IMPEACH AND WAS ALREADY

10  GIVEN THE OPPORTUNITY TO IMPEACH MR. SANCHEZ WITH, AND THAT

11  THAT IS SUFFICIENT DISCLOSURE AT THIS POINT.

12          THE COURT:  ALL RIGHT.

13          MR. STEWART:  YOUR HONOR, IF I MAY JUST ADD A COUPLE

14  OF THINGS, YOUR HONOR.

15          THE COURT:  ONE LAST POINT BEFORE YOU DO.  REGARDING

16  HIS STATUS AS D.E.A. AND BIAS, WHAT'S YOUR THINKING WITH

17  RESPECT TO BIAS AND WORKING WITH D.E.A. AFTER MAKING THE

18  REPORT TO HSI?

19          MS. MARSH:  I THINK THAT -- SO WE'VE ALREADY

20  DISCLOSED THE LETTER THAT REFERS TO THE PAYMENT THAT HE

21  RECEIVED.  AND THAT'S ABSOLUTELY JUST SOMETHING HE CAN BE

22  IMPEACHED WITH AND ALREADY HAS BEEN IMPEACHED WITH, THAT HE

23  WORKED WITH D.E.A. AFTER SPEAKING WITH HSI.

24          THE COURT:  HAVE YOU DISCLOSED ANY BRIEFINGS WITH

25  D.E.A.?

1       MS. MARSH:  I BELIEVE WE'VE DISCLOSED THE NAME OF

2  THE AGENT WHO WORKED WITH HIM, AND WE HAVE NOT DISCLOSED THE

3  ACTUAL C.I. FILE, BUT WE'VE DISCLOSED THAT LETTER THAT

4  SUMMARIZES ALL OF HIS WORK THAT HE DID WITH D.E.A.

5        THE COURT:  ALL RIGHT.  THANK YOU, MA'AM.

6        SIR.

7        MR. STEWART:  YOUR HONOR, A COUPLE THINGS.

8        IN TERMS OF HIS DEPOSITION, NOT AT ANY POINT, ANY

9  POINT DID HE ADMIT TO BEING INVOLVED IN DRUG TRAFFICKING OR

10  WITH A DRUG-TRAFFICKING ORGANIZATION; NOT AT ANY POINT.  AND

11  SO WHILE COUNSEL IS CORRECT THAT THERE ARE POINTS WHERE HE

12  INDICATED THAT, YOU KNOW, HE PICKED UP MONEY, AND THEN I

13  BELIEVE HE MAY HAVE BEEN QUESTIONED, WELL, WAS IT DRUG MONEY?

14  NO, I'M NOT SAYING I WAS INVOLVED IN ANY DRUGS.

15        SO HE REPEATEDLY, ANY TIME THERE WAS A QUESTION

16  ABOUT WHETHER HE WAS CONNECTED TO, INVOLVED IN IN ANY WAY

17  DRUG TRAFFICKING, HE SAID NO.  I JUST WANT THAT TO BE CLEAR.

18        BUT THE OTHER PIECE ABOUT IT, YOUR HONOR, IS THAT

19  THE GOVERNMENT IS TRYING TO REALLY LIMIT OUR CASE.  ONE OF

20  THE IMPORTANT FACTORS OF BRADY AND RULE 16 IS THAT ONCE YOU

21  CAN REALLY MAKE A GOOD-FAITH SHOWING -- AND I THINK THAT WE

22  HAVE -- THEN WE SHOULD BE ABLE TO INVESTIGATE.  BECAUSE THE

23  GOVERNMENT DOESN'T EVEN WANT TO OPEN THE DOOR OF WHAT

24  ADDITIONAL INFORMATION WE MAY GET THROUGH OUR INVESTIGATION,

25  GIVEN WE'VE ALREADY MADE A GOOD-FAITH SHOWING.

1        I HAD THIS IDENTICAL, ALMOST IDENTICAL SITUATION

2    WITH JUDGE BASHANT, AND THE WAY THAT SHE CHOSE TO HANDLE IT

3    WAS PRIOR TO ORDERING THE DISCLOSURE OF THE --

4        THE COURT:  I DON'T NEED TO HEAR HOW SHE HANDLED THE

5    MATTER, SIR.  JUST TALK TO ME.

6        MR. STEWART:  OKAY.  WELL, THE IDEA IS THAT THE

7    COURT CAN ORDER THE GOVERNMENT TO PRODUCE THE PERSON FOR AN

8    IN-CAMERA INVESTIGATION, BECAUSE I THINK WE'VE AT LEAST MADE

9    ENOUGH OF A SHOWING TO SHOW THAT THERE IS -- THAT THERE IS

10   INFORMATION, BOTH RULE 16 AND BRADY.

11       AND IF THE COURT WANTS TO KNOW, YOU KNOW, HOW MUCH

12   OR HOW FAR IT GOES, THEN THE COURT HAS AVAILABLE TO IT TO

13   CONDUCT AN IN-CAMERA EXAMINATION TO ALLOW DEFENSE COUNSEL TO

14   SUBMIT QUESTIONS FOR THE EXAMINATION SO THAT THE COURT CAN

15   INITIALLY ASSESS HOW MUCH MORE INFORMATION OR HOW, YOU KNOW,

16   ADDITIONALLY RELEVANT THE INFORMATION IS THAT CAN COME FROM

17   THIS SOURCE.

18       BUT, YOUR HONOR, I WILL CERTAINLY INDICATE THAT

19   GIVEN THAT THIS PARTICULAR WITNESS IS SO IMPORTANT TO THE

20   GOVERNMENT'S CASE, THAT WE SHOULD HAVE A RIGHT TO INVESTIGATE

21   THROUGH THIS SOURCE.  BECAUSE, AGAIN, THE GOVERNMENT IS

22   BRINGING THIS CASE.  SO I WOULD ARGUE, YOUR HONOR, THAT FOR

23   THEM TO BOTH BRING IT AND THEN TO LIMIT VERY CAREFULLY THE

24   INFORMATION THAT WE HAVE, EVEN THOUGH IT'S RELEVANT, THAT IS

25   QUINTESSENTIALLY UNFAIR, YOUR HONOR.

1          MS. MARSH:  YOUR HONOR, MAY I BE HEARD TO CLARIFY

2     ONE ADDITIONAL FACT?

3          THE COURT:  SURE.

4          MS. MARSH:  SO I JUST WANT TO CLARIFY THE TIME LINE

5     AS TO HIS WORKING WITH D.E.A.  SO HE WAS ARRESTED -- HE CAME

6     INTO CONTACT WITH HSI, INVOLVED IN THIS INVESTIGATION IN

7     2013.  THERE WAS PERIODIC CONTACT WITH MR. SANCHEZ THROUGHOUT

8     THE PREPARATION AND INVESTIGATION OF THE CASE.  AS THE COURT

9     KNOWS, I THINK PRIOR TO THE DEPOSITION, WE HAD A NUMBER OF

10    SERIES OF INTERVIEWS WITH HIM.

11         HE WAS ADVISED BY THE GOVERNMENT NOT TO ENGAGE IN

12    ANY CRIMINAL CONDUCT, HAVING TALKED TO US.  AND THEN IN 2017,

13    HE WAS ARRESTED FOR TRANSPORTING METHAMPHETAMINE, AND HE

14    SERVED A PRISON SENTENCE FOR TRANSPORTING METHAMPHETAMINE.

15    HE DID NOT DENY THAT AT ALL DURING THE DEPOSITION.

16         IN FACT, I HAVE THE PAGES AND LINES OF THE

17    DEPOSITION WHERE HE WAS ASKED:

18         DO YOU HAVE A CONVICTION FOR POSSESSION OF DRUGS?

19    YES, I HAVE ONE.

20         DO YOU RECALL WHEN YOU RECEIVED THAT?  OCTOBER 13TH,

21    IF I'M NOT MISTAKEN.

22         DID YOU PLEAD GUILTY TO THAT?  YES.

23         WAS THAT CONVICTION IN SAN DIEGO COUNTY AREA?  YES.

24         WERE YOU SENTENCED TO PRISON?  YES.

25         HOW LONG DID YOU SERVE IN PRISON?  I WAS THERE FOR

1  EIGHT MONTHS.

2          AS A RESULT OF THAT CONVICTION, ARE YOU ALLOWED TO

3  LEGALLY ENTER THE UNITED STATES?  NO.  I WAS SENT TO

4  IMMIGRATION FOR 13 DAYS AND THEN I WAS DEPORTED.

5          DO YOU CURRENTLY HAVE ANY TYPE OF BORDER-CROSSING

6  CARD?  NO.

7          AND THEN AFTER THAT CONVICTION IS WHEN D.E.A.

8  CONTACTED HIM AND ASKED HIM TO WORK AS AN INFORMANT, AND HE

9  RECEIVED THE $500 PAYMENT.  SO I JUST THINK IT'S IMPORTANT TO

10 CLARIFY THE TIME LINE FOR THE COURT TO SEE THAT THAT IS SORT

11 OF A SEPARATE-AND-APART INCIDENT THAT HE DOES NOT DENY AND IS

12 NOT DIRECTLY RELATED TO HIS PRIOR PROVIDING INFORMATION IN AN

13 INTERVIEW WITH BORDER PATROL REGARDING THIS INSTANCE, THIS

14 CASE.

15         THE COURT:  DOES THAT NOT CREATE BIAS TO WORK WITH

16 THE GOVERNMENT, TO BE ON THE GOVERNMENT'S GOOD SIDE IN ORDER

17 TO AVOID PROSECUTION FOR, AGAIN, THE ATTEMPTED BULK-CASH

18 SMUGGLING?

19         MR. STEWART:  AND, YOUR HONOR, I WOULD NOTE THAT HE

20 WAS NEVER PROSECUTED FOR THE ALIEN SMUGGLING THAT THEY

21 INITIALLY APPROACHED HIM FOR WHEN HE THEN PROVIDED THE

22 INFORMATION ALLEGEDLY ABOUT MR. DUREN SO --

23         THE COURT:  HE WAS ARRESTED FOR ALIEN SMUGGLING --

24         MR. STEWART:  NO, NO.  HE CAME TO THE PORT.  THEY

25 HAD INFORMATION THAT HE HAD BEEN ALIEN SMUGGLING, AND THEY

1    ENCOUNTERED HIM.  AND DURING I GUESS THAT CONVERSATION OR

2    THAT MEETING, THEY DID NOT ARREST HIM, BUT HE GAVE THE

3    INFORMATION ABOUT MR. DUREN AS BEING ENGAGED IN THIS

4    ACTIVITY.

5         SO THERE IS CERTAINLY -- AT LEAST THERE IS AN

6    APPEARANCE THAT THEY CHOSE TO ACT UNDER THIS INFORMATION AS

7    OPPOSED TO PURSUING HIM FOR ALIEN-SMUGGLING CHARGES.

8         THE COURT:  TO THE EXTENT THAT THERE IS AN ARGUMENT

9    FOR A BENEFIT CONFERRED, YOU HAVE THAT INFORMATION ALREADY?

10        MR. STEWART:  RIGHT.

11        AND THEN THE OTHER THING, YOUR HONOR, I WANT TO

12    POINT OUT, YOU KNOW, THIS CONVICTION -- AND I'M NOT SURE, THE

13    PROSECUTOR INDICATED FOR POSSESSION -- AND HE SERVED EIGHT

14    MONTHS.  IN TERMS OF GRAVITY, I DON'T EVEN KNOW IF THAT IS

15    THE SAME REALM OF DRUG TRAFFICKING.  AND IT WAS FOUR YEARS

16    LATER.

17        NOW, WHAT WE'RE TRYING TO DO IS UNDERMINE HIS

18    TESTIMONY PARTICULARLY WITH REGARD TO THE INCIDENT IN

19    QUESTION AND THAT TIME PERIOD, YOU KNOW, AS OPPOSED TO FOUR

20    YEARS OR SO -- THREE OR FOUR YEARS LATER THAT HE GETS

21    ARRESTED FOR POSSESSION.  I'M NOT SURE THAT IT EVEN IS THE

22    SAME NATURE OF CHARGE.

23        THE COURT:  ANYTHING ELSE?

24        MS. MARSH:  YOUR HONOR, I AGREE THAT IT CERTAINLY

25    DOES GO TO BIAS, AND HE CAN BE IMPEACHED WITH THE FACT THAT

1   HE ENGAGED IN DRUG TRAFFICKING, THAT HE WAS PAID $500 FOR

2   WORKING WITH D.E.A. AFTER THAT ARREST.  THERE IS NOTHING --

3   THERE IS NO ADDITIONAL INFORMATION THE GOVERNMENT NEEDS TO

4   PROVIDE IN ORDER TO ALLOW DEFENSE COUNSEL TO IMPEACH HIM

5   ABOUT THAT CONDUCT.

6         AND THERE IS NO -- THERE WAS NO REPORT GENERATED.

7   THERE WAS NO POTENTIAL PROSECUTION ABOUT THE LOAD THAT HE

8   REPORTED HAVING STOLEN FROM HIM.  HE IS THE ONLY PERSON WHO

9   CAME FORWARD AND SAID, I WAS TRANSPORTING MONEY, BULK-CASH

10  SMUGGLING SOUTH AND SOMEONE STOLE IT FROM ME.  IT'S NOT LIKE

11  THERE WAS A PENDING CASE THAT HE WAS TRYING TO AVOID

12  PROSECUTION FOR.  HE'S THE ONE WHO BROUGHT THAT TO THE

13  GOVERNMENT'S ATTENTION, WHICH I THINK MATTERS IN BALANCING

14  THE POTENTIAL IMPEACHMENT.

15        MR. STEWART:  WE'LL SUBMIT, YOUR HONOR.  THANK

16  YOU.

17        THE COURT:  THANK YOU.

18        THE COURT DENIES THE DEFENDANT'S REQUEST FOR ANY

19  ADDITIONAL INFORMATION WITH RESPECT TO BEING A SOURCE OF

20  INFORMATION FOR D.E.A.  THAT OCCURRED AFTER THE FACT.  THAT

21  WAS ADDRESSED AT THE DEPO.

22        WITH RESPECT TO THE CONFIDENTIAL SOURCE OF

23  INFORMATION, I WANT TO SAY THE FIRST SOURCE OF INFORMATION

24  THAT LED TO LOOKING AT SANCHEZ.

25        MS. MARSH:  YOUR HONOR, CAN I CLARIFY?

1           THE COURT:  YES.

2           MS. MARSH:  I DON'T THINK THERE IS A FIRST SOURCE OF

3    INFORMATION THAT LED TO LOOKING AT SANCHEZ THAT DEFENSE IS

4    REQUESTING ANYTHING ABOUT.  I THINK WHAT THEY ARE ASKING

5    ABOUT IS THE FBI INFORMANT.

6           THE COURT:  NOT THE D.E.A. ONE; THE FBI ONE?

7           MS. MARSH:  RIGHT.

8           THE COURT:  YES.  THAT'S WHAT I'M REFERRING TO.

9           WITH RESPECT TO THE FBI SOURCE OF INFORMATION, I'D

10   LIKE TO REVIEW THAT IN-CAMERA.  I'D LIKE TO REVIEW THAT

11   REPORT, ALL THE BRIEFING NOTES, ANY REPORTS WRITTEN, I'D LIKE

12   TO REVIEW IT IN-CAMERA.

13          AND THE DEFENDANT MAY SUPPLEMENT ITS PLEADINGS BY

14   SUBMITTING QUESTIONS AS TO WHAT IT NEEDS TO KNOW AND WHY

15   BASED UPON THE PLEADINGS YOU'VE ALREADY SUBMITTED, AND I'LL

16   DETERMINE WHETHER OR NOT THERE IS ANYTHING THERE THAT WE

17   SHOULD ADDRESS AT A LATER DATE.

18          LET'S GO TO THE AUDIO RECORDING THAT WAS LOST OR

19   UNREADABLE FROM THE SEPTEMBER OF 2013 INTERVIEW.

20          THE CLERK:  IS THAT STILL WITH THE SAME MOTION IN

21   GENERAL?

22          THE COURT:  MR. MCDOWELL, THIS IS A MULTIFACETED

23   DISCOVERY MOTION.

24          WE GO THROUGH THIS IN THESE CASES.  THERE ARE

25   MULTIPLE PARTS TO REQUEST FOR DISCOVERY AS TO MR. SANCHEZ.

1    ALL RIGHT.  I'M DENYING THE ONE WITH RESPECT TO D.E.A., BEING

2    A D.E.A. INFORMANT.

3         WITH RESPECT TO THE REQUEST FOR INFORMATION ON THE

4    SOURCE OF SUPPLY TO THE FBI, WE'LL HAVE AN IN-CAMERA REVIEW.

5    AND THAT GOES TO THE BIAS.  THOSE QUESTIONS WILL BE ADDRESSED

6    ONCE I REVIEW THE IN-CAMERA, IF THAT HAS ANY IMPACT ON BIAS

7    AND SUCH.

8         ANOTHER SUBPART OF THE EVIDENCE RELATING TO

9    MR. SANCHEZ IS THE AUDIO -- THERE WAS AN AUDIO RECORDING OF

10   SEPTEMBER 23RD, 2013 REGARDING AN INTERVIEW RELATED TO AND AN

11   E-MAIL BETWEEN TWO AGENTS.  THE GOVERNMENT INDICATES THAT THE

12   RECORDING -- THEY WERE NOT ABLE -- IT WAS NOT ABLE TO RECOVER

13   THE RECORDING ON THAT TAPE.

14        DEFENSE COUNSEL REQUESTS A COPY OF IT SO THAT A

15   FORENSIC INDIVIDUAL CAN SEE WHAT IT CAN DO, HE OR SHE CAN DO.

16        MS. MARSH:  I CAN ADDRESS THE STATUS OF THAT.

17        DEFENSE COUNSEL AND I SPOKE ABOUT THIS PRIOR TO THE

18   HEARING.  WE REACHED OUT TO THE AGENT WHO DID THAT

19   SEPTEMBER 23RD, 2013 INTERVIEW, AND HE INDICATED THAT HE

20   RECORDED IT ON A DIGITAL RECORDER THAT WAS NEW TO HIM.  WHEN

21   HE GOT BACK TO THE STATION AND TRIED TO UPLOAD IT, IT WOULD

22   NOT TRANSFER.  HE GOT HIS I.T. DEPARTMENT INVOLVED IN

23   ATTEMPTS TO TRANSFER THAT AND WAS NOT ABLE TO DO SO.

24        SO HE WROTE AN R.O.I. SUMMARIZING THE INTERVIEW VERY

25   PROMPTLY AFTERWARDS.  HE SINCE HAS LEFT BORDER PATROL AND

1    THAT ASSIGNMENT, SO HE NO LONGER HAS THE RECORDER.  HE'S

2    TURNED IT BACK IN.  THE GOVERNMENT IS WILLING TO INVESTIGATE

3    FURTHER WHETHER WE COULD RECOVER THAT RECORDER AND SEE IF

4    THAT RECORDING EXISTS.  I'M NOT VERY HOPEFUL ABOUT IT, BUT WE

5    WILL CERTAINLY INQUIRE.

6            THE COURT:  RIGHT.  I GUESS THAT'S THE FIRST STEP.

7            MS. MARSH:  RIGHT.

8            THE COURT:  THAT YOU USE YOUR BEST EFFORTS TO SEE IF

9    YOU CAN IDENTIFY THE DEVICE.  IF YOU CAN IDENTIFY THAT

10   DEVICE, THE COURT FINDS IT REASONABLE FOR THE DEFENDANT TO

11   ATTEMPT TO HAVE A FORENSIC INDIVIDUAL TO SEE IF THEY CAN

12   RECOVER IT.

13           MS. MARSH:  UNDERSTOOD.

14           THE COURT:  EVEN THOUGH YOUR DEPARTMENT MAY DO GREAT

15   WORK, AS FAR AS THE I.T. SECTION GOES, BUT ON OCCASION, I'VE

16   HAD IT IN OTHER CASES WHERE ANOTHER FORENSIC PERSON OUTSIDE

17   OF THE GOVERNMENT WAS ABLE TO RECOVER SOMETHING THAT

18   GOVERNMENT FORENSIC INDIVIDUALS HAVE NOT.  OKAY.

19           MS. MARSH:  I UNDERSTAND.

20           AND, IN FACT, YOUR HONOR, AT THIS JUNCTURE, I'D LIKE

21   TO RAISE THE POINT THAT DEFENSE COUNSEL WROTE IN THEIR

22   PLEADINGS THAT THEY HAVE RECOVERED SOMETHING FROM A DISC THAT

23   WE PROVIDED TO THEM THAT WAS -- WE BELIEVED TO BE ENCRYPTED.

24   THEY HAVE NOT PRODUCED THAT TO US, EVEN THOUGH WE HAVE

25   PRODUCED A GREAT DEAL OF DISCOVERY TO THEM.  SO I WOULD

1    REQUEST THAT RECIPROCAL DISCOVERY AS WELL.

2           THE COURT:  ALL RIGHT.  THE DEFENDANT IS ORDERED TO

3    RECIPROCATE.

4           MR. STEWART:  CERTAINLY, YOUR HONOR.

5           THE COURT:  PROVIDE THE DISCOVERY TO THE GOVERNMENT

6    WITHIN THE NEXT TWO WEEKS.  WHATEVER YOU HAVE ON THAT

7    SUBJECT.

8           SO IF YOU'RE ABLE TO IDENTIFY THE DEVICE, YOU ARE TO

9    RELEASE -- ALLOW YOUR I.T. SECTION TO WORK WITH DEFENSE

10   COUNSEL AS TO HOW TO MIRROR IT OR DELIVER THE DEVICE FOR

11   FURTHER FORENSIC EXAMINATION.  ALL RIGHT.

12          MS. MARSH:  CERTAINLY.  THANK YOU, YOUR HONOR.

13          THE COURT:  THE DEFENSE ALSO REQUESTS VIDEO OBTAINED

14   AT THE STARBUCKS PARKING LOT ON JULY 18TH, 2013.  THE

15   GOVERNMENT REPRESENTS THAT IT WAS NOT ABLE TO OBTAIN ANY

16   VIDEO FROM STARBUCKS.  THE DEFENDANT DID NOT REPLY TO THIS.

17   THE REQUEST IS DENIED.

18          THE DEFENDANT REQUESTS PREVIOUS DRUG SEIZURES,

19   INCLUDING IN LOS ANGELES AND SAN DIEGO, TO OBTAIN THE CLAIMS

20   FILED BY SANCHEZ FOR POTENTIAL IMPEACHMENT.  WITH RESPECT TO

21   THE LOS ANGELES SEIZURE, THE GOVERNMENT REPRESENTS THAT THE

22   DEPOSITION, PLUS ALL THE DOCUMENTS PROVIDED -- IT HAS, HAS

23   BEEN PROVIDED TO THE DEFENDANT.  THAT MOTION IS -- THAT

24   REQUEST IS DENIED.

25          MR. STEWART:  YOUR HONOR, I'M SORRY TO INTERRUPT.

1    MAY I JUST CLARIFY ONE THING?

2        THE GOVERNMENT HAS CERTAINLY PROVIDED PRETTY MUCH

3    THE PUBLICLY AVAILABLE INFORMATION.  WHAT WE'RE REQUESTING,

4    YOUR HONOR, IS THAT IF THE GOVERNMENT HAS INFORMATION IN

5    THEIR INVESTIGATIONS OF THOSE SEIZURES THAT MR. SANCHEZ WAS

6    INVOLVED IN DRUG TRAFFICKING, THAT'S THE INFORMATION THAT WE

7    WANT THAT HAS NOT BEEN PRODUCED.

8        THE COURT:  TO SUPPORT THE SEIZURE, INFORMATION TO

9    SUPPORT THE SEIZURE IN LOS ANGELES?

10       MR. STEWART:  RIGHT, RIGHT.  BECAUSE -- SO IF, IN

11    FACT, THEY HAVE OTHER INFORMATION THAT HE WAS INVOLVED IN

12    DRUG TRAFFICKING THAT WAS A PART OF THAT INVESTIGATION THAT

13    WE DON'T HAVE, IT STILL GOES TO OUR CASE AND OUR ARGUMENT AND

14    OUR IMPEACHMENT OF THIS INDIVIDUAL'S CREDIBILITY.

15        AND SO WE'RE NOT JUST TALKING ABOUT THE FACT THAT HE

16    FILED A CLAIM TRYING TO GET MONEY BACK.  WE'RE NOT ASKING

17    THAT THE GOVERNMENT HAS TO PRODUCE THAT.  WE'RE JUST ASKING

18    THAT IF IN THOSE INVESTIGATIONS, OR THOSE TWO SEIZURES OF

19    LARGE MONIES THAT ARE BELIEVED TO BE INVOLVED IN DRUG

20    TRAFFICKING, IF THEY HAVE EVIDENCE THAT THEY ARE SITTING ON

21    THAT SANCHEZ WAS INVOLVED IN THE TRAFFICKING, WE THINK THAT

22    THAT SHOULD BE PRODUCED.

23       THE COURT:  DO YOU HAVE EVIDENCE SUPPORTING THOSE

24    SEIZURES?

25       MS. MARSH:  WE HAVE NO INFORMATION THAT MR. SANCHEZ

1  WAS INVOLVED IN THOSE INITIAL SEIZURES.  HE IS NOT NAMED IN

2  THE REPORTS UNDERLYING THE SEIZURES.  SO I DON'T KNOW IF

3  THERE IS A MISUNDERSTANDING, BUT I DON'T -- WE DON'T HAVE

4  INFORMATION THAT HE WAS INVOLVED IN THE UNDERLYING BULK-CASH

5  SMUGGLING AT ALL.  HE WASN'T PRESENT FOR THOSE.

6         THE COURT:  IN EITHER ONE?

7         MS. MARSH:  AT EITHER ONE.

8         MR. STEWART:  AND OUR POINT -- AND WE'RE NOT SAYING

9  THAT THE GOVERNMENT DOES.  OFTEN IT'S THE CASE THAT IN TERMS

10  OF THE INVESTIGATION, THEY MAY -- IF THE GOVERNMENT HAS, YOU

11  KNOW, LOOKED AND SAYS, HEY, WE'VE LOOKED INTO IT.  YOU KNOW,

12  THERE ISN'T ANY INFORMATION THAT HE WAS INVOLVED, YOU KNOW,

13  IN THE UNDERLYING DRUG-TRAFFICKING ACTIVITY LEADING TO THAT

14  SEIZURE, WE ACCEPT THAT.

15         BUT WE AT LEAST WANTED TO MAKE THE REQUEST, SO IT

16  WAS A MATTER OF THE RECORD, SO THAT IF IT EVER CAME OUT, THAT

17  WE AT LEAST DID TRY TO GET THAT INFORMATION.

18         THE COURT:  ALL RIGHT.  THE COURT WILL ACCEPT THE

19  GOVERNMENT'S REPRESENTATIONS.  REQUEST IS DENIED.

20         THE DEFENDANT REQUESTS THE CONFIDENTIAL INFORMANT'S

21  APRIL 4TH, 2018 DEPOSITION.  THIS IS SANCHEZ; RIGHT?

22         MS. MARSH:  YES.

23         THE COURT:  ALL RIGHT.  THE RESPONSE IS THAT THE

24  GOVERNMENT -- THAT THE DEFENDANT HAS IT.  THAT REQUEST IS

25  DENIED.

1          THE COURT WILL ORDER THE GOVERNMENT TO PRODUCE FOR

2     INSPECTION SANCHEZ'S A-FILE.  AND THAT HAS TO BE DONE

3     OBVIOUSLY WITH A GOVERNMENT REPRESENTATIVE PRESENT WHILE THAT

4     INSPECTION TAKES PLACE.

5          WITH RESPECT TO ARAGON, WHO DEFENDANT SAYS IS ALSO A

6     PERCIPIENT WITNESS -- THE ISSUE WITH -- I AGREE WITH THE

7     DEFENSE WITH RESPECT TO SANCHEZ.  HE'S A PERCIPIENT WITNESS.

8     HE'S ALSO, BASED UPON THE FACTS, VIOLATING THE LAW, AND HE

9     PRESENTS HIMSELF AND PRESENTS THESE FACTS IN CONJUNCTION WITH

10    AN ALLEGED OTHER VIOLATION IN DEALING WITH ALIEN SMUGGLING OR

11    SOMETHING.  THAT CREATES A LOT OF BIAS.

12         THAT'S WHY THOSE ISSUES ARE IMPORTANT TO THE COURT

13    THAT THE COURT IS OF THE MIND THAT THE DEFENDANT HAS MET ITS

14    BURDEN UNDER THE RULES WITH RESPECT TO PRODUCTION OF THOSE

15    THINGS.  OKAY.  IT'S ALL FAIR GAME.  AGAIN, MOTION IN LIMINE,

16    WE DETERMINE WHAT COMES IN AND WHAT DOESN'T; BUT THAT DOESN'T

17    MEAN HE SHOULDN'T GET IT AT THIS JUNCTURE.

18         WITH RESPECT TO ARAGON, FIRST, THE GOVERNMENT ARGUES

19    THAT THIS DEFENDANT WAS NOT DEPORTED AND TAKEN OUT OF THE

20    REACH OF THIS -- THIS INDIVIDUAL WAS NOT DEPORTED AND TAKEN

21    OUT OF THE REACH OF THE DEFENDANT, DENYING HIM THE

22    OPPORTUNITY TO CONFRONT.  THERE HAS BEEN NO SHOWING OF

23    MATERIALITY.

24         THE COURT AGREES.  THERE IS NOTHING ABOUT HIS

25    REMOVAL FROM THE UNITED STATES, BASED UPON AN ISOLATED

1    INCIDENT, THAT SUGGESTS THAT THERE HAS BEEN SOME REMOVAL, SO

2    THAT IT CREATES A DUE-PROCESS ISSUE FOR THE DEFENDANT.  SO

3    THE EVIDENCE OF HIS DEPORTATION AFTER SEPTEMBER 18TH, 2013 IS

4    DENIED IN PART.

5          HERE, THE COURT WOULD ORDER THE A-FILE TO BE

6    PRODUCED AS WELL.

7          MS. MARSH:  I CAN REPRESENT TO THE COURT THAT

8    THROUGH OUR INVESTIGATORS WITH HOMELAND SECURITY

9    INVESTIGATION, WE RESEARCHED WHETHER HE EVEN HAS AN A-FILE,

10   AND HE DOES NOT.

11         THE COURT:  HE HAD A BORDER-CROSSING CARD.  HE'S GOT

12   TO HAVE AN A-FILE.

13         MS. MARSH:  SO THE INFORMATION THAT WAS CONVEYED TO

14   ME AS A RESULT OF OUR SEARCH, IS THAT THERE IS NOT ACTUALLY

15   AN A-FILE.  THAT'S THROUGH THE STATE DEPARTMENT.  SO THERE

16   ARE PROBABLY DOCUMENTS THAT SUPPORT HIS APPLICATION FOR THE

17   BORDER-CROSSING CARD, BUT THAT DOES NOT GENERATE AN A-NUMBER

18   AND A-FILE.

19         DEFENSE COUNSEL AND I SPOKE ABOUT THIS BEFORE THE

20   PROCEEDINGS, AND WE WILL WORK TO PRODUCE THOSE DOCUMENTS, IF

21   THE COURT SO ORDERS.  BUT IT'S DIFFERENT THAN AN A-FILE.

22         THE COURT:  SO HIS BORDER-CROSSING CARD WAS

23   PULLED --

24         MS. MARSH:  CORRECT.

25         THE COURT:  -- BUT IT DID NOT CREATE AN A-FILE?

1          MS. MARSH:  CORRECT.

2          THE COURT:  COUNSEL.

3          MR. STEWART:  YOUR HONOR, SO THAT DON'T WE QUIBBLE

4    OVER WHETHER IT WAS STATE DEPARTMENT OR HOMELAND SECURITY, I

5    THINK THE COURT IS CORRECT THAT THIS GUY HAD A

6    BORDER-CROSSING CARD, AND THERE SHOULD BE DOCUMENTATION

7    RELEVANT TO THAT BORDER-CROSSING CARD AND THE TERMINATION OF

8    THAT BORDER-CROSSING CARD.

9          SO WHETHER THAT'S IN AN A-FILE OR WHETHER THAT'S

10   HELD SEPARATELY, NOT IN AN A-FILE, WE'RE JUST REQUESTING

11   ACCESS TO THOSE RELEVANT DOCUMENTS.

12         MS. MARSH:  AND I CAN REPRESENT TO THE COURT THAT

13   THOSE DOCUMENTS, THE STATE DEPARTMENT APPLICATION DOCUMENTS

14   HAVE ACTUALLY ALREADY BEEN DISCLOSED ON THE HARD DRIVE.  THEY

15   ARE NOT SEPARATELY BATES STAMPED, BUT WE WILL EITHER DISCLOSE

16   THEM AGAIN WITH BATES STAMP NUMBERS OR POINT DEFENSE TO WHERE

17   THEY ARE IN THE PRIOR DISCLOSURES.

18         MR. STEWART:  NO, NO.  IT'S NOT JUST THAT, YOUR

19   HONOR.  WE WANT ALSO THE -- WHICH ARE PROBABLY MORE

20   IMPORTANT, DOCUMENTS RELATED TO THE TERMINATION I THINK OF

21   THE PERSON'S A-FILE.  SO TWO THINGS.

22         I THINK TO THE EXTENT THAT THEY PRODUCE THE INITIAL

23   APPLICATION, AND THERE IS NOTHING ELSE UNDER THE SUN, BUT

24   WHEN HIS -- HERE IS WHAT OCCURRED I BELIEVE, YOUR HONOR.

25   ARAGON I THINK WAS ARRESTED AND PROSECUTED FOR A DUI IN THE

STATES.  HIS BORDER-CROSSING CARD WAS TAKEN.  THEY SAY HE WASN'T DEPORTED, BUT SOMETHING DID HAPPEN, WHETHER IT WAS A VOLUNTARY DEPARTURE.

BUT IF HE'S IN THE STATES WHEN HE'S ARRESTED, AND HIS BORDER-CROSSING CARD IS TAKEN, IT SEEMS AS THOUGH THAT SOMETHING OCCURRED TO THEN GET HIM OUT OF THE COUNTRY.  AND NORMALLY, YOU KNOW, THAT'S DOCUMENTED.

AT THIS STAGE OF THE GAME, YOUR HONOR, WE'RE NOT NECESSARILY MAKING THE MOTION THAT THERE IS A DUE-PROCESS VIOLATION.  WE REALLY DON'T KNOW IF WE HAVE ALL OF THAT.  BUT CERTAINLY IN TERMS OF -- IN WORKING IT UP AND INVESTIGATING, YOU KNOW, WHETHER OR NOT -- THE CIRCUMSTANCES UNDER WHICH HE WAS EXCLUDED.

SO IN THIS CASE -- WELL, WE DON'T KNOW IF HE WAS DEPORTED OR NOT, BUT THEY SAY HE WASN'T DEPORTED, BUT WHATEVER RESULTED IN HIM BEING EXCLUDED FROM THAT POINT FROM THE U.S.  HIS CARD WAS CANCELED AND EITHER HE WAS VOLUNTARILY REMOVED, SOMETHING HAPPENED.

THE COURT:  WHAT EVIDENCE DO YOU HAVE THAT HE WAS IN THE UNITED STATES WHEN HIS CARD WAS PULLED?

MR. STEWART:  WELL, THE GOVERNMENT PRODUCED EVIDENCE AS I RECALL THAT HE WAS -- HIS BORDER-CROSSING CARD WAS REVOKED AS A RESULT OF HIS -- OF A DUI, I BELIEVE IS WHAT IT IS.  AND SO, YOU KNOW, WE DON'T HAVE -- SO THAT'S KIND OF ALL WE HAVE; SO NOW WE'RE TRYING TO GET MORE INFORMATION.

1    SO NORMALLY IT WOULD BE THE CASE THAT, YOU KNOW,

2 HE'S ARRESTED FOR THE DUI.  HE'S PROSECUTED.  THAT ALERTS THE

3 GOVERNMENT TO THE CRIME, AND THEN HIS BORDER-CROSSING CARD IS

4 TAKEN.  AND WE DON'T HAVE -- WE REALLY DON'T HAVE ANY

5 INFORMATION AS TO EXACTLY HOW IT PLAYED OUT.  AND SO THAT'S

6 WHY WE'RE REQUESTING IT.

7    BUT CERTAINLY WE THINK -- IT'S POTENTIALLY MATERIAL,

8 BUT THE OTHER PROBLEM, YOUR HONOR, IS WE'RE REALLY TRYING

9 TO -- IF, IN FACT, IN THIS DOCUMENTATION THERE IS INFORMATION

10 RELATED TO HIS ADDRESS, HIS WHEREABOUTS, HOW WE CAN LOCATE

11 HIM AS A PERCIPIENT WITNESS, THIS IS OUR ONLY METHOD OF

12 TRYING TO PURSUE THE AVENUE AVAILABLE TO US, WHICH WOULD BE

13 THOSE TYPES OF DOCUMENTS.

14    WE DON'T HAVE ANY OTHER INFORMATION, AND THE

15 GOVERNMENT HASN'T PRODUCED ANY INFORMATION ABOUT MR. ARAGON'S

16 WHEREABOUTS, OTHER THAN HE'S IN MEXICO.  BUT THE GOVERNMENT

17 HASN'T PRODUCED -- HE'S A PERCIPIENT WITNESS.  WE THINK THAT

18 IF THE GOVERNMENT HAS HIS ADDRESS OR INFORMATION RELATING TO

19 THAT, THEY SHOULD PRODUCE IT SO THAT WE HAVE A FAIR CHANCE TO

20 TRY TO CONTACT HIM AND INTERVIEW HIM.  BUT WE DON'T HAVE

21 ANYTHING AND THE GOVERNMENT, WE THINK, DOES HAVE SOME

22 CONTACT, BUT WE DON'T HAVE IT.  SO THAT'S WHAT WE'RE GETTING

23 AT.

24    THE COURT:  THE GOVERNMENT'S PLEADINGS AND EXHIBITS

25 INDICATE THAT THE SPECIAL AGENT CONTACTED MR. ARAGON FROM

1    MEXICO.  HE SAYS HE WASN'T COMING BACK.

2              DOES THE GOVERNMENT HAVE ANY UPDATED INFORMATION

3    THAT HE MAY HAVE BEEN FOUND IN THE UNITED STATES AT ANY

4    POINT?

5              MS. MARSH:  NO, YOUR HONOR.  AND IT'S OUR

6    UNDERSTANDING THAT HE TRIED TO REENTER THE UNITED STATES AND

7    HIS BORDER-CROSSING CARD WAS REVOKED AT THAT TIME.  IT WASN'T

8    THAT HE WAS ACTUALLY REMOVED.  JUST TO CLARIFY THAT.

9              THE COURT:  HE WAS EXCLUDED.

10             MS. MARSH:  HE WAS EXCLUDED.  HE TRIED TO REENTER

11   AND WAS EXCLUDED.

12             THE COURT:  OKAY.

13             MS. MARSH:  AND NO, WE DON'T HAVE ADDITIONAL CONTACT

14   INFORMATION.  IN FACT, WE WANT -- WE WANTED HIM AS A WITNESS.

15   WE TRIED TO GET HIM TO THE DEPOSITION.

16             THE COURT:  ALL RIGHT.  THE REQUEST IS DENIED.  THE

17   COURT WILL NOT RELEASE THE NAME AND ADDRESS OF WITNESSES,

18   CERTAINLY UNDER THESE CIRCUMSTANCES.

19             SO THE REQUEST FOR CONTACT INFORMATION REGARDING

20   ARAGON IS DENIED.  THE REQUEST FOR EVIDENCE OF ARAGON'S

21   DEPORTATION AFTER JULY OF 2013 IS DENIED.  THERE IS NO

22   A-FILE.

23             NOW, WITH RESPECT TO -- THE NEXT ISSUE DEALS WITH

24   THREE -- THE REQUEST TO OBTAIN THREE UNUSED CUSTOMS AND

25   BORDER PROTECTION EVIDENCE BAGS AS DEMONSTRATIVE EVIDENCE.

1       AS I UNDERSTAND IT, THESE WERE -- ACCORDING TO THE

2 DEFENDANT, THE THREE BAGS IN QUESTION WERE ALL THE SAME -- OF

3 THE SAME NATURE, THE SAME SIZE, STANDARDIZED IN THE PROTOCOL

4 OF THE AGENCY. ONE OF THEM, WITH SERIAL NO. 6356644, WAS

5 FOUND IN THE DEFENDANT'S GOVERNMENT VEHICLE.

6       IF ALL OF THE OTHERS ARE IDENTICAL, THE COURT IS OF

7 THE MIND THAT -- I WOULD ASSUME THAT'S BEING HELD AS

8 EVIDENCE?

9       MS. MARSH: IT IS, YOUR HONOR.

10       THE COURT: ALL RIGHT. IF THEY ARE ALL IDENTICAL,

11 AS THE DEFENDANT REPRESENTS, THERE IS NO NEED TO HAVE OTHERS.

12 BUT THE COURT WILL ORDER THE GOVERNMENT TO PERMIT THE DEFENSE

13 TO INSPECT THAT BAG. OKAY.

14       MS. MARSH: AND WE HAVE NO OBJECTION TO THAT.

15       MR. STEWART: YOUR HONOR, CAN I EXPLAIN WHAT WE

16 INTEND TO DO?

17       THE COURT: I UNDERSTAND ABOUT THE WEIGHT, SIR. I

18 GET IT.

19       MR. STEWART: SO WE WANT TO DO THAT, YOUR HONOR, AS

20 A DEMONSTRATIVE USING THE ACTUAL BAG IN COURT.

21       THE COURT: BUT YOU CAN USE ONE AND EXTRAPOLATE.

22       MR. STEWART: OKAY. WE CAN DO IT IN COURT WITH THE

23 ACTUAL BAG, BECAUSE WE WON'T HAVE THE ACTUAL BAG. WE CAN

24 INSPECT IT; I GET IT.

25       SO MAYBE THE IDEA IS THAT WHEN WE INSPECT IT, THAT

1  IS WHEN WE CAN DO WHATEVER WE WANT TO DO WITH IT, AND

2  VIDEOTAPE IT PERHAPS AT THAT TIME, AND WE CAN USE THAT

3  DEMONSTRATIVE PERHAPS IN COURT.

4      THE COURT:  HOW BIG IS THE TEAR IN THIS BAG, THE

5  CUT?  I MEAN, WILL IT DESTROY THE EVIDENCE IF IT WAS USED AS

6  A DEMONSTRATIVE PRIOR TO TRIAL?

7      MS. MARSH:  THE AGENTS ARE INFORMING ME IT'S A

8  PRETTY BIG CUT IN THE BAG.  THE SIDE OF THE BAG IS MY

9  UNDERSTANDING.

10      THE COURT:  ALL RIGHT.  IS IT POSSIBLE TO, WHERE WE

11  CAN, TAKE A PICTURE BEFOREHAND?  I'M SURE YOU HAVE PICTURES

12  ALREADY.

13      MS. MARSH:  WE DO.

14      THE COURT:  ALLOW THEM TO UTILIZE IT FOR THE

15  DEFENSE'S EXPERIMENT, PULL THE TAPE OFF AFTERWARDS, WITH SOME

16  CLEAR TAPE OR WHATEVER, WHERE IT'S BACK AS NEAR AS POSSIBLE

17  TO THE ORIGINAL CONDITION, CHAIN OF CUSTODY, EVERYBODY IS

18  WATCHING THIS HAPPEN, VIDEOTAPE THAT, TOO, AND PRESERVE THE

19  EVIDENCE IN THAT WAY?

20      MS. MARSH:  I THINK THAT'S AGREEABLE.

21      THE COURT:  ALL RIGHT.  I DIRECT THE PARTIES TO MEET

22  AND CONFER IN THAT REGARD.

23      MR. STEWART:  THANK YOU, YOUR HONOR.

24      THE COURT:  THE REQUEST FOR ADDITIONAL BAGS IS

25  DENIED.

1    ALL RIGHT.  EVIDENCE RELATING TO THE DEFENDANT.

2  WITH RESPECT TO THE FORENSIC COPY OF THE DEFENDANT'S

3  GOVERNMENT COMPUTER.  THE GOVERNMENT ASSERTS THAT IT

4  DISCLOSED THIS ON -- IN APRIL OF 2018.  THE DEFENSE SUGGESTS

5  THAT IT WAS NOT PRODUCED PURSUANT TO EXHIBIT G OF ITS

6  PLEADING -- OF ITS REPLY.  I NEED SOME EXPLANATION ABOUT G

7  AND HOW TO FOLLOW THAT PLEADING, SIR.

8    IN ADDITION, THE DEFENDANT REQUESTS ALL E-MAILS

9  BETWEEN JUNE OF 2013 AND APRIL 2014 STORED ON THE GOVERNMENT

10  E-MAIL SERVER.  BUT IN ITS PLEADINGS, THE DEFENDANT ALSO SAYS

11  THAT IT DID NOT RECEIVE ANY WORK E-MAILS FROM MAY OF 2014 TO

12  SEPTEMBER OF 2014.

13    COUNSEL.

14    MR. STEWART:  YES, YOUR HONOR.

15    WITH REGARD TO THE FORENSIC HARD DRIVE, I'VE SPOKE

16  WITH GOVERNMENT COUNSEL, AND THEY HAVE INDICATED -- THEY HAVE

17  CONCEDED THAT WHAT WAS PRODUCED WAS NOT AN ENCASE FORENSIC

18  COPY.  THEY ARE GOING TO SPEAK WITH THEIR I.T. DEPARTMENT

19  ABOUT THAT AND GET BACK WITH US.  MY UNDERSTANDING IS THAT

20  THEY ARE GOING TO FIND OUT WHAT IS REQUIRED TO EITHER PRODUCE

21  IT OR TO MAKE IT AVAILABLE TO US.  SO THAT'S MY

22  UNDERSTANDING, AND I'M SURE THEY CAN LET YOU KNOW IF THAT'S A

23  CORRECT UNDERSTANDING, YOUR HONOR.

24    WITH REGARD TO THE E-MAILS, WE ALSO SPOKE ABOUT

25  THAT, YOUR HONOR.  AND ESSENTIALLY THEY HAVE PRODUCED ON

1    THEIR DISCOVERY WHAT APPEARS TO BE THE MAJORITY OF THE

2    E-MAILS, BUT THERE IS A COUPLE-MONTH PERIOD THAT THEY FAILED

3    TO PRODUCE.  AND THE GOVERNMENT UNDERSTANDS THAT IT MAY HAVE

4    BEEN JUST OVERSIGHT, BUT THEY ARE GOING TO PRODUCE THOSE IN

5    DUE COURSE AS WELL.

6              THE COURT:  COUNSEL.

7              MS. MARSH:  AS TO THE FORENSIC ENCASE, DEFENSE

8    COUNSEL IS CORRECT, WHAT WAS PRODUCED WAS AN IMAGE OF THE

9    NETWORK DRIVE, BECAUSE IT'S DIFFERENT THAN A COMPUTER THAT IS

10   SEIZED IN A SEARCH WARRANT, WHERE YOU DO A FORENSIC DOWNLOAD.

11   BECAUSE IT WAS COMING FROM A GOVERNMENT NETWORK, IT WAS JUST

12   IMAGED, AS OPPOSED TO THE FORENSIC ENCASE.  WE WILL WORK WITH

13   OUR EXPERT TO SEE IF THAT CAN BE PRODUCED IN THE FORMAT THAT

14   DEFENSE IS REQUESTING.

15             THE E-MAILS, I AGREE AGAIN WITH DEFENSE COUNSEL, THE

16   DATES THAT THEY ARE REQUESTING WERE NOT REQUESTED AS PART OF

17   OUR INVESTIGATION; SO WE WILL GO BACK AND SEE IF -- I ASSUME

18   THOSE ARE STILL PRESERVED, AND WE WILL PRODUCE THE DATES, THE

19   MAY 15TH, 2014 THROUGH SEPTEMBER 29TH, 2014 DATES.

20             THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

21             THE COURT GRANTS THE DEFENDANT'S MOTION FOR A

22   FORENSIC COPY OF THE DEFENDANT'S GOVERNMENT COMPUTER.  THE

23   PARTIES ARE TO MEET AND CONFER TO MAKE SURE THAT TRANSFER

24   OCCURS.  AND THE COURT GRANTS THE DEFENDANT'S MOTION FOR ALL

25   E-MAILS BETWEEN MAY 2014 AND SEPTEMBER 29TH, 2014.

1          WITH RESPECT TO -- DEFENDANT ALSO REQUESTS COPIES OF

2    DOCUMENTS FROM THE CANADIAN BORDER INSPECTION LAW ENFORCEMENT

3    TEAM.  THE GOVERNMENT ASSERTS THAT ALL -- THE GOVERNMENT HAS

4    PRODUCED THE TWO DOCUMENTS IT HAS FROM THAT AGENCY.  THAT

5    REQUEST IS DENIED.

6          THE DEFENDANT REQUESTS GPS CELL TOWER DATA FOR

7    DEFENDANT'S ASSIGNED GOVERNMENT PHONE FOR DATES OF ALLEGED

8    THEFTS.  THE GOVERNMENT ASSERTS THAT IT HAS PRODUCED,

9    PROVIDED THAT INFORMATION THAT'S WITHIN ITS POSSESSION.  THAT

10   MOTION IS DENIED.

11         THE DEFENDANT IS REQUESTING EVIDENCE RELATING TO THE

12   SAN CLEMENTE SEIZURE ON MARCH 13TH, 2014.  THE GOVERNMENT

13   ASSERTS THAT THE CD IN ITS CASE FILE IS UNREADABLE.  HERE

14   AGAIN, THE DEFENSE REQUESTED AN OPPORTUNITY TO HAVE ITS

15   FORENSIC PERSON TO TAKE A LOOK.

16         WHAT'S YOUR TAKE ON THAT?

17         MS. MARSH:  WE AGREE TO DO SO.

18         THE COURT:  VERY WELL.

19         MR. STEWART:  YOUR HONOR, I'M SORRY TO INTERRUPT,

20   YOUR HONOR.

21         TWO STEPS BACK, WITH THE CELL PHONE DATA, YOUR

22   HONOR.  THE ONLY ISSUE THERE -- AND MAYBE THE GOVERNMENT CAN

23   CLARIFY -- IS THEY INDICATED THAT THEY PROVIDED THE CELL

24   TOWER DATA.  WE ALSO WANTED THE TOLL DATA AND THE -- AND ALL

25   OTHER PHONE DATA ON THE PHONE AT THAT TIME.

1          AND SO I DON'T -- AS THEIR RESPONSE WAS WRITTEN, IT

2     WASN'T INCLUSIVE OF ALL OF THAT, AND SO I DON'T KNOW IF THAT

3     MEANS THAT THEIR RESPONSE DID INCLUDE ALL OF THAT, MEANING

4     THAT THEY FEEL THAT THEY HAVE PROVIDED ALL OF THE DATA FROM

5     THE PHONE, INCLUDING THE TOLL AND OTHER PHONE DATA, BECAUSE

6     THEIR RESPONSE WAS LIMITED TO CELL TOWER; AND SO WE WERE

7     REQUESTING BROADER THAN CELL TOWER.

8          SO I DON'T KNOW IF THEIR RESPONSE WAS INTENDED TO

9     INCLUDE ALSO TOLL AND OTHER PHONE DATA OR IF IT TRULY WAS

10    LIMITED TO CELL TOWER, BECAUSE OUR REQUEST WAS BROADER THAN

11    CELL TOWER.

12          THE COURT:  COUNSEL.

13          MS. MARSH:  WE HAVE PRODUCED CELL TOWER AND TOLL

14    DATA FOR THE SEIZURES THAT -- THE TWO SEIZURES DATES, THE

15    SAN CLEMENTE SEIZURE AND THE JULY 18TH SEIZURE.  I'M NOT SURE

16    IF DEFENSE COUNSEL WAS REQUESTING A BROADER TIME PERIOD THAN

17    THAT; I THINK THEY WERE.

18          WE HAVE INQUIRED, AND TOLL DATA IS NOT -- THAT DATA

19    IS THAT STORED BY THE PHONE COMPANY LONGER.  I MEAN, THAT'S

20    NOT -- THE PHONE COMPANY NO LONGER IS IN POSSESSION OF THAT

21    DATA.

22          MR. STEWART:  AND WE'LL ACCEPT THAT, YOUR HONOR.

23    BUT THAT UNDERSCORES THE ISSUE WE HAVEN'T GOTTEN TO YET, THAT

24    THERE HAS BEEN THIS FOCUS ON THESE TWO INCIDENTS, BUT

25    APPARENTLY THE GOVERNMENT MAY BE TRYING TO PROVE OTHERS, AND

1    WE JUST DON'T -- AND THAT'S I GUESS WHAT WE'LL GET TO WITH

2    THE BILL OF PARTICULARS.

3         THE COURT:  THAT'S A MOTION-IN-LIMINE ISSUE AS

4    WELL.

5         MR. STEWART:  OKAY.

6         THE COURT:  THE COURT GRANTS THE MOTION FOR EVIDENCE

7    RELATING TO THE MARCH 2014 SEIZURE AT SAN CLEMENTE.  THE

8    PARTIES ARE TO MEET AND CONFER TO RELEASE THE DATA TO

9    DEFENDANT'S EXPERTS.

10        TECS.  THE DEFENSE REQUESTS TECS RECORDS FROM AGENT

11   DE LA HERON; IS THAT CORRECT?

12        MS. MARSH:  DE LA HERON.

13        THE COURT:  THANK YOU.  MY HANDWRITING.  I CAN'T

14   READ IT.  AND ANY OTHER AGENTS.

15        THE GOVERNMENT REPRESENTS THAT AGENT DE LA HERON

16   DOES NOT HAVE ACCESS TO TECS, DOES NOT LOG INTO IT.  THE

17   REQUEST IS DENIED.

18        THE DEFENDANT REQUESTS EVIDENCE REGARDING THE

19   SEIZURE 6051, REFLECTING THE FIRST SIGNATURE OF ACCEPTANCE OF

20   THE FUNDS BY THE BRINKS AGENCY.

21        AND THIS GOES TOWARD THE HANDWRITING EXEMPLAR?

22        MR. STEWART:  YES, YOUR HONOR.  I THINK WE

23   CLARIFIED, BECAUSE I MAY HAVE MISSTATED.  I MAY HAVE

24   MISSTATED OUR POSITION IN THE ORIGINAL MOTION THAT I THINK I

25   CLARIFIED IN THE REPLY.

1          ESSENTIALLY, YOUR HONOR, THERE IS A 651 THAT

2     DOCUMENTS THE SEIZURE.  AND IN THIS CASE, AGENT DE LA HERON

3     HAS AFFIRMED THAT HE SIGNED IT.  BUT THEN ON THE RIGHT SIDE,

4     THERE IS INDICATION OF THE THREE DIFFERENT BAGS, THE L -- THE

5     THREE DIFFERENT L-BAGS.  AND OUR READING OF THE REPORT IS

6     THAT HE NOW IS EQUIVOCATING ON WHETHER OR NOT THAT WAS

7     WRITTEN BY HIM.  OKAY.

8          THE COURT:  AS TO ONE OF THE SIGNATURES?

9          MR. STEWART:  AS TO THE L -- THE ENTRIES FOR THE

10    BAGS; RIGHT.

11         THE COURT:  OKAY.

12         MR. STEWART:  AND THEN THERE IS ALSO ONE OTHER LINE

13    ON THE 651 WITH ADDITIONAL PERTINENT INFORMATION THAT IS

14    SUGGESTING HE'S EQUIVOCATING ON WHETHER OR NOT HE PUT THAT IN

15    THERE.  SO THE REASON WHY -- NOW, IT MAY BE THAT THAT'S THE

16    WAY THE REPORT IS WRITTEN, BUT IT MAY NOT ACTUALLY BE WHAT

17    HE'S SAYING.  WE TALKED ABOUT THAT.  SO WE'RE NOT CLEAR.

18         BUT THE WAY THE REPORT IS WRITTEN, WE BELIEVE

19    SUGGESTS THAT HE'S EQUIVOCATING.  AND SO MY UNDERSTANDING IS

20    THAT THE 651 -- 6051 THAT WE HAVE IS KIND OF THE END PRODUCT,

21    WHERE EVERYBODY HAS GOTTEN IT, SIGNED OFF ON IT.

22         BUT WE'RE SAYING, IF YOU GIVE US THE EARLIER ONE

23    AFTER HE HAD IT, BEFORE EVERYBODY ELSE HAD IT, THAT IF THE

24    BAG INDICATIONS ARE ON THERE, AND THE OTHER PERTINENT

25    INFORMATION BEFORE OTHER FOLKS GOT TO FILLING IT IN, THEN

1    THAT WOULD PROVIDE ADDITIONAL EVIDENCE THAT, IN FACT, WHEN HE

2    DID COMPLETE ORIGINALLY THE 6051 DETAILING THE SEIZURE, HE

3    LISTED THE BAGS.  AND THE BAGS ARE IMPORTANT BECAUSE THEY ARE

4    A CERTAIN SIZE AND TYPE, AND THAT WILL COME INTO OUR

5    CASE-IN-CHIEF.

6         AND SO WE WANT TO BE ABLE TO ESTABLISH IF HE IS

7    EQUIVOCATING ON WHETHER OR NOT HE ACTUALLY PUT THAT

8    INFORMATION IN THERE OR IF SOMEONE ELSE PUT IN IN THERE, AND

9    WE DON'T KNOW WHO.  WE'RE ARGUING THAT, NO, HE DID.  AND

10   THAT'S WHY WE WANT THE PORTION OF THE FORM BEFORE IT WAS SENT

11   OFF TO OTHERS, AND WE BELIEVE THAT IF THAT PORTION OF THE

12   FORM AFTER HE COMPLETED IT, DOES REFLECT THAT INFORMATION,

13   THEN FOR US, WE BELIEVE THAT WE CAN STRONGLY ESTABLISH THAT

14   HE PUT THAT INFORMATION ON THERE.  SO THAT'S WHAT WE'RE

15   REQUESTING AND WHY.

16        THE COURT:  ALL RIGHT.  THANK YOU.

17        COUNSEL.

18        MS. MARSH:  IT'S MY UNDERSTANDING FROM AGENT

19   DE LA HERON THAT HE FILLED OUT THE EVIDENCE FORM 6051, AS

20   WE'RE REFERRING TO IT, INCLUDING HIS SIGNATURE AND THE FORM.

21   THAT HE IS DENYING HAVING -- HAVING WRITTEN HIS NAME ON THE

22   BAG WHERE HIS NAME IS REFLECTED ON THE BAG.

23        WE WILL CERTAINLY CLARIFY WITH HIM AND SEE IF THERE

24   IS ANOTHER VERSION OF THE FORM.  THE FORM THAT WE HAVE

25   PRODUCED IS THE FINALIZED FORM.  IT'S NOW MY UNDERSTANDING

1    FROM SOME FURTHER INQUIRY THAT THIS FORM IS SOMETIMES -- OR

2    IS IN TRIPLICATE; SO THERE MAY BE A COPY LEFT BEHIND WITHOUT

3    THE FURTHER CHAIN OF CUSTODY.

4           SO WE WILL INVESTIGATE WHETHER THERE IS ANOTHER FORM

5    THAT DOES -- YOU KNOW, IS MISSING THE INFORMATION DEFENSE

6    COUNSEL IS SEEKING.  BUT AS OF NOW, WE HAVE PRODUCED THE ONLY

7    FORM WE HAVE THAT IS COMPLETED.

8           THE COURT:  ALL RIGHT.  ANYTHING ELSE?

9           MR. STEWART:  NO, YOUR HONOR.  SO IT'S OUR

10   UNDERSTANDING TWO THINGS:  IS THAT I THINK THE GOVERNMENT HAS

11   REPRESENTED THAT MR. DE LA HERON IS NOT DISPUTING THAT HE

12   WROTE THE BAG NUMBERS ON THERE; AND SO IF THAT'S THE CASE,

13   THEN WE HAVE NO FURTHER ISSUE.  BUT IF HE IS DISPUTING THAT,

14   THEN THAT'S WHAT WE'RE REQUESTING THAT FURTHER, THAT OTHER

15   DOCUMENTATION.

16          MS. MARSH:  UNDERSTOOD.

17          THE COURT:  SO THAT'S A WITHDRAWAL OF YOUR REQUEST

18   FOR EXEMPLARS?

19          MR. STEWART:  NO, YOUR HONOR.  PERHAPS THE THING TO

20   DO, BECAUSE THE GOVERNMENT IS NOT -- NEEDS TO CHECK BACK WITH

21   AGENT DE LA HERON AND LOOK -- MAYBE WE CAN JUST -- MAYBE THE

22   COURT CAN JUST ALLOW THE PARTIES TO MEET AND CONFER ON THIS

23   ONE.

24          THE COURT:  ALL RIGHT.  SO -- OKAY.  THANK YOU.

25          SO THE OTHER TWO BAG NUMBERS, DEFENSE PROFFERS THAT

1    THE GOVERNMENT KEEPS TRACK OF THESE VARIOUS BAGS.  SO AS --

2    AND I INFER THAT THE DEFENSE BELIEVES THEY ARE IN THE SYSTEM

3    SOMEWHERE AND THEY SHOULD BE ABLE TO BE LOCATED BASED UPON

4    THE NUMBERS.  IS THAT TRUE OR NOT, IN YOUR VIEW?

5         MS. MARSH:  I'M NOT SURE, BUT I'M WILLING TO INQUIRE

6    FURTHER IF THEY ARE.

7         DO YOU HAVE A DIFFERENT UNDERSTANDING?  LET ME

8    INQUIRE OF MY CASE AGENTS.

9         IT'S OUR UNDERSTANDING THAT THE TWO BAGS ARE GONE,

10   BUT WE WILL INQUIRE FURTHER TO SEE IF -- TO CLARIFY THIS

11   POINT, BECAUSE I THINK IT WILL BE IMPORTANT TO BOTH

12   PARTIES.

13        THE COURT:  ALL RIGHT.  THE COURT ORDERS THE

14   GOVERNMENT TO INVESTIGATE THE LOCATION OF THE OTHER TWO BAGS

15   AND TO MEET AND CONFER WITH COUNSEL.

16        THE PHOTO LOG -- THE DEFENSE REQUESTS A PHOTO LOG OF

17   THE SAN CLEMENTE SEIZURES FROM THE DEFENDANT'S CASE FOLDER.

18   LET'S SEE HERE.  I REVIEWED THE RESPONSE.

19        HERE, I'M GOING TO REQUEST -- DIRECT AN INSPECTION

20   AGAIN, AND IF THAT INSPECTION -- EXCUSE ME, IF THAT

21   INSPECTION LEADS TO WHERE YOU WANT A FORENSIC PERSON TO LOOK

22   AT THE PHOTO LOG, I DON'T KNOW WHAT THE PHOTO LOG IS, BUT TO

23   MEET AND CONFER FOR AN INSPECTION OF THAT PHOTO LOG, AND THEN

24   TO FOLLOW UP FROM THERE AND SEE WHERE YOU CAN GO WITH IT.

25   OTHERWISE, BRING IT BACK TO MY ATTENTION.  ALL RIGHT.  SO THE

1  COURT IS ORDERING AN INSPECTION AT THIS POINT.

2  THE LAST MATTER IS DEALING WITH THE DISCLOSURE OF

3  CONFIDENTIAL INFORMANT POSSESSING INFO RELATIVE TO

4  CREDIBILITY OF SANCHEZ.  I THINK WE'VE COVERED THESE AREAS.

5  MR. STEWART:  YES, YOUR HONOR.

6  THE COURT:  WE'VE COVERED THAT.

7  DOES THAT HANDLE THE MATTERS ON YOUR LIST FOR MOTION

8  TO COMPEL?

9  MR. STEWART:  IT DOES, YOUR HONOR.  THANK YOU VERY

10  MUCH.

11  THE COURT:  ALL RIGHT.  COUNSEL, I KNOW YOU'VE

12  TRAVELED A MIGHTY LONG WAY TO BE HERE TODAY.  WE HAVE AN

13  ISSUE TO DEAL WITH -- IS THERE AN ISSUE WITH RESPECT TO

14  EXPERTS?

15  MR. RAPP:  WELL, FROM OUR PERSPECTIVE, JUDGE, THERE

16  IS ONLY ONE EXPERT THAT REALLY WE'RE CONCERNED ABOUT.  AND AS

17  THE COURT KNOWS, THIS CASE HAS BEEN CONTINUED FOR ONE EXPERT

18  ONLY, AND THAT IS THE DEFENSE FINANCIAL EXPERT.

19  IF THE COURT RECALLS FROM THE VARIOUS STATUS

20  CONFERENCES, THERE HAS BEEN MANY A REPRESENTATION BY THE

21  DEFENSE THAT THEY HAVE AN EXPERT, THEY HAVE RETAINED AN

22  EXPERT, THIS EXPERT IS WORKING DILIGENTLY, THIS EXPERT IS

23  DOING A FINANCIAL ANALYSIS, A DEPOSIT-BY-DEPOSIT ANALYSIS.

24  AND I THINK THE COURT WOULD HAVE TO AGREE THAT THE EXPERT

25  NOTICE WITH RESPECT TO THAT EXPERT, THE INITIAL EXPERT NOTICE

1   WAS PRETTY DEFICIENT.  IT DIDN'T GIVE US ANY INFORMATION

2   ABOUT THIS EXPERT.

3          WE CALLED THAT EXPERT, AND THIS EXPERT KNOWS ALMOST

4   NOTHING ABOUT THIS CASE.  HE HAS NO FINANCIAL DOCUMENTS.

5   NOTHING.  SO THE DEFENSE FILED A SUPPLEMENT IN RESPONSE, AND

6   THE SUPPLEMENTAL NOTICE AS TO MICHAEL B. HANDELMAN.

7   MR. HANDELMAN IS A SUPPLEMENTAL EXPERT TO THE INDIVIDUAL

8   MR. DUREN HAD ORIGINALLY BELIEVED WOULD TESTIFY AS TO

9   MR. DUREN'S FINANCIALS AND TAXES IS THIS CASE.  I THINK THEY

10  MEANT "IN THIS CASE."

11         MR. HANDELMAN IS ONE OF THE CERTIFIED PUBLIC

12  ACCOUNTANTS WHO HAD BEEN PREPARING MR. DUREN'S TAX FILINGS,

13  2011 TO PRESENT.  MR. HANDELMAN WILL TESTIFY AS TO THE MANNER

14  IN WHICH MR. DUREN'S TAXES WERE PREPARED, INCLUDING THE

15  SOURCES OF INFORMATION THAT WERE USED TO PREPARE THOSE TAXES,

16  AND THAT THOSE TAXES WERE PREPARED USING REGULARLY ACCEPTED

17  ACCOUNTING PRINCIPLES.

18         JUST AS AN ASIDE, THE LAST TIME MR. DUREN FILED

19  TAXES WAS IN 2008, 2009.  SO IT'S REALLY UNCLEAR WHAT TAXES

20  THEY ARE TALKING ABOUT HERE, BUT I GO ON.

21         MR. HANDELMAN WILL TESTIFY AS TO HIS EXAMINATION OF

22  MR. DUREN'S OTHER FINANCIAL DOCUMENTATION.

23         SO WE E-MAILED MR. HANDELMAN ON FRIDAY, DECEMBER

24  8TH, AND THIS IS A RESPONSE TO AGENT THOMAS MILLER.  THOMAS,

25  NOTHING HAS CHANGED SINCE OUR LAST COMMUNICATION.  I HAVE NOT

1  COMMUNICATED ABOUT OR BEEN RETAINED TO PREPARE ANY TAX

2  RETURNS.

3        SO I MEAN, THERE IS THESE OTHER EXPERTS; I'M NOT

4  THAT CONCERNED ABOUT THEM.  I CAN'T IMAGINE A WORLD WHERE

5  SOME OF THESE EXPERTS WOULD BE ABLE TO TESTIFY.  SOME ARE

6  GIVING SORT OF GENERAL INFORMATION ABOUT GAMBLING.  NOTHING

7  REALLY TO DO WITH MR. DUREN.  ONE EXPERT IS PROPOSED TO

8  TESTIFY ABOUT HIS OWN PROPERTIES IN PHILADELPHIA, AND I'M NOT

9  SURE WHAT THE RELEVANCE IS.  WE WILL TAKE CARE OF THAT AT

10  TRIAL.

11        BUT THIS CASE HAS BEEN CONTINUED FOR THIS FINANCIAL

12  EXPERT, AND I'M TOLD JUST BEFORE WE CAME IN HERE BY MR. KIRBY

13  THAT THIS REALLY ISN'T THE EXPERT THAT'S BEEN DOING THE

14  ANALYSIS.  SO I'VE BEEN TOLD THAT IT IS ACTUALLY A GENTLEMAN

15  BY THE NAME OF STEPHEN CORSO WHO HAS BEEN DOING THE ANALYSIS.

16  AND I GUESS MR. HANDELMAN, WHO HAS NOT RECEIVED ONE DOCUMENT,

17  HE'S EXPECTED TO TESTIFY TO THAT.

18        OF COURSE, WE'D LIKE TO BE NOTICED AS TO WHO THE

19  EXPERT IS AND WHAT THEY DID TO COME UP WITH THE FINANCIAL

20  ANALYSIS, BUT THE ONLY STEPHEN CORSO WE CAN FIND IN THIS AREA

21  IS A STEPHEN P. CORSO.  HE ALSO GOES BY STEPHEN JOHN CORSO.

22  HIS OFFICE IS IN ENCINITAS AND THEN ORANGE COUNTY, AND HE'S

23  BEEN CONVICTED OF FRAUD.

24        SO WE'D REALLY LIKE TO KNOW WHO THE FINANCIAL

25  ANALYST IS, BECAUSE THE CASE KIND OF RISES AND FALLS ON THE

1   FLOW OF MONEY.  WE HAVE PROVIDED THREE EXPERTS.  WE PROVIDED

2   SUMMARY CHARTS.  WE PROVIDED A GREAT DEAL OF DETAIL ABOUT THE

3   TRACING OF THE MONEY, AND WE'VE GOT -- RECEIVED NOTHING FROM

4   THE DEFENSE.  SO THAT'S OUR REALLY ONLY GRIPE ABOUT THE

5   EXPERT NOTICE.

6          THE COURT:  ALL RIGHT.  ANY RESPONSE?

7          MR. KIRBY:  YES, YOUR HONOR.

8          FROM THE BEGINNING, MR. CORSO HAS BEEN TAKING THE

9   LABORING OAR ON PREPARING MR. DUREN'S FINANCIALS.

10  MR. HANDELMAN IS AN INDIVIDUAL THAT, QUITE FRANKLY, I HAD NOT

11  DEALT WITH BECAUSE HE WORKED FOR MR. CORSO AND HAD BEEN DOING

12  DISCRETE TASKS RELATED TO MR. DUREN'S TAXES DURING THE TIME

13  PERIOD THAT MR. CORSO WAS DOING THE GENERAL FINANCIAL

14  ANALYSIS.

15         NOW, MR. CORSO PROBABLY -- HAS PROBABLY DONE 80

16  PERCENT OF THE WORK, WITH MR. HANDELMAN DOING THE OTHER 20.

17  FOR OBVIOUS REASONS, I'D RATHER USE MR. HANDELMAN AS THE

18  EXPERT.  HE HAS WORKED ON THE CASE.  AND I THINK HE CAN

19  FAMILIARIZE HIMSELF ENOUGH WITH THE WORK THAT MR. CORSO HAS

20  ALSO DONE TO BE THE FINANCIAL EXPERT IN THIS CASE.

21         BUT AS TO WHETHER THEY HAVE BEEN WORKING STEADILY,

22  THEY HAVE BEEN WORKING STEADILY ON THE FINANCIAL ANALYSIS.  I

23  INQUIRED AS TO WHY IT IS TAKING SO LONG AND WAS TOLD THAT

24  DOING THIS ANALYSIS, BASICALLY THEY ARE DEALING WITH EIGHT --

25  AN EIGHT-YEAR TIME PERIOD WITH 32 SEPARATE ENTITIES WHICH

1    RELATE TO EACH GROUPING OF HOUSES THAT MR. DUREN OWNED, AND

2    THAT THERE ARE NUMEROUS, SMALL TRANSACTIONS THAT ARE BEING

3    DEALT WITH, AND THAT'S WHY IT'S TAKING SO LONG, YOUR HONOR.

4         THE COURT:  THE GOVERNMENT REPRESENTS THAT THIS

5    HANDELMAN GUY DOESN'T HAVE ANY INFO.

6         MR. KIRBY:  AND I INQUIRED OF MR. CORSO AS TO HOW

7    THAT COULD BE, AND MR. CORSO TOLD ME THAT HE HAS BEEN GIVING

8    HIM DISCRETE TASKS, NUMBERS TO WORK WITH ON QUICKBOOKS AND

9    THINGS LIKE THAT.  AND MR. DUREN'S NAME MAY NOT HAVE BEEN ON

10   ANY OF THAT DOCUMENTATION.

11        THE COURT:  WHEN WAS THE CUTOFF FOR THE EXPERT?

12        MR. RAPP:  JUDGE, I DON'T HAVE THAT DOCUMENT, BUT

13   THE CUTOFF PURSUANT TO THE COURT-ORDERED SCHEDULING ORDER WAS

14   I BELIEVE --

15        THE COURT:  I THINK I EXTENDED THIS FALL OR LATE

16   SUMMER.

17        MR. RAPP:  YOU'RE RIGHT.  NO, NO.  YOU'RE RIGHT.

18   OCTOBER 9TH.

19        THE COURT:  DID YOU NOTICE THE CPA BY OCTOBER 9TH?

20        MR. STEWART:  YEAH.

21        MR. KIRBY:  YES, WE DID.

22        THE COURT:  YOU CHALLENGE THE QUALIFICATIONS -- YOU

23   RECEIVED THE NOTICE, BUT CHALLENGE THE QUALIFICATIONS?

24        MR. RAPP:  WELL, I DON'T HAVE ANY QUALIFICATIONS OF

25   HIM.  I DON'T HAVE A C.V.  I DON'T HAVE ANYTHING.

1    BUT WHAT I DO KNOW IS MY AGENT HAS ACTUALLY TALKED

2    TO HIM, WHICH BY THE WAY WOULD BE MORE THAN MR. KIRBY DID,

3    AND HE'S NEVER HEARD OF MR. DUREN.  HE DOESN'T -- JUDGE, WHAT

4    HE'S TELLING US IS QUITE AT ODDS WITH WHAT MR. KIRBY IS

5    SAYING.  HE'S NOT SAYING HE'S BEEN GIVEN DISCRETE TASKS.

6    HE'S SAYING HE'S NEVER BEEN RETAINED.  HE DOESN'T EVEN KNOW

7    MR. DUREN.

8         THE COURT:  WHICH ONE?

9         MR. RAPP:  MR. HANDELMAN.

10        THE COURT:  OKAY.  THE OTHER GENTLEMAN, WHAT ABOUT

11   THE OTHER GENTLEMAN?

12        MR. RAPP:  THE FIRST TIME I HEARD OF MR. CORSO WAS

13   ABOUT 12 MINUTES -- WELL, ABOUT AN HOUR AGO.  THAT HAS NEVER

14   BEEN DISCLOSED TO US.  I CAN ONLY INFER THAT THIS MR. CORSO

15   IS THE SAME MR. CORSO WHO HAS BEEN CONVICTED OF FRAUD, WHICH

16   MIGHT BE THE REASON THEY WOULDN'T WANT TO PUT HIM ON THE

17   STAND.

18        BUT, LOOK, THEY HAVE REPRESENTED TWICE IN PLEADINGS

19   THAT MR. DUREN IS GOING TO FILE HIS TAXES.  HE'S NOT GOING TO

20   FILE HIS TAXES.  HE CANNOT FILE HIS TAXES BECAUSE HE'S UNABLE

21   TO TRACE THE MONEY TO A LEGITIMATE SOURCE.  WE HAVE BOTH OF

22   THE CPA'S WHO HAVE EVALUATED MR. DUREN'S FINANCIAL PICTURE

23   DURING THE RELEVANT TIME PERIOD.  THEY ARE NOT TESTIFYING FOR

24   THE DEFENSE.  THEY ARE TESTIFYING FOR US.  AND THEY ARE GOING

25   TO TESTIFY THAT MR. DUREN IS INCAPABLE OF PROVIDING THEM

1    SUPPORTING DOCUMENTS FOR THESE LARGE CASH DEPOSITS IN HIS

2    ACCOUNT.

3         SO THE NOTICE IS DEFICIENT.  IT'S NOT CONSISTENT

4    WITH THE INFORMATION WE'RE GETTING.  WE'RE -- IN FAIRNESS TO

5    MR. KIRBY, WE'RE ACTUALLY TALKING TO THIS GENTLEMAN, AND HE'S

6    SAYING HE DOESN'T KNOW ANYTHING ABOUT MR. DUREN.  SO

7    OCTOBER 9TH WAS THE CUTOFF, THAT'S IT.  IT'S NOT MR. CORSO.

8    ALTHOUGH, YOU KNOW, IF MR. HANDELMAN WERE TO TRY TO IN SOME

9    FASHION RELY UPON MR. CORSO'S EVALUATION, WE, OF COURSE, HAVE

10    PROBLEMS WITH THAT.

11         THE COURT:  SIR.

12         MR. STEWART:  YOUR HONOR, IF I MAY JUST JUMP IN

13    THERE, YOUR HONOR.

14         SO I GUESS TWO THINGS:  ONE, THE ISSUE IS WE HAVE

15    NOTICED AN EXPERT WHO WE UNDERSTAND TO BE WORKING ON

16    MR. DUREN'S TAXES.  WE DO UNDERSTAND THAT WE BELIEVE -- WE

17    UNDERSTAND THERE ARE TWO PEOPLE WHO ARE WORKING IN

18    CONJUNCTION ON THOSE TAXES.  NOW, HOW THE LABOR IS DIVIDED

19    AND WHO IS DOING WHAT, WE'RE NOT QUITE SURE.

20         BUT IN TERMS OF THE NOTICE, WE THINK THAT WE'VE

21    CERTAINLY IN GOOD FAITH MADE NOTICE.  I UNDERSTAND THE

22    GOVERNMENT PERHAPS NEEDS MORE DETAILS.  GIVEN THE TRIAL

23    SCHEDULE THAT WE HAVE, YOUR HONOR, IT CAUSES NO PREJUDICE I

24    DON'T THINK AT THIS POINT FOR THE GOVERNMENT IF WE NEED TO

25    FURTHER DETAIL OR DISCLOSE; I WOULD JUST ASK FOR LEAVE FOR US

1    TO DO THAT.

2          GIVEN THE TRIAL SCHEDULE, THERE IS NOT GOING TO BE

3    ANY PREJUDICE HERE.  AND I THINK GIVEN ALL THE OTHER WORK

4    THAT WE'VE BEEN DOING, PARTICULARLY AS OF LATE, WE ARE

5    SHOWING THAT WE ARE REALLY IN GOOD FAITH PROGRESSING THIS

6    CASE ALONG NOW.  AND THERE WILL BE NO PREJUDICE, IF, IN FACT,

7    WE NEED TO PROVIDE A MORE FULL DISCLOSURE WITH REGARD TO THE

8    FINANCIAL EXPERT.

9          BUT AGAIN, YOUR HONOR, IT IS OUR UNDERSTANDING THAT

10   MR. DUREN'S -- AT LEAST SEVERAL YEARS' WORTH OF MR. DUREN'S

11   TAXES SHOULD BE FILED VERY SOON.  THAT'S THE INFORMATION THAT

12   WE'RE GETTING BACK.  AND WE BELIEVE THAT TO BE THE CASE.

13         I UNDERSTAND THAT THERE IS SOME DISCREPANCIES HERE

14   THAT WE NEED TO SORT THROUGH, AND WE CAN IF THE COURT GIVES

15   US LEAVE.  BUT I DON'T THINK THERE IS ANY PREJUDICE HERE AT

16   THIS POINT IF THE COURT GIVES A LITTLE BIT MORE TIME TO KIND

17   OF SORT THROUGH THESE ISSUES.

18         SO WE WOULD REQUEST LEAVE, A LITTLE BIT OF LEAVE,

19   YOUR HONOR, TO SORT THROUGH THIS ISSUE SO THAT WE CAN INQUIRE

20   WHO IS DOING EXACTLY WHAT IN THIS PROCESS, BECAUSE WE MAY NOT

21   HAVE ALL THE INFORMATION THAT WE NEED.

22         MR. KIRBY:  WELL, YOUR HONOR, I DO KNOW THAT

23   MR. CORSO HAS BEEN WORKING ON THESE TAXES DILIGENTLY.  I HAVE

24   BEEN --

25         THE COURT:  DOES THIS MAN HAVE A LICENSE, WITH A

1  FRAUD CONVICTION?

2       MR. KIRBY:  YOUR HONOR, I'M NOT SURE, QUITE FRANKLY.

3  THE FRAUD CONVICTION IS EIGHT YEARS OLD.

4       THE COURT:  I'M SORRY?

5       MR. KIRBY:  IT'S EIGHT YEARS OLD.

6       THE COURT:  EIGHT ZERO?

7       MR. KIRBY:  EIGHT YEARS.

8       THE COURT:  OH, WHAT HE'S WORKING ON?

9       MR. KIRBY:  NO.  THE CONVICTION.

10       THE COURT:  OH.

11       MR. KIRBY:  IN ANY EVENT, YES, YOUR HONOR.  I MEAN,

12  THERE IS SEVERAL PEOPLE WORKING ON MR. DUREN'S TAXES.

13  OBVIOUSLY, WE WOULD LIKE THE PERSON WHO DOESN'T HAVE A

14  CONVICTION TO TESTIFY AS TO THE TAX ISSUES.  IF WE NEED TO

15  USE MR. CORSO, THEN WE NEED TO USE MR. CORSO.

16       THE COURT:  HERE WE ARE.  HERE WE ARE.  NO CORSO.

17  HE WASN'T NOTICED.  THIS OTHER GENTLEMAN, YOU NOTICED HIM.

18       I'M GOING TO SET IT FOR A MOTION IN LIMINE ON THE

19  EXPERT TO FLESH IT OUT EARLY.  AND IF HANDELMAN, WHAT'S HIS

20  NAME, IF HE'S NOT IN, HE'S OUT, THERE IS NO OTHER EXPERT.

21  REBUTTAL, THAT'S ANOTHER ISSUE TO DISCUSS.

22       BUT THIS GENTLEMAN THAT YOU'RE REFERRING TO NOW WAS

23  NOT NOTICED BY OCTOBER 9TH.  HE'S OUT.  SO IF THIS OTHER

24  GENTLEMAN, HANDELMAN, WHATEVER HIS NAME IS -- IT'S GETTING

25  LATE; I'M SORRY -- IF HE DOESN'T QUALIFY AFTER MOTION IN

1    LIMINE, HE'S OUT.  AND THERE YOU ARE.  THAT'S YOUR CASE.

2             THE TRIAL IS NOT GOING TO BE CONTINUED.

3             MR. KIRBY:  I UNDERSTAND.

4             THE COURT:  WE'RE ON OUR WAY.

5             MR. KIRBY:  I'M NOT ASKING FOR THAT.

6             THE COURT:  OKAY.  I'D RATHER DO THIS SOONER THAN

7    LATER SO WE CAN GET THIS ISSUE RESOLVED, ONE WAY OR ANOTHER.

8    AND I'M NOT DISCOUNTING THE GOVERNMENT'S INVESTIGATION HERE.

9    I THINK THAT GOES MORE TO PRECLUSION AT THIS POINT, IN MY

10   MIND.  IF THE NOTICE WAS GIVEN, LET'S DEAL WITH -- IF THERE

11   IS GOING TO BE A PRECLUSION ISSUE, LET'S DEAL WITH IT SOON.

12   ALL RIGHT.

13            FEBRUARY 11TH.

14            MR. KIRBY:  I'M SORRY.  FEBRUARY 11TH?

15            THE COURT:  FEBRUARY 11TH.  HOLD ON.  LET'S SEE.

16   LET ME DOUBLE-CHECK.

17            FRIDAY, THE 15TH, FEBRUARY 15TH.  THE AFTERNOON IS

18   BETTER, COUNSEL TO THE GOVERNMENT, AS FAR AS TRAVEL AND SUCH?

19            MR. RAPP:  LATE MORNING WOULD BE FINE.

20            THE COURT:  ALL RIGHT.

21            MR. STEWART:  THANK YOU, YOUR HONOR.  THAT WORKS.

22            THE COURT:  IS THAT A GOOD DATE?

23            MR. STEWART:  YES, YOUR HONOR.  THANK YOU.

24            THE COURT:  11:00 A.M.  11:00 A.M.  LET'S GET THAT

25   ISSUE RESOLVED SO WE CAN MOVE ON, COUNSEL.

1          BUT THERE IS NO NOTICING ANYONE ELSE.  YOU PASSED

2     THE DEADLINE FOR NOTICING AN EXPERT.  THIS IS THE ONLY PERSON

3     NOTICED.  WE'LL DETERMINE WHETHER OR NOT HE'S IN.  ALL RIGHT.

4          AND AS WITH LAWYERS, WE HAVE NO LOCAL RULE ON THIS,

5     BUT THIS COURT'S LOCAL RULES DO NOT PERMIT GHOSTWRITING, FOR

6     SOMEONE WHO IS NOT IN THE CASE, NOT OF RECORD TO PRESENT FOR

7     SAY EVEN A PRO SE PERSON TO WRITE AND THAT INITIAL PERSON

8     ISN'T SUBJECT TO THE RULES OF THE STATE OF CALIFORNIA

9     CERTIFICATION RULES OR WHATEVER THE CIRCUMSTANCE IS.

10         THE COURT -- I CAN JUST SHARE THAT THE COURT IS NOT

11    OF THE MIND FOR A GHOSTWRITER AND HAVE A MOUTHPIECE TO COME

12    IN AND PRESENT.  IT'S GOT TO BE MORE SUBSTANTIAL THAN THAT.

13    ALL RIGHT.

14         I REALLY NEED TO GO FOR THE DAY.  AND IF YOU WOULD

15    LIKE, WE CAN SET UP A STATUS CONFERENCE TO SEE WHAT ELSE IS

16    OUTSTANDING THAT WE HAVEN'T TOUCHED ON TODAY, OR WE CAN

17    HANDLE IT ON THE 11TH OF FEBRUARY.

18         MR. RAPP:  15TH.

19         MS. MARSH:  15TH.

20         THE COURT:  15TH OF FEBRUARY.

21         MR. STEWART:  YOUR HONOR, ON THE 15TH OF FEBRUARY,

22    WOULD THE COURT BE WILLING TO ADDRESS THE MOTION FOR BILL OF

23    PARTICULARS?

24         THE COURT:  YES.  LET'S DO THAT THEN, TOO.

25         MR. STEWART:  THANK YOU, YOUR HONOR.

1        THE COURT:  LET'S MOVE IT UP TO -- THAT'S A MOVE UP;

2   RIGHT?

3        MR. STEWART:  YES, YOUR HONOR.

4        THE COURT:  YEAH.  LET'S ADVANCE THE MOTION FOR BILL

5   OF PARTICULARS TO THE SAME DATE.

6        MR. RAPP:  JUDGE, I THINK THERE IS A MARCH 25TH

7   MOTION-IN-LIMINE DATE.  IS THAT STILL IN PLACE OR IS THAT

8   BEING ACCELERATED?

9        THE COURT:  I'M NOT MOVING EVERYTHING UP.  LET'S

10  JUST DEAL WITH THE EXPERT NOW AND LET'S DEAL WITH THE BILL OF

11  PARTICULARS, TOO, SINCE IT'S BRIEFED.  THIS IS JUST A LIMITED

12  MOTION IN LIMINE TO DEAL WITH THIS EXPERT ISSUE.  IT'S BEEN A

13  MATTER THAT'S CAUSED THIS CASE TO BE CONTINUED.  LET'S GET

14  THAT OUT OF THE WAY, AND THEN WE'LL KEEP THE OTHER

15  MOTION-IN-LIMINE SESSION.

16        MR. STEWART:  THANK YOU, YOUR HONOR.

17        THE COURT:  ALL RIGHT.

18        MR. RAPP:  THANK YOU, YOUR HONOR.

19        MS. MARSH:  THANK YOU, YOUR HONOR.

20        THE COURT:  OKAY.  WE'RE IN RECESS.

21        THANK YOU FOR YOUR PATIENCE, COUNSEL.

22        (PROCEEDINGS CONCLUDED AT 5:30 P.M.)

23                          --OOO--

24

25

C E R T I F I C A T I O N

     I HEREBY CERTIFY THAT I AM A DULY APPOINTED, QUALIFIED AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED STATES DISTRICT COURT; THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE PROCEEDINGS HAD IN THE AFOREMENTIONED CAUSE; THAT SAID TRANSCRIPT IS A TRUE AND CORRECT TRANSCRIPTION OF MY STENOGRAPHIC NOTES; AND THAT THE FORMAT USED HEREIN COMPLIES WITH THE RULES AND REQUIREMENTS OF THE UNITED STATES JUDICIAL CONFERENCE.

     DATED:  DECEMBER 30, 2018, AT SAN DIEGO, CALIFORNIA.

                   S/CAMERON P. KIRCHER
                   CAMERON P. KIRCHER