1             IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3  UNITED STATES OF AMERICA,     )
                            )  No. 3:16-CR-02892-JAH

4          Plaintiff,     )
                            )

5  v.                    )  April 4, 2019
                            )

6  TYRONE CEDRIC DUREN,       )
                            )  Courtroom 13B

7          Defendant.     )
  _____)  San Diego, California

8

9                TRANSCRIPT OF PROCEEDINGS

10               (Motions Hearing)

11     BEFORE THE HONORABLE JOHN A. HOUSTON, DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22  COURT REPORTER:         AMANDA M. LeGORE
                        RDR, CRR, CRC, FCRR, CACSR

23                      U.S. District Court
                        333 West Broadway, Suite 420

24                      San Diego, CA 92101
                      amanda_legore@casd.uscourts.gov

25

```
 1   APPEARANCES:
     FOR THE PLAINTIFF:        ABBIE BROUGHTON MARSH
 2                             Assistant U.S. Attorney
                               U.S. Attorney's Office
 3                             40 N. Central
                               Phoenix, AZ  85004
 4                             (602)514-7500

 5

 6                             KEVIN RAPP
                               Assistant U.S. Attorney
 7                             U.S. Attorney's Office
                               Southern District of California
 8                             880 Front Street, Room 6293
                               San Diego, CA  92101-8893
 9                             (619)557-5610

10

11   FOR THE DEFENDANT:        MARCEL STEWART
                               Attorney at Law
12                             600 B Street, Suite 2100
                               San Diego, CA  92101
13                             (619)702-4123

14

15                             JOHN KIRBY
                               Attorney at Law
16                             110 West A Street, Suite 1100
                               San Diego, CA  92101
17                             (619)557-0100

18

19

20

21

22

23

24

25
```

```
 1              (Thursday, April 4, 2019; 9:57 a.m.)

 2

 3                      P R O C E E D I N G S

 4

 5          THE CLERK:  All right.  This is No. 2 on the

 6   calendar.  It's 16-CR-2892, United States of America versus

 7   Tyrone Cedric Duren.

 8          MR. RAPP:  Good morning.  Kevin Rapp and Abbie Marsh

 9   on behalf of the United States.

10          THE COURT:  Good morning.

11          MR. KIRBY:  Good morning, your Honor.  Marcel Stewart

12   and John Kirby on behalf of Mr. Duran, who is before the Court,

13   on bond.

14          THE COURT:  Good morning.  Good morning, sir.

15          Counsel -- Mr. Stewart, I understood you were in

16   another courtroom.

17          MR. KIRBY:  I was, your Honor.  I apologize.  I

18   failed to give Mr. McDowell advance notice of that.  I was

19   before Judge Gallagher.

20          THE COURT:  All right.  And, Mr. Kirby, I understand

21   you were outside with your client?

22          MR. KIRBY:  Yes, your Honor.  I was waiting for Mr.

23   Stewart.

24          THE COURT:  Both of you should have advised

25   Mr. McDowell.  I have a very tight calendar today, and it's
```

1   going to significantly impact the work of the Court today since
2   we're starting in -- a half an hour late here.

3           We're going to do what we can, but I need to handle
4   some other matters timely.  I cannot -- I will not be able to
5   handle this matter straight through, in light of, you know, the
6   balance of my calendar.  We'll -- we'll do what we can.  But
7   both of you have been practicing in this district long enough
8   to know to check in.  And it's an inconvenience to counsel.
9   It's been a terrible inconvenience to the Court this morning.

10          We'll proceed with the matters as we can get to them
11  at this time.  Okay?

12          MR. STEWART:  Thank you, your Honor.

13          THE COURT:  We're here for substantive motions and
14  motions in limine.

15          It's my view that we should go through with the
16  substantive motions first.  But before we do, there's one
17  administrative matter.

18          I understand there's been some inquiry with respect
19  to the results of the questionnaire and the notice that was
20  mailed out by the jury administrator.  The jury administrator
21  sent out 500 notices and questionnaires.  There have been 65
22  responses and 27 yeses for the time frame.

23          The deadline for responses is Monday, May 8th.

24          THE CLERK:  April 8th.

25          THE COURT:  I'm sorry?

1          THE CLERK:  April.

2          THE COURT:  April 8th?

3          THE CLERK:  Yeah, April 8th.

4          THE COURT:  The deadline for the responses is April

5     8th, yes.  So we have a few days to go.

6          The Court will endeavor to review the negatives, some

7     38 negative responses before it leaves the district, to

8     determine whether or not those persons should appear anyway.

9          We will have a tally on -- a final tally on Monday --

10    or shortly after Monday the 8th as to the number of persons who

11    say yes.

12         My thinking is the Court will review any other noes

13    remotely and coordinate with the jury administrator in that

14    regard, who is told not to recognize the noes.  That's the

15    Court's practice, is not to allow counsel to -- to intervene

16    with respect to the no responses.  And if we are short, the

17    Court may direct the jury administrator to bring in more people

18    on May 7th, to make sure we have enough here to select a panel.

19         I've directed the jury administrator to provide you

20    with the yeses and the questionnaires after the full tally in

21    May, May 8th.  We'll go through the full tally to provide the

22    yes responses and also the responses to the questionnaires as

23    soon as they're collected and collated and -- and they're able

24    to be distributed; perhaps electronically to you, in that

25    regard.

1     Second housekeeping issue is that trial is set to

2  start on May 7th.  The Court has an administrative matter it

3  must deal with on May 9th.  We have interviews for a new

4  magistrate judge, and that practice takes all morning.

5  Sometimes to 12:30 or one o'clock.  We begin interviewing in

6  the morning.  And by 1:00, or so, we select the next judge, and

7  then we go back to work.

8     The question becomes whether or not we take a break

9  for the rest of the day in case I'm delayed and the jury is in

10  the hallway.  Or -- or we -- or we have the jury come in at

11  1:30, or so, for three and a half or so hours that day.

12     We can discuss that matter -- give that some thought

13  and discuss that at the end of the hearing.

14     Let's start with the substantive motions.  The

15  defendant has filed substantive motions to be heard today.

16     I've reviewed the motions, response, and reviewed the

17  pleadings in this regard.

18     I would like to hear from the defendant first with

19  respect to the motion to strike Sanchez's deposition due to

20  violation of rule -- of Rule 16, *Brady* and *Jencks*.

21     MR. STEWART:  Yes, your Honor.

22     Your Honor, we believe that we've made a very strong

23  case that the Government has violated not one but all three of

24  the important rules concerning discovery:  Rule 16, the -- the

25  *Brady* rule, as well as the *Jencks* rule.

1          Consequently, we believe it would be very, very

2    difficult to, in our opinion, your Honor, you know -- well,

3    we -- we strongly believe that striking the deposition

4    testimony is the only fair and just resolution of this matter.

5          With regard to Rule 16, the Government -- let me just

6    set the stage, your Honor.

7          This particular interview, although we're not --

8    we're -- we're not accusing the Government of bad faith.  But I

9    just want to be clear about something, so that everyone

10   understands the timing of this.  That -- that Mr. Duran's

11   defense has requested this interview multiple times throughout

12   these proceedings.  The Government has claimed that this

13   interview was unrecoverable.

14         It wasn't until I filed a supplemental motion very

15   late in the proceedings, after this interview had been

16   requested several times by the defense, and the Court actually

17   ruled on that motion, ordering at that time the Government to

18   provide over the device that has the corrupted audio.

19         Well, what the Government provided, magically, was --

20   the Government had the device.  But the Government came better

21   than that.  Magically, the Government came with the actual

22   recovered audio.

23         Now, we're not claiming any bad faith.  But I will

24   just say, your Honor, that through the majority of this case

25   with the defense requesting the audio, it was unrecoverable.

And somehow after the Court ordered that we receive the device, it becomes recoverable. Okay?

So, at a minimum, what I will argue, your Honor, is that the Government was not diligent. Was not diligent in trying to recover that audio device and provide it as required to the defense.

So we're not arguing bad faith. We are arguing clearly a lack of diligence. And the Court ordering the turning over of that device, resulting in the Government being more diligent, and then the defense receiving the material.

Clearly the material is Rule 16, which is necessary for the preparation of defense because Sanchez -- no one can dispute that Sanchez is one of the Government's key witnesses. Sanchez is the only percipient witness that alleges that they observed Mr. Duren still in line. Right? So he's percipient. He's a confidential source. He's clearly material -- okay? -- to the Government's -- to the Government's case. And he's material, therefore, to the defense.

Now, because there was a deposition the defense fully should have been given all of the material relevant to cross-examine Mr. Sanchez.

THE COURT: What did you have? What material did you have?

MR. STEWART: Well, your Honor, we did have other interviews that Mr. Sanchez had done. But, to our knowledge,

1    we were not aware of any other interviews where Mr. Sanchez was

2    threatened.

3           And so we did not know -- we did not have the

4    information available to us that -- based on what we now have,

5    that we believe that Mr. Sanchez had an extreme mode of

6    self-interest due to the threats of incarceration, due to the

7    threats of his papers being taken, due to the threats that his

8    family would not be able to come in, due to the threats that he

9    would be able to withheld -- be held until some unknown period

10   of time.  So we were not able to question Mr. Sanchez to that

11   extent, based on his -- the threats that were leveled by the

12   Government against him in terms of his motivation and the

13   extent of his motivation to provide testimony that we believe

14   is favorable to the Government.

15          With regard to *Brady* -- the beautiful thing about

16   *Brady*, your Honor, is that it doesn't require bad faith.  All

17   it requires is that the Government fail to provide information

18   that -- in this case -- *Brady* and *Giglio* impeachment

19   information that goes to both credibility and motives and bias

20   of the witness.  I think it's very, very clear that it's *Brady*

21   when you have an interview where the witness is -- is

22   threatened.

23          And I think any other reading of -- of -- of those

24   multiple instances, your Honor, we would argue would be --

25   would be just not based on the reading of the transcript.  That

1  Mr. Sanchez was threatened multiple times.

2       Here's the other thing, though, your Honor.  Okay.

3  The Government couldn't recover the -- the audio until some

4  later date.  Fine.  But the Government knew that Agent Weaver,

5  one of its case agents, was in the interview.  And the

6  interview report doesn't talk anything about these threats.

7       So the Government had an opportunity not just by

8  virtue of an audio recording but by virtue of an interview

9  report that shows some fidelity and some honesty to what

10  occurred to list it in there.  And the Government failed to do

11  that as well.

12       So the Government had multiple bites at the apple, at

13  relaying this information, and simply failed to do it.

14       And so the Government's report does not do fidelity,

15  and does not provide the essential information, which is *Brady*.

16  That's the Government's obligation.  And if its agent -- case

17  agent is in there, then the Government knows about it.  Whether

18  the Government was able to recover the audio or not, it knew

19  about it because the Government's agent was in there -- case

20  agent was in there.  And yet they failed to put it in their

21  report so the defense would be aware of it.

22       Again, we're not arguing bad faith because it's not

23  necessary.  All that's necessary is that the -- the Government

24  failed to timely provide.

25       Next, your Honor, we get to *Jencks*.  *Jencks* is as

clear as day.  The testimony that was given was in lieu of
trial testimony.  It was under oath, under the penalty of
perjury, to be used at -- at -- in anticipation of this
particular trial.

Consequently, the Government had an obligation,
immediately upon the conclusion of Mr. Sanchez's testimony, to
provide the defense with his prior -- with all of his prior
statements.

Well, the Government --

THE COURT:  Excuse me.  I take it that the
Government, at that time, is of the impression that the disk
was -- that the audio file was corrupt.

MR. STEWART:  And, again, your Honor, we won't accuse
the Government.  But we will say, your Honor, that it
nevertheless resulted in the defense not being provided it, and
it ended up being the case that the Government was wrong.

So if the Court has to make a decision on who to
penalize, I would respectfully argue to the Court that the
defense was not in a position to produce it to itself.  The
defense was not in a position to write a more thorough report.
The defense was not the -- the Government had not provided the
defense, at that point, the device.  The defense couldn't have
even tried to recover it.

So if the Court has make a decision about who was
in the position to act or who either failed to act, even if it

1   was by error, that would be the Government.  It certainly

2   wasn't Mr. Duren because Mr. Duren requested the material

3   multiple times.

4          And so, your Honor, the situation we now have is we

5   have, I would argue, indisputably a statement of the witness.

6   That statement has, at all times, been in the possession of the

7   Government.  Not at any time been in the possession of the

8   defense until, I believe, March 6th, 2019.

9          The fact of the matter is that that statement became

10  recoverable after the Court ordered that the Government produce

11  the device, and we've been denied it.

12         And so here's the thing, your Honor.  Your Honor --

13  your Honor can grant our request and the Government still has

14  the opportunity to bring in -- the witness into court -- which

15  is really the best way to -- to produce this witness of this

16  magnitude in this case.

17         So the Court could rule that at that time the

18  Government didn't give us everything that we were entitled to,

19  and the Government gets another bite at the apple.  But to deny

20  the defense -- even when the Government has another bite at the

21  apple, your Honor, there's not much more that we can do to

22  argue that Rule 16 was violated.  And, therefore, as a

23  sanction, we should get this stricken.  That *Brady* was

24  violated.  Therefore, as a sanction, we should get this

25  deposition testimony stricken.  And that *Jencks* was violated.

1    And then we should get testimony stricken.  And then that puts

2    us in a situation where the Government can bring this witness,

3    and then everybody can fully examine this with all of the

4    material and Mr. Duren is not disenfranchised.

5         If the Court failed to do that, and it allows the

6    Government to proceed with this evidence, then the defense is

7    disenfranchised and the Government had another opportunity

8    where they could have presented their witness and it's their

9    burden.

10        So if the Court has to make a weighing decision, we

11   would respectfully argue that we made a good case for a

12   violation of all three of those rules.  That it wasn't

13   Mr. Duren's fault.  That he requested the material multiple

14   times.  And that in granting this sanction, the Government

15   would still be able to produce -- to introduce this evidence

16        So with that, your Honor, we would submit.  Because

17   we have nothing really stronger that we can argue, other than

18   standing on the rules and on -- and on the facts, your Honor.

19   And I think that it would be really minimizing this to -- to

20   think that a confidential source, who is a percipient witness,

21   who was threatened, that shouldn't be produced to the defense.

22        It -- again, we can't argue stronger facts, as it

23   relates to the law.  And the last point, your Honor -- and I'll

24   just reiterate -- that the Government had a second bite at the

25   apple, if the Court chose to grant our motion.  So I would

1   submit on that -- on that, your Honor, with regard to that
2   particular motion.
3            THE COURT:  All right.  Thank you.
4            Counsel.
5            MS. MARSH:  Yes, your Honor.
6        I would like to start, first, by making, I think,
7   some factual corrections for the record.  The case agent who
8   was present -- or the agent who was or agents who were present
9   during the September 23rd interview did not include Agent
10  Weaver, the case agent in this case.  The agents who were
11  present at the September 23rd interview were Border Patrol
12  intel Agents Aron Marcellus and Daniel Rodriguez.
13       They initially came into contact with the witness
14  because he was -- the witness, Mr. Sanchez, was being
15  investigated for alien smuggling.
16       There was an alert regarding him when he crossed into
17  the United States.  And they began interviewing him
18  specifically to gather intelligence and to confront him about
19  the intelligence they had regarding alien smuggling.
20       They were not involved in an investigation in this
21  case that has come before the Court at that time.  They were
22  investigating something entirely different.  So the case agent
23  in this case, Ms. Weaver -- Agent Weaver was not present in
24  this interview.
25       I would also like to list the items that defense

1    counsel was provided prior to the deposition, in some detail.

2    I attached that to our pleadings as Exhibit A.

3         It is a fairly lengthy one-page matrix which

4    summarizes all of the different times that Mr. Sanchez was

5    contacted and interviewed, by whom, what types of report or

6    audio we have regarding each of those interviews.  And it

7    starts with that September 23rd contact.  And defense counsel

8    was on notice that the Government was unable to recover the

9    audio file but was referred to the report prepared by Border

10    Patrol Agent Marcellus regarding these contacts.

11         THE COURT:  I've reviewed Exhibit A.  Okay.

12         MS. MARSH:  So, to that end, there was a dearth of

13    information, really, provided.  There was a great amount of

14    information provided to defense counsel prior to the

15    deposition, which included a report summarizing this interview.

16         And while I acknowledge the report is not a verbatim

17    summary of every statement that was made, the contact was

18    reported and explained in that interview, as was the next

19    interview of Witness Sanchez.  The October 2nd interview, which

20    is detailed in the same report, also attached to our pleadings.

21         That interview was audio recorded and the audio --

22    and not on a corrupt file.  And that audio was produced to

23    defense counsel prior to the deposition.

24         And I would point the Court and counsel to some

25    excerpts from that interview that are included in our

pleadings.  In three different portions of the October 2nd
interview, the Border Patrol agents -- and Agent Marcellus went
by the nickname of Steve when he was doing these intel
interviews at the beginning, to clarify any confusion.  That
really is Border Patrol Agent Marcellus who is named Steve in
these transcripts.

He was -- he was in contact during that interview,
and told the witness, "We're not going to arrest you for this
now as long as you cooperate."  There's some more conversation.

Another of the interviewing agents speaking to
Sanchez during the interview went on to say, "You're concerned
about what's going to happen here, about your future, your
kids, and your visa."

And then later in that interview, as well, Ernesto --
or Sanchez, the witness himself, stated, "Either I cooperate or
I lose my visas.  I can possibly even go to jail."  And that
information was absolutely in the possession of the defense
prior to the deposition.

At -- also important factually for the Court's
consideration is that at the deposition itself, on April 4th of
2018, defense counsel cross-examined the witness on the very
issues they're raising now.

Also quoted from the deposition, Mr. Kirby asked the
witness:

"You were originally stopped by Border Patrol.

1        Correct?  And they wanted to talk to you about

2        alien smuggling?  Correct?"

3        "Yes."

4        Mr. Kirby also asked the witness:

5        "They told you you weren't getting arrested.

6        Correct?"

7        Addressing bias, addressing whether he was getting

8    arrested or whether he was testifying or -- or brought these

9    statements forward because he felt that he was under a threat.

10        He was asked -- Sanchez was asked, "You were allowed

11   to keep your documents?"  Addressing whether he felt that he

12   would lose visa or his status to cross into the United States

13   if he did not make these statements.  Again, that bias was

14   addressed.

15        And then later in the deposition, or shortly later in

16   the deposition, Mr. Kirby asked him:

17        "You're hoping to get your papers back, aren't you?"

18        Again, addressing the very bias and issue that the

19   defense is now raising and arguing that they were not on notice

20   of because of the lack of production of this corrupted audio

21   file.

22        I also have one other factual correction.  Defense

23   counsel argued that Mr. Sanchez was the only percipient witness

24   to this event.  That's not accurate.  There was a passenger in

25   the vehicle, Marcos Aragon.  At this point, Marcos Aragon is

1  not available to testify.  He was not -- he didn't appear.  We

2  weren't able to get him there for a deposition.  But just for

3  clarification, there really was another witness present.

4       Additionally, I would remind the Court as I think

5  you --

6       THE COURT:  What difference does that make, if he's

7  not available?

8       MS. MARSH:  Well, I -- it probably doesn't.  I think

9  it's just more a factual clarification.

10      THE COURT:  And the Government hasn't provided an

11  address?

12      MS. MARSH:  Right.  We were unable to provide an

13  address.  We certainly have tried.  But you're right, your

14  Honor.  He's not available for trial.

15      But there are -- there is substantial other evidence

16  available for trial that will be presented at trial that

17  corroborates Mr. Sanchez's statements.

18      And without belaboring the argument, we have GPS

19  tracker data that puts Mr. Sanchez and the phone data from

20  Mr. Duren, that puts Mr. Duren at the location of this stop.

21  And the Court will recall, Mr. Duren had denied -- absolutely

22  denied ever having been present at this stop.  At what

23  Mr. Sanchez is reporting and the subject of his testimony, this

24  rip of money that happened on July 18th of 2013, Mr. Duren has

25  denied being present.  And there's substantial other evidence

corroborating his presence, in addition to what Mr. Sanchez
will testify about.  Because we have the phone data and the GPS
data and the photos and videos from the Bank of America, there
is substantial other corroboration.  And there is a strong case
in addition to what Mr. Sanchez will testify to.  And I will
say, for the record, it is absolutely the Government's goal to
have Mr. Sanchez testify.

This entire motion to strike may be moot because it
was our goal to get Mr. Sanchez here to testify before the
jury.  It is only if he is unavailable that this truly becomes
an issue where we would need to present the deposition.

In going through -- and I think that's sort of the
factual background.

THE COURT:  We should take on each of the alleged
violations.

MS. MARSH:  So in taking on each of the rule
violations, I'll start with Rule 16.  The Government concedes
that this is a statement that should have been produced.
However, the question is really whether it was material.  And
as -- as I've stated and argued previously in summarizing the
deposition testimony, the witness was cross-examined on this
issue.  And I would argue that defense counsel has
characterized these statements as threats.  They certainly were
statements about the defendant's visa or his status or his
ability to cross into the United States.  They were a threat or

a statement saying he could be arrested for his alien smuggling
conduct.  But I think saying that they are threats that forced
him to make this statement rises above the level of what the
statements truly were.

And, in addition to that, defense counsel
cross-examined on those issues.  They were provided evidence of
similar statements.  And because they cross-examined the
witness on those issues, it's not a -- it's -- the information
may be material but defense counsel was able to successfully
cross-examine on those issues.

So the defendant bears the burden of showing that it
was material, which requires a presentation of facts that would
tend to show the Government was in possession of information
that was helpful to the defense.  I agree.  It likely was
helpful to the defense.  However, the same type of information
was provided and there was an ability to use that information
to successfully cross-examine the witness.

And I would also point out the district courts have a
broad discretion concerning the remedy imposed for a violation
of Rule 16.

So there are a variety of remedies available.  But
what really matters here, even if the information was material,
is that the defense was on notice and successfully
cross-examined on these issues.  So there is no prejudice
resulting.

1       Because defense counsel had that information and

2   used -- or similar information and used that similar

3   information to cross-examine, there is no prejudice.  And,

4   therefore, the deposition should not be stricken.

5       In addressing the *Brady* violation, the issue really

6   is whether there is -- whether there was a reasonable

7   probability that had this evidence been disclosed, had -- had

8   the corrupt file been able to be recovered sooner.  And the

9   Court, having reviewed the moving documents, knows that -- or

10  the response, knows that Agent Marcellus summarized all the

11  efforts he made to recover this information, how this happened.

12  There really was no bad faith here.  It was something that he

13  was not able to recover, that he even had his IT people try to

14  help with.  And I know that *Brady* doesn't require bad faith.

15  But the question is really whether there was a reasonable

16  probability that, had this evidence been disclosed, would the

17  proceeding have been different.

18      And I would submit to the Court that it would not

19  have been different.  The questions along these lines were

20  asked in the deposition.  The potential bias regarding alien

21  smuggling and arrest and visas was raised with Mr. Sanchez.  He

22  was confronted on these issues, and he answered those

23  questions.

24      Additionally, under the *Brady* analysis, this audio --

25  the recovered, corrupted file -- really is cumulative

1  impeachment evidence.  It is cumulative to other items that

2  were already produced.

3          And so it did not change the outcome in the hearing

4  in any way, and the case law supports that.  U.S. v. *Bagley* and

5  *U.S. v. Coring* (phonetic).  Where there is no prejudice when

6  the witness is crossed on the issue, there is no *Brady*

7  violation.

8          And then, finally, looking at *Jencks*.  Again, the

9  same question really arises, acknowledging these are three

10  different discovery rules, three different alleged discovery

11  violations.

12          The question again, though, is whether the defendant

13  was prejudiced.  And, again, where a missing item is

14  duplicative of other items that were produced and defense was

15  able to cross-examine the witness regarding those issues, there

16  is no prejudice.  And the district court, again, can choose not

17  to strike that deposition and has discretion in how to deal

18  with a violation if one did in fact occur.

19          The Government would submit that the -- the Court can

20  weigh the small piece of audio, the small piece of the puzzle

21  that was missing or the small piece of evidence that was a

22  corrupted audio file that was not produced prior to the

23  deposition, against the cumulative total of information that

24  was produced prior to the deposition.  And, C, that defense

25  counsel absolutely was on notice and fully able to

cross-examine effectively. And because they were able to do that cross-examination and no prejudice resulted, the deposition should not be stricken.

MR. STEWART: Your Honor, may I just respond to just a couple of quick things?

THE COURT: Yes.

MR. STEWART: Importantly -- because I want to make sure that the Court is not misled. That absolutely that interview was part of this investigation for this case. I think that the Government is suggesting that it was simply for some alien smuggling incidents.

The reason that we know that, in part, it was absolutely related to this case is that factually Sanchez is questioned about the quantity of money. Not -- so I'm not talking about the alien smuggling.

I'm talking about he's questioned about the quantity of money. That's the quantity of money that we're talking about in this case.

And, importantly, what we could have crossed on is that at that time Sanchez had no idea. Now, at the deposition time, he claimed to know how much it was.

At that time we had no idea where that could have went in terms of Rule 16 on this amount. The amount of money, whether -- let's say Mr. Duren is convicted. The amount of money would go to the guidelines. And so that testimony is

1    significant in impacting the guideline, the offense level.

2         We could have demonstrated -- laid the foundation

3    that Mr. Sanchez lacked knowledge as to the amount of money,

4    that any test -- any testimony he was providing at his

5    deposition about that was completely hearsay.  And hearsay

6    that's not even redeemed by any co-conspirator rule because

7    well after the event happened -- as late as September 23, when

8    this interview occurred -- he still had no idea.  So the -- the

9    co-conspirator, as it relates to that money smuggling event,

10   would have long been gone.

11        So we would have been able to cross-examine him and

12   lay the foundation to demonstrate that that testimony should

13   not come into evidence as hearsay, unredeemable by any hearsay

14   rule.  And so it's important to know that part of those

15   questionings relates completely to this case.

16        And the last thing I would say, your Honor, is that

17   what the Government wants to do -- the Government really wants

18   to say, well, we had similar -- in a very broad context, right?

19   The Government had -- the Government's not even saying that we

20   had as strong of threats as we had here because we didn't.  And

21   the Government's not acknowledging the fact that to be able to

22   question -- cross-examine the witness, it's not just about

23   cross-examine as to a topic, it's about having the information

24   that when the witness provides a response, then you can probe

25   and challenge that response because you have these statements.

1    And that's what we were not able to do.

2         Sure, we can ask about any topic.  But the whole idea

3    about having prior statements is that when you get a response,

4    then you're able to probe and challenge if that response does

5    not do justice to the prior statements that you have, and

6    that's how we were prejudiced.

7         That we weren't able to really dovetail into the

8    credibility of Sanchez as strong as we would have because we

9    didn't have these threats.  We didn't have the information that

10   Sanchez didn't know about the quantity of the money.  So these

11   are some very important issues that go to the examination that

12   we would have conducted, your Honor.

13        And so, again, that -- for the Government to argue

14   that we lack any prejudice, that's not -- that's simply not

15   true.  And, essentially, the Government wants to insert its

16   judgment for how deeply we should have been able to question

17   Sanchez for our own, your Honor.  And that would be letting the

18   Government have too many ways, in terms of controlling our

19   inquiry and our -- and our investigation.

20        And so -- and I apologize for misstating.  I had it

21   wrong that Agent Weaver was involved.

22        But Agent Marcellus, I understand, was involved in

23   other investigations relevant to -- or interviews relevant to

24   this case, my understanding.  And so I just want to be clear

25   that this interview was, in part, related to the case.  And

1   that's how we know because of part of the substance in the

2   interview.

3          Thank you.

4          THE COURT:  All right.  Thank you.

5          With respect to the motion to strike Sanchez's

6   deposition due to violation of -- violations of Rule 16, *Brady*,

7   and *Jencks*, the defense requested production of the audio file

8   numerous times but did not receive it until March 6th, 2019,

9   after the Court ordered the disk produced to the defendant to

10  allow its expert to try to obtain information from the alleged

11  corrupted file.

12         Numerous requests for that audio file was made prior

13  to the depo.  The motion was continued for production even

14  after the depo.

15         We're concerned here with primarily the rule -- the

16  2000 -- the September 23rd, 2013, interview of Sanchez.

17         Defense argues that under Rule 16 -- well, first of

18  all, Rule 16 requires that the information not necessarily be

19  exculpatory or impeaching but must be relevant to assist the

20  defense in developing its theory of the case.  Even if it's

21  inculpatory evidence, it may render the defense -- defense's

22  planned strategy to -- to change or allow the defense to

23  determine whether or not its planned strategy is useless.

24         The Government produced a number of materials here,

25  including an August 10th, 2000 -- August 10th interview that's

been discussed.

Defendant had it. The defendant was provided with the recovered disk and supplemental reports supporting that disk after the deposition, albeit much later after the deposition, where it was not helpful during the course of the deposition. And the defense did provide -- did present a cross-examination on areas of bias during the course of the deposition with the information produced by the United States because the defense was provided with other reports and audio contacts relating to Sanchez.

The Government asserts that the audio file was disclosed as soon as it was recovered and two months before the trial. The defense is not claiming bad faith with respect to Rule 16.

With *Brady*, any evidence material to either guilt or punishment favorable to the defendant should be produced. Any evidence bearing on the credibility of Government witnesses, including bias, should be produced. And the defense argues that it was deprived of the opportunity to fully and fairly cross-examine Sanchez with respect to the bias information during the course of the videotaped deposition.

The Government acknowledges that that information was *Brady*, it was impeachment information, and that the audio file was not produced. So the issue here is really materiality and whether or not there was good faith.

1    The disk was provided to the defense, once again,

2  after the deposition and after the Court ordered the

3  production.

4    With respect to *Jencks*, the Government must produce

5  any statement of a witness in the preparation of -- in the

6  possession of the Government that relates to the subject

7  matter.  The allegation by defendant is that the Government

8  failed to produce the statement until after Sanchez testified

9  under oath at the deposition and the Government is culpable for

10 failure to produce that statement.

11    *Jencks* applies to statements that are a part of the

12 ongoing investigation.  And defense argues that the Government

13 did not prepare or produce an accurate report detailing the

14 threats.  The audio file was in the Government's --

15 Government's possession for at least five years.  The

16 Government claims that the file was unrecoverable.  And, later,

17 the Court ordered its production, and the information was

18 thereafter recoverable.

19    The Court finds that the Government had not made

20 exhaustive efforts to recover the audio recording.  The

21 Government asserts that this information regarding threats is a

22 small piece of the entire puzzle.  The Court finds this is a

23 significant piece of the entire puzzle.  The threat being the

24 only percipient witness available to testify is a significant

25 piece of the puzzle.  It affected what it has affected -- or

continued to affect the defendant's preparation for trial.
That interview was the kickoff of this whole investigation, and
to say it's a minor piece in the puzzle is disingenuous.

Having found that, we all know -- I think we all
agree that the information should have been produced under Rule
16. The Court finds it had a reasonable probability to
produce -- should have been produced earlier, and it could
result in prejudice at trial because of that -- how significant
the evidence is.

But the Court also finds that the defense has been
provided with other evidence relating to bias. Bias was
brought up during the course of the videotaped deposition.
There are plenty of documents produced to the Government with
respect to Sanchez in the contact -- interactions with Sanchez
during the course of this investigation.

The Court finds that that information was material in
that -- for the reasons stated. But -- but because the
defendant had a significant amount of information with respect
to -- you know, from other reports produced, the Court finds
that the prejudice prong has not been met in its entirety, in
the Court's mind.

So, in essence, the Court finds that the defendant --
the Government did not exhaust efforts to recover the
information. The audio was not intentionally withheld. The
defendant had the benefit of other evidence to assist in -- in

1  a cross-examination of the witness.  And, for that reason,

2  there was no prejudice.  That does not go to -- to -- to

3  state -- those findings do not go to state that there has not

4  been some level of prejudice in this case, and there's other

5  remedies the Court can provide.

6          So based upon the bidding, the Court will permit the

7  cross-examination of Marcellus, Ramirez, and Weaver and any

8  other percipient witness regardless of whether or not Sanchez

9  testifies regarding as to what happened.

10         Any -- any objection with respect to the extrinsic

11  nature of it will be denied.

12         Do you have a copy of the audio recording now, sir?

13  To the defense?  Was it produced to you?

14         MR. STEWART:  Yes, your Honor.  The audio was -- was

15  produced on March 6th, your Honor.

16         THE COURT:  All right.  Thank you.

17         In addition, the Court orders that the Government is

18  to provide to the defense all of the agents' notes from all of

19  the interviews seven calendar days before trial.  *Jencks*

20  requires production after trial.  But in light of the

21  circumstances here, that production shall occur before trial to

22  permit the defendant to prepare in light of its lack of

23  opportunity to fully cross-examine Sanchez during the course of

24  the deposition.

25         The testimony as to the amount of evidence testified

1   in the deposition is stricken.  That was crucial.  He didn't

2   know about it at the time.  That should not come into evidence.

3   It's hearsay.  And -- regardless, because he learned about it

4   from someone else.

5           So any evidence from the -- if the deposition has to

6   be played, the portion of the deposition that goes to the

7   amount of money seized is stricken.  The defense did not have

8   an opportunity to cross-examine on that material point.

9           Again, the Court will permit the defense a full

10  breadth of cross-examination with respect to any Government

11  witness if Sanchez does not show up.

12          If Sanchez shows up and -- then the regular rules

13  with respect to extrinsic evidence will be reviewed at the time

14  based upon the circumstances.

15          With respect to the second motion to dismiss Count 2

16  for violation of statute of limitations, the Government has no

17  objection.  The Court grants the motion to dismiss Count 2.

18          THE CLERK:  Judge.

19          (Pause, Court and clerk conferring.)

20          THE COURT:  To be clear, the first motion to strike

21  Sanchez's deposition testimony is granted in part and denied in

22  part.  It's granted as to testimony regarding the amount of

23  money only.  It's denied in all other respects, in light of the

24  remedial points that the Court has addressed here.

25          One second.

1          (Pause, referring.)

2          THE COURT:  Are you available -- I need to trail this

3     matter to 1:30 to complete our discussion here.

4          All right.  We're in recess -- we'll trail the rest

5     of these matters until --

6          (Court and clerk conferring.)

7          THE COURT:  I understand you have transportation

8     plans.

9          MS. MARSH:  I'm available.  I think Mr. Rapp has a

10    flight earlier, but he can address that or make changes if he

11    needs to.

12         THE COURT:  All right.  Sir?

13         MR. RAPP:  Well, I'm unable to -- I'm unable to

14    change that.  But I think Ms. Marsh can handle it at 1:30.

15         THE COURT:  All right.  Very well.  We're in recess

16    until 1:30 on this matter.  We're trailed until 1:30.

17         MR. RAPP:  Thank you, your Honor.

18         (Recess taken at 10:45 a.m.)

19         (Court resumes at 1:32 p.m.)

20         THE CLERK:  We're back on the record with the United

21    States of America versus -- versus who?  Tyrone Cedric Duren.

22         MS. MARSH:  Good afternoon, your Honor.  Abbie Marsh

23    for the United States.

24         THE COURT:  Good afternoon.

25         MR. STEWART:  Good afternoon, your Honor.  Marcel

Stewart and John Kirby on behalf of Tyrone Duren.  He's present
before the Court on bond.

(Court and clerk conferring.)

THE COURT:  One second, Counsel.

The Court is trailing its two o'clock matter to make
sure we have time to complete this within the next hour.

To continue with substantive motions, the record
shall reflect the parties are present.

The -- there's a motion to sever Count 35, alleging
conspiracy to commit bank fraud, from the remaining counts.

I would like to hear from the defendant on this
motion.

MR. STEWART:  Thank you, your Honor.

Your Honor, the defense position is that Count 35 has
no significant relation to the remaining counts and to the bulk
of the Superseding Indictment.  Count 35, your Honor, precedes
the allegations -- the remaining allegations of the Indictment.

The Court will note that Count 1, which is the
conspiracy count -- Count 1 begins in, I believe, January of
2010, whereas Count 35 includes dates between, I believe, 2004
to 2009.

I say this so that initially the Court understands
from a temporal standpoint that Count 35 simply does not bear
on the remaining counts, either temporally or really factually
because they precede -- all of the actions that would be

relevant to Count 35 are actions that precede the remaining counts.

Now, the concern here, your Honor, is that, you know, Count 35 -- which really pertains to, as we're contending -- counts that precede the remaining counts, so unrelated transactions -- which is one of the factors that the Court will look at, whether it's a part of the same series of transactions, if it largely bears on the same evidence.  We would say that it does not, your Honor.  And that's what we argued in our paperwork here.  But what Count 35 does is we think that it further works to taint and set Mr. Duren in fact in a negative light.

And so the concern here is a spillover prejudice, the thought that, well, if Mr. Duren was engaged in shady business with regard to banks in Count 35, then he's more likely to have engaged in shady business with regard to the remaining counts.  So the idea is that propensity -- which, of course, we know -- is not allowed.

Count 35, your Honor, simply cannot be 404(b).  Let me first note that to my knowledge -- and I'm sure Government counsel would correct me -- that I do not believe that we received 404(b) notice for Count 35.

So if the Government's claiming that Count 35 represents 404(b), I don't believe we received 404(b) notice to that effect.

1       Secondly, your Honor, 404(b) has prongs.  Prongs of a

2  test, your Honor, that the Government would need to meet if the

3  Government is claiming that in fact the information is 404(b).

4  And the Government did not -- did not address any of those

5  prongs.  But I would indicate, your Honor, that it will be very

6  difficult for the Government, I think, to address, given that

7  it's a completely different allegation.

8       Now, the other thing, your Honor, is that the

9  Government claims that Count 35 is inextricably intertwined

10  with the investigation.  I had to look at that because it's

11  very clever.  First of all, when somebody is inextricably

12  intertwined, it has to be inextricably intertwined to the

13  crime, not to the investigation.  So I want to make that

14  distinction, so that it does not go unnoticed.  That it would

15  need to be inextricably intertwined as part of the crime

16       Well, here, your Honor, the first and clearest basis

17  that we know it's not inextricably intertwined as part of the

18  crime is that it precedes the crime.  2004, 2009 precedes 2010

19  to 2000 -- perhaps -- '15 or '16, or '14; whenever the

20  Government claims that the conspiracy ended.

21       But then to make further note, your Honor, just in

22  terms of context, the Government certainly claims that there

23  was stolen money seizure in July of 2013.  Another in March of

24  2014.

25       So this 2004, 2009 bank allegation certainly precedes

any real evidence the Government has of -- of this money laundering or this theft. But, again, it even precedes the entire conspiracy.

So from a factual standpoint, your Honor, we contend that the facts that would prove Count 35 are not the same facts that would prove the crimes -- or the alleged crimes that came after that.

And, your Honor, the rest, I think, I laid out in -- in our paperwork here. That in terms of the rule for whether or not the claims should be joined, that it simply does not satisfy -- it's not part of the same actual transaction. It's not part of a common scheme. And it is not the same or similar character. Right? The character in the remaining Indictment pertains to, really, largely this conspiracy and the substantive nature of money laundering, of structuring financial transactions and the like.

And so this bank conspiracy, your Honor -- essentially, when we break it down, it claims that Mr. Duren and Ms. Duren, you know, lied on their -- lied or misrepresented on their banking applications for either the purchase of -- of new property. These are completely different allegations that then the remaining Indictment -- and the facts that would prove them up are completely different. And, again, they completely predate the remaining charges in -- in the Indictment.

1          So we would argue that the Count 35 was not properly

2    joined to the remaining count for the other counts in the

3    Indictment under rule -- I believe Rule 8, and that the Court

4    should sever to avoid any spillover prejudice.

5          And, again, given that the facts really are

6    different, that the claims are different, that there's no real

7    justifiable reason to put them together when there is the risk

8    of that spillover prejudice; the propensity, basically, that if

9    Mr. Duren engaged in this unrelated crime that relates to --

10   that relates to truthfulness, honesty, and so forth, well, that

11   that means he more or less engaged in the others.  And that's

12   what we are concerned with and we want to prevent, your Honor.

13          THE COURT:  Yes, ma'am.

14          MS. MARSH:  Your Honor, it's the Government's

15   position that Count 35 is properly joined, properly charged.

16          And I will address defense counsel's argument or

17   statement that no notice was filed as to whether this was

18   404(b) evidence.

19          I don't believe that that would be required, as

20   defense counsel is clearly on notice of the evidence, and it

21   was charged as a substantive count, which would be a very

22   reasonable explanation for why it was not -- or noticed as

23   404(b) notice.

24          And I will get to whether it satisfies the prongs for

25   404(b).  But I would start with the fact that it is -- it does

1    satisfy this count, Count 35, satisfies Rule 8(a), because the

2    charged conduct is similar -- of similar character.

3        The other charges in this Indictment include false

4    statements, money laundering, and a number of other counts --

5    structuring -- that are a conspiracy between the same two

6    people who are charged in Count 35 as co-conspirators in the

7    bank fraud.

8        Certainly bank fraud is similar to false

9    statements -- the false statements does not have -- Jennifer

10    Duren is not a co -- co-conspirator in the false statements

11    count, but she is a co-conspirator in the money laundering

12    conspiracy. So it's the Government's position that these

13    charges are of similar nature, though not identical.

14        Further, and maybe more importantly, these Count --

15    the evidence that is -- will be presented to prove Count 35 is

16    connected and clearly constitutes part of a common scheme or

17    plan.

18        Defense counsel is right with his explanation of the

19    timing, that the bank fraud occurred significantly -- well, the

20    bank fraud occurred before the money laundering began. But I

21    would point the Court to Exhibit H to our moving papers, which

22    is a timeline of the events in this case. And while Count

23    35 -- the conspiracy that makes up Count 35 does go back to

24    2004, because that's when the first house was purchased that is

25    sort of in this series of events, the false statements on the

loan application happened in 2009, which is close in time to

when the money laundering conspiracy began.

THE COURT:  You mean the October 13th false

statement?

MS. MARSH:  No.  The false statement that makes up

the mortgage fraud allegation --

THE COURT:  All right.

MS. MARSH:  -- happened in 2009 on that mortgage

application.

THE COURT:  Right.

MS. MARSH:  So if you -- if the Court looks at the

timeline, what's happening in the defendant's life around this

time is that he's resigning from CHP in 2007 and starting a job

with Homeland Security in 2008.

And then they are unable to make payments on their

mortgage on the initial property, on the Monet Way property.

They make their last mortgage payment in 2009 on that property.

And then, separately, Jennifer Duren, his wife, who

is charged as a co-conspirator in both the money laundering

count and in Count 35, goes on to purchase a residence -- as a

single woman, on her own, separately -- and makes false

statements at the direction of her husband.

Those events, while temporally separated by this

1  small amount, are what triggers the defendant's need to begin

2  committing these thefts and laundering this money.

3          This scheme is an ongoing scheme that is motivated by

4  the financial stress that they were in surrounding the

5  mortgage.

6          THE COURT:  Okay.  Hold on -- let's go -- let's --

7  run that by me again with respect to that connection there.

8  What's --

9          MS. MARSH:  So if the Court -- if it's helpful for

10  the Court to refer to Exhibit H, there's a timeline of events

11  in Exhibit H.

12          THE COURT:  Okay.

13          (Pause, referring.)

14          THE COURT:  All right.  All right.

15          MS. MARSH:  Starting in 2004 -- and this is the first

16  page of Exhibit 8.  The Durens purchase -- make a land purchase

17  on Monet Way to build the house.  They get a construction loan

18  following that for the -- the building -- for the construction

19  of that home.

20          They go on, between 2004 and 2009 -- sorry.  2004 and

21  2007 to do a series of refinances on that property.  That gets

22  them to the point where they owe $620,000 on that original

23  property, the Monet Way property, as of January 1st, 2009.

24          As of March 26th of 2009, Jennifer Duren goes and

25  applies for a mortgage for a new house.  When she does so, she

1    makes a series of misrepresentations.

2          THE COURT:  Before we go on -- before we go on, prior

3    to January 2009, what's the problem?  Individuals always

4    generally re -- you know, refinance to make cash -- take cash

5    out and buy another home with it.  What's the problem with

6    having that in the Indictment?  I mean, how does that translate

7    to what happens next?

8          MS. MARSH:  It goes to the loss on that property,

9    because that is the property that is foreclosed on.

10         THE COURT:  Okay.

11         MS. MARSH:  So it's probative of the loss on that

12   property.

13         In the purchase of the new home that Jennifer Duren

14   purchases on her own, as a single woman, she makes

15   misrepresentations about her status as a single woman, the

16   different properties that they own as part of the business,

17   what she owns, what Mr. Duren owns.  And those statements -- or

18   those false statements on that loan application are the fraud

19   that's alleged, or the bank fraud that's alleged.

20         This is all happening -- then they go on and

21   defendant specifically requests a short sale on Monet Way.

22   That's denied.  And then Monet Way is foreclosed.  The other

23   property that they owe the 600,000 on.

24         There will be testimony before the Court that the --

25   the lender on the new property, the Overland Court (phonetic)

1  property, would not have given that loan, had they known about

2  these liabilities and these false statements.  That's the

3  mortgage fraud.

4       This is all happening as the defendant is

5  transitioning jobs and moving from CHP to his role at HSI.

6       This is the motive for him to go on and commit the

7  thefts of money that he goes on to launder.

8       THE COURT:  How so?

9       MS. MARSH:  Because they are in financial strain.

10 They have had a foreclosure.  They -- he has taken a

11 significant pay cut when he leaves CHP to take a job with HSI.

12 And they are living on the money that they have taken out in

13 the refinance on the property that's being foreclosed, to make

14 ends meet while he's transitioning to this other job.

15      THE COURT:  And how much is that?

16      MS. MARSH:  The last refinance -- I can't recall the

17 amount right now.  But it's -- it may be on the timeline.  How

18 much did they get paid out of the refinance?

19      $101,000 was the last refinance on the Monet Way

20 property that they --

21      THE COURT:  Yes.  But he put 99,000 on the two

22 properties in Philly.  That leaves him $2,000 left.  So where's

23 the rest, in October 2007?

24      MS. MARSH:  That was prior to the last refinance.  He

25 took that other -- refinance after that.  The --

1          THE COURT:  September 2007, he refinances for

2   $620,000?

3          MS. MARSH:  The first refinance -- or the second

4   refinance paid for that -- those two properties, the 99,800.

5          THE COURT:  Yes.

6          MS. MARSH:  And then there's another refinance after

7   that, that they used to live on during the job transition.

8          THE COURT:  All right.

9          MS. MARSH:  And this is all during the period that

10  he's making that job transition.

11          So it's the Government's assertion that this is all

12  part of this common scheme and plan that is leading to the

13  motivation -- or leading to the thefts that make up the SUA for

14  the money laundering.

15          And because it is all interrelated in that way, it is

16  part of the common scheme and plan.  It is also inextricably

17  intertwined or very related to the civil lawsuit that's

18  happening at the time, that is costing the defendant a

19  significant amount of money.  He's spending large amounts of

20  money to retain lawyers because he was being sued -- Granite

21  Hills property, his -- Granite Hills Properties, his property

22  management company that is -- is managing or is the owner of

23  the properties in Philadelphia, is being sued by his business

24  partner.  So that's an additional factor of financial strain

25  that goes to his motive to commit these thefts.

1          And you can see in the timeline, in the 2010, the

2    business partner purchased some of those properties.  And then

3    the lawsuit was filed later.  I believe in 2012.  I'm not sure.

4    It's on the timeline.

5          So all of this conduct is just very related.  And to

6    sever this count or limit the presentation of this evidence

7    really limits the presentation of the Government's case as to

8    this common scheme and plan that's ongoing.

9          So not only is the bank fraud charge similar in

10   character to the money laundering count, it is also connected

11   and constitutes that common scheme or plan and is necessary for

12   the Government to present the full story and the evidence of

13   the case.

14         Now, turning to 404(b) --

15         THE COURT:  But those -- but, you know, some of those

16   overt acts are not laid out in Count 1.  They're not laid out

17   in objects of a conspiracy, methods or means of a conspiracy.

18   Right?

19         MS. MARSH:  That doesn't --

20         THE COURT:  They don't have to be, no.

21         MS. MARSH:  Yeah, I don't disagree with your Honor.

22   But I don't think they have to be, to be still inextricably

23   intertwined or still part of that common scheme, or the conduct

24   leading to that behavior that's part of that common scheme.

25         And particularly because it's with the same

1  co-conspirator. I think that's relevant as well. This is not

2  an independent act or a completely separate offense or separate

3  unrelated offense, as defense counsel is arguing here. It

4  really is connected as a scheme. It may not go directly to

5  some particular element, but that doesn't mean it's not

6  inextricably intertwined. It does not have to go to each

7  element. It does not -- the law does not require that this be

8  the same offense for it to be properly joined; or even that

9  they cross over in time.

10       And I understand that the timeline we're talking

11  about is broad, starting in 2004. But it does come together in

12  2009 and 2010, to cross over in that common scheme.

13       And, arguably, it does satisfy 404(b). It is not

14  prejudicial propensity evidence because it goes to the motive

15  to commit the ongoing charges in the money laundering

16  conspiracy. Evidence such as this is admissible to prove

17  motive, and so it is not so prejudicial because the timelines

18  don't match up exactly or because the dates don't overlap.

19       It is part of that common scheme and plan, and it

20  does go to motive. And, for those reasons -- and because the

21  law really favors joinder -- the law favors keeping counts

22  together if they are related. And because these counts are

23  related, in the ways that the law requires, the Government

24  believes the Court should not sever this count.

25            THE COURT: All right. Thank you.

1    MR. STEWART:  Your Honor, the Government makes very

2  conclusory statements, believing that simply saying that it's

3  part of the common scheme makes it part of the common scheme.

4    It's very clear that the Indictment does not

5  demonstrate how it's part of the common scheme.  The

6  Government's arguments don't demonstrate how it's part of the

7  common scheme.

8    What the Government indicates is the Government wants

9  to argue that it's motive.  So let's, you know, be clear here.

10  That the Government, in no way, has demonstrated any part of a

11  common scheme at all.  What the Government's trying to argue

12  is -- they want to be able to argue a motive.  But even that

13  doesn't make sense.  Right?  Because you can see how Mr. Duren

14  is taking money out well before.  There's plenty of money.

15  He's also making money from rental -- there's plenty of money

16  around.  So the Government is wanting to surmise and make these

17  arguments.  But Rule 8(a) is not based on the Government's

18  surmising or making arguments.  It's based on concrete things.

19    And the concrete things that it's based on is not the

20  Government's ability to argue that in its opinion that it

21  thinks and wants to connect.  That's not the standard for Rule

22  8(a).

23    But I think the fact that the Government is arguing

24  so strongly that way demonstrates that -- that it's not

25  connected.  So the Government wants to argue that this could

have been a motive.

But presumably Rule 8(a) wouldn't even be there if simply the -- the answer to it could be that, ah, you can solve misjoinder problems if the Government wants to argue that, you know, this could be a motive.  That's not the factor set down in Rule 8(a).

What we know here is that the -- the 35 -- Count 35, the bank conspiracy, predate the counts in the Indictment -- the other counts in the Indictment.

We know that the broadest count in the Indictment is the conspiracy count, Count 1.  It predates Count 1.

And, as the Court picked up on, nowhere else in the Indictment are there claims that this bank conspiracy is in any way related to any of these other counts.  So -- so that's what exists.

And so the Court, according to the case law, you know, has to make this ruling based on what's in the Indictment -- the Superseding Indictment, actually, in this case.  Not only the speculation and conjecture that the Government wants to -- wants to argue, but based on the connection as pled in the Indictment.  And the Indictment pleads no connections whatsoever.  And so that's the point I really want to make clear.

And the Government wants to throw these words out, same transaction or same common scheme, but it's not.  And the

1    Government hasn't been able to link them to be.  Even taking

2    what the Government says, this scheme or this conspiracy

3    related to (indicating with hands) bank fraud, as it relates to

4    refinancing their homes -- which is, first of all, just

5    completely different than the rest of the stuff in the

6    Indictment.  Just completely different.

7            That's the first piece of it.  Second -- and the

8    Government wants to underscore it.  But the Government's trying

9    to argue intertwining -- there is no intertwining whatsoever.

10   From a legal standpoint, the intertwined is when you have a

11   crime and there's actions going on contemporaneously with that

12   crime that then that's clearly --

13           THE COURT:  Or before.

14           MR. STEWART:  Or before, that's clearly linked.

15   That's clearly linked.

16           The Government has not shown any clear link.  All the

17   Government has offered this Court is it wants to argue a

18   motive.

19           And then on top of its idea it wants to argue, its

20   support is conclusory at that.  There's plenty of moneys that

21   the Durens have coming in at that point, and the Government

22   isn't even sharing all of it within this argument in terms of

23   his rental incomes.

24           So the Government basically wants to be able to put

25   this other information before the jury so that it can encourage

1  the jury to -- to speculate and also be able to, again, put

2  this propensity evidence before the jury.

3        But in terms of relation and the factors under 8(a),

4  they simply don't exist.  So the question simply comes down to

5  does the Government's argument -- the Government's desire to

6  argue motive, is that what is set out in Rule 8(a) for joinder?

7        And I would argue that it's not.  I would also argue

8  that the case law for joinder says that the Court's to look at

9  the allegations in the Indictment and what's pled, and there's

10 nothing pled that connects Rule 35 with the other -- the

11 other --

12        THE COURT:  Count 35.

13        MR. STEWART:  Of Count 35.  I'm sorry, your Honor.

14        I'll submit.

15        THE COURT:  Ma'am?

16        MS. MARSH:  Just briefly.

17        I would remind the Court of case law that I -- I'm

18 certain the Court is aware of.

19        Joinder is appropriate where there are large areas of

20 overlapping evidence.  In this ongoing conduct between these

21 two spouses, their financial situation, their business dealings

22 as they relate to properties they own themselves, that their

23 businesses are purchasing, that is all evidence that is

24 overlapping with the charges in Count 1 because with that --

25 all of that overlapping evidence goes to some of the assertions

1   defendant is likely to make about where the money that the

2   Government alleges was laundered came from.

3   I anticipate -- the Government anticipates that the

4   defendant will say this cash came from my business in

5   Philadelphia.  These refinances, the purchases of the

6   properties in Philadelphia, the foreclosure on their personal

7   home, that all relates to whether the business in Philadelphia,

8   the rental property business was in fact generating profits,

9   which goes to disproving -- or proving the source of these

10  funds that are alleged in Count 1.  So it really is not just

11  the timeline but a significant amount of overlapping evidence

12  that the Court should consider.  And, for those reasons,

13  joinder is proper.

14  THE COURT:  Okay.  I would like to -- thank you,

15  ma'am.  I would like to go back.

16  Do you need a moment?

17  MS. MARSH:  Just one moment, please.

18  THE COURT:  Sure.

19  (Pause, conferring.)

20  MS. MARSH:  Okay.  I just -- I would add, when we

21  were looking at the timeline, just for clarification, there are

22  actually three refinances on the Monet Way property.  53,000

23  was taken out in 2005 to pay down personal debt.  89,000 was

24  taken out that was the down payment on the Philadelphia

25  properties, that the Court referenced earlier.  And then in

1   2007 there was another refi that we talked about also earlier,

2   the 101,000. And 56,000 of that was used to buy the Overland

3   Court property, where the false statements were made, and the

4   remainder of that was used to live on while he was

5   transitioning jobs.

6           And I don't dispute that he probably had some rental

7   income from the properties in Philadelphia during that time.

8           THE COURT: And, also, there's an inheritance

9   property. There's an inheritance in there, too, in 2007.

10          MS. MARSH: Yes. That's one of the properties that

11  could be generating income.

12          THE COURT: Okay.

13          MS. MARSH: That was a property that was inherited in

14  Philadelphia.

15          THE COURT: I recognize there is a factual issue as

16  to where it might have came from. But, I mean, as to whether

17  it is legitimate or not, ma'am, the first -- the first

18  refinance, he uses the money -- according to your chart -- to

19  buy properties in Philadelphia.

20          MS. MARSH: The first refinance --

21          THE COURT: In November 2006.

22          MS. MARSH: No, I would point the Court back to a

23  refinance in 2005, I believe. One moment.

24          THE COURT: No, that's a construction loan. Right?

25          MS. MARSH: On 9-27-2005, loan refinance, Monet Way.

1          THE COURT:  Yes.

2          MS. MARSH:  Refinances with Sunset Mortgage for

3  405,000, that's after the construction loan.

4          THE COURT:  Okay.

5          MS. MARSH:  $53,000 was taken out.

6          THE COURT:  Did he -- was there smurfing with that?

7  Was there money laundering with that in 2012, 2014?

8          MS. MARSH:  Not that we know of, no.

9          THE COURT:  All right.  2006, 1100 -- $111,000.

10  Let's see.  He takes out --

11          MS. MARSH:  89,000.

12          THE COURT:  89,000.

13          He purchases -- he purchases property with it.

14          MS. MARSH:  Correct.

15          THE COURT:  Okay.  So where's the fraud there?

16  Where's the misstatements?

17          MS. MARSH:  There are not misstatements on that

18  application that we are intending to prove.

19          THE COURT:  Okay.  Okay.  And then we're down to

20  2007, the 2007 refinance.

21          MS. MARSH:  Correct.  And that's the one that relates

22  to the misstatements on the Overland Court application because

23  the funds from that -- half of the funds from that refinance --

24  about a little more than half, were used to purchase the

25  property where the fraudulent statements were made on the loan

1  application.

2          And one of them is statement --

3          THE COURT:  Excuse me.  Excuse me.  It says,

4  September 2007, he pulls out 102 -- a little bit more than

5  $102,000 from that property on the refinance, but a month later

6  he purchases properties for $99,000, two properties in Philly.

7          So there's 2,000 left.

8          MS. MARSH:  And then there's one more.  I guess that

9  there are four total refinances.  I was missing one in my --

10          THE COURT:  So all of that is kind of irrelevant.

11  There's nothing dirty about that refinancing effort.  It's

12  legitimate to do all of that with -- it doesn't have to be an

13  unlawful act; yes, granted.

14          There's nothing suspicious about that activity that

15  everyday Americans do, and it's all legal.  And there's no cash

16  that he's holding in a bank account to smurf -- you know, to

17  commit transaction report violations later, the way this looks.

18  Right?

19          MS. MARSH:  Correct.

20          THE COURT:  Okay.

21          MS. MARSH:  I would argue, however, that they're

22  related because of the purchases of the properties in

23  Philadelphia because he later launders money through other

24  purchases of other properties in Philadelphia that are all

25  owned by this same greater entity, Granite Hills Property.

1          THE COURT:  But -- but as to these -- whichever

2     property is purchased up -- up unto this point, there's no

3     laundering going on.

4          MS. MARSH:  Agreed.

5          THE COURT:  So it doesn't relate to Count 1.

6          He's purchasing property with -- with cash out of

7     mortgage refinancing.  Buys other properties with it.  That's

8     not money laundering.

9          I mean, that's -- that's -- that doesn't connect or

10    that's not associated with the charges in Count 1.

11         Do you agree?

12         MS. MARSH:  The Government would assert that it is

13    related to.  It is not --

14         THE COURT:  How is it related?

15         MS. MARSH:  It is related to Count 1 in that it's his

16    motive to commit the offenses that lead to Count 1.

17         Is that it is what is driving him.  This financial

18    strain he's putting himself in is what is driving himself to

19    begin stealing money and laundering money.

20         THE COURT:  Well, I would -- I mean, we're on -- at a

21    particular stage.  But if they're legitimately purchased up to

22    2007, that evidence should come in as to how he purchased them.

23    But that's not the main issue we're discussing here because

24    there's no illegality.  Those aren't other acts to deal with --

25    he owns property.  Many people own property.  So having

previously owned property doesn't bring them into this criminal scheme as far as inextricably intertwined, in the Court's view.

MS. MARSH:  I think, though, your Honor, that it may bring it in because he's going to assert that the money -- the unexplained cash that he is structuring and laundering later is the proceeds from the purchases of these properties in Philadelphia.

THE COURT:  But maybe that's the starting point. That may be a legitimate starting point from the investigation, not how he bought them.  Because how he bought them has -- it appears to me -- there's no connection with the manner in which he is -- how he obtained the income to buy these properties, as being part of the Count 1 scheme.  Okay?  He bought them legitimately.

Now, if there's a certain point where -- you know, you allege that he's taken -- you know, that there's money laundering going on, if his defense is that they're from rents, that's what the jury decides.  But how he obtained these properties aren't relevant.  He legitimately obtained these properties.  He owns property.  Maybe he gets into trouble. He's got to, you know, like keep his head above water and starts -- but once he purchased it -- I don't even see how up until 2000 -- October 2007 how any of that comes into evidence.

MS. MARSH:  Does the Court believe that it becomes inextricably intertwined once we're talking about the 2007 --

1          THE COURT:  What's what I -- that's next.  I need to

2     hear from you on that.  I need to hear more.

3          MS. MARSH:  Once we get to the 2007 refinance -- not

4     the first 2007 refinance.  I think there's a second one.  The

5     one that I'm looking at is the 101 --

6          THE COURT:  101,000?  The 102,000?

7          MS. MARSH:  Just a moment, your Honor.

8          THE COURT:  September 2007, he nets $102,000 from the

9     refinance.  It goes into a joint bank account at Mission

10     Federal Bank.  A month later he purchases two properties for

11     $99,800.

12          MS. MARSH:  Just one moment.

13          THE COURT:  Sure.

14          MS. MARSH:  I'm sorry.  I needed to clarify this with

15     the case agent.

16          THE COURT:  Sure.

17          (Pause, conferring.)

18          MS. MARSH:  Thank you.  So the October 7th, 2007,

19     purchase of the properties in Philadelphia were not from that

20     refinance.  They were loans obtained with his partner in the

21     business.  So that -- I think that's where I was getting

22     confused or I was maybe confusing the Court, possibly.  That

23     September 2007 refinance for 101,000, 56,000 of that was used

24     to buy Overland Court.  And the remainder was used to live on.

25          That 99,800, the Buiten Bonnefin properties in

Philadelphia were purchased using loans with his business partner and a small down payment.

So the Government would argue that starting at that 2007 refinance, this really is related to the later money laundering.

I'm not saying that he laundering these particular proceeds later, but I am saying it is related to this ongoing scheme that led him to commit the crime to launder the funds.

And he did take a job, knowing he was going to take a pay cut from $100,000-ish down to 50,000-ish, just a month later.

So the timing of that, while I'm not asserting that changing jobs is illegal in any way, but maybe taking money out, knowing you have no intention of repaying it and then committing a fraud on another loan and using that money to live on is criminal in nature and part of the conduct that leads to the thefts and the money laundering.

THE COURT:  All right.  Thank you.

MR. STEWART:  Your Honor, that's -- that's argument, your Honor.

The Government hasn't linked these two situations.

They're -- they're wanting to -- again, where there is no clear connection, they're wanting to argue that we think this is motivation.  But, again, as you explore his financial picture -- Mr. Duren's financial picture, that --

1          THE COURT:  Well, motivation would have to be 404(b).

2          MR. STEWART:  I'm sorry, your Honor?

3          THE COURT:  Motive is -- is -- is -- is a reason to

4     introduce other act evidence.

5          MR. STEWART:  Well, but then you have to have --

6     there's a sufficiency, you know, kind of consideration that the

7     Court needs to make and whether the Government is really

8     showing enough of a -- enough of a -- enough of a connection.

9     Because the Government's not really demonstrating that

10    financial -- one, that he was actually in financial distress.

11    That's -- that's the first thing, that he was even in financial

12    distress, such that now he's motivated to steal.

13         And I would just say to your Honor that we get into

14    touchy territory where when the Government begins to argue

15    because of the person's financial condition, they're more --

16    that's what kind of leads them, you know, into this criminal

17    conduct.

18         But, here, the Government is wanting to bring in --

19    I'm sorry, your Honor.  May I have just a moment?

20         THE COURT:  Sure.

21         (Pause, Mr. Stewart and the defendant conferring.)

22         THE COURT:  Yes, you can push the mics back, please.

23         (Pause, Mr. Stewart and the defendant conferring.)

24         MR. STEWART:  I'm sorry, your Honor.

25         I think -- the issue here, your Honor, is that the

1    Court has to weigh.  And weigh whether the probative value --

2    right? -- is more probative of -- than -- than -- than

3    prejudicial and potentially propensity.

4         And here, your Honor, the Government is hanging on

5    the most barest of threads, wanting to introduce a count that

6    can very easily lead to propensity consideration.  Particularly

7    where there's overwhelming evidence that Mr. Duren, at that

8    point, engaged in business and property transactions that's

9    generating pop -- paying for property.  But aside from that,

10   your Honor, is that, again, the Government hasn't really, you

11   know, linked to any really material or significant way.

12        And so this is a decision for the Court, you know, to

13   determine if there is a sufficient -- sufficient basis that

14   would overcome.  Because let's say there is some minimal value.

15   We still dispute that.  But the question then becomes is it

16   more probative?  Has the Government really shown enough of a

17   connection to make it more probative than -- than prejudicial?

18        But I would argue in terms of severance, your Honor.

19   I believe that severance is really dealing with the allegations

20   set forth in the Indictment.  And the Court's supposed to look

21   at the four corners of the Superseding Indictment, not really

22   this argument that the Government is making.  And to the extent

23   that the law focuses the Court in making its determination on

24   looking at the four corners of the Indictment, then, your

25   Honor, I would argue that we're well beyond -- well beyond the

1    four corners of the Indictment that was put forth by the grand

2    jury on this particular issue.

3            So I think that there's a number of conditions here.

4    The fact that when you look at the allegations in the

5    Indictment and the four corners, the four corners won't support

6    this -- this joinder.  And now the Government is giving

7    additional argument to support the joinder.  But this

8    additional argument is outside of the four corners of the

9    Superseding Indictment, which I believe this Court is supposed

10   to consider.

11           But then, in addition to that, the argument the Court

12   then can also weigh -- basically, the probative, the

13   prejudicial nature.  So our two arguments are, one, that it

14   doesn't -- that this Count 35, in terms of the four corners of

15   the Indictment, that there's nothing linking Count 35 to the

16   other counts in the four corners of the Indictment.  I believe

17   that that's what the Court should look to.

18           But then, in addition, the Court is looking to

19   information beyond that.  We would argue whatever minimal

20   thread that the Government has in terms of probative, that the

21   risk of prejudice far outweighs.  And we would say that the

22   probative nature is very, very, very slim given that Mr. Duren

23   has, at that point, a history of purchasing these properties,

24   getting financial return from these properties, and the like.

25           And so, your Honor, it -- we would just simply argue

1   that the prejudicial nature potentially outweighs more than the

2   probative nature.  That there is no -- that these actions

3   aren't linked as part of some series of transactions.

4         It's clear that there's an allegation of fraud -- of

5   mortgage fraud, relating to people buying homes, the Durens

6   buying homes.  And then there's all of these other allegations.

7   And so for the Government to argue that as part of the same

8   series of transactions, it -- it is -- simply factually does

9   not appear to be that way.  It's factually not pled that way.

10  And so it's really just argument, now, that the Government has

11  given the Court to surmise that.

12        And so, your Honor, we'll rest on that.  But in terms

13  of what we just contend that the Court should look to under the

14  factors of Rule 8(a), your Honor, we would argue that -- that

15  the count is not proper.

16        THE COURT:  Thank you.  Anything else, ma'am?

17        MS. MARSH:  Just briefly.  It's the Government's

18  position first that it is -- this count is properly joined

19  under both of the factors of 8(a).  But if the Court were to

20  determine that it's not, it's the Government's position it is

21  relevant, admissible 404(b) because of it is probative of

22  motive.

23        THE COURT:  All right.

24        MR. STEWART:  And, your Honor, we would request --

25  because -- to the extent the Court determines that the count is

1   not properly joined under 8(a), we would request leave to more

2   clearly set this out in terms of the 404(b) issue; if the Court

3   were to go down -- go down that road.  Because we do believe --

4   and we couldn't right now -- marshal all of our information.

5   But we also believe that from the tracing standpoint, that we

6   may be able to demonstrate to the Court that the funds that

7   went into that Overland property were not even funds that came

8   from that -- from the refinance that the Government is talking

9   about.

10          So we would like the opportunity, if -- if the Court

11  were to decide that the count's not properly joined, to address

12  that specific issue, the 404(b) issue, in further detail.

13          THE COURT:  All right.  Thank you.

14          I'll take this matter under submission.  So we'll

15  move forward.

16          I appreciate the input, Counsel.

17          MS. MARSH:  Thank you, your Honor.

18          (Pause.)

19          THE COURT:  The next motion is to produce grand jury

20  transcripts.

21          First, to the United States, are there any grand jury

22  testifiers who will be testifying at trial?

23          MS. MARSH:  There are not, your Honor.

24          THE COURT:  All right.  The Court will summarily deny

25  this motion.  The Court finds that Rule 6 specifically requires

1    testifiers to be -- the transcript of testifiers to be

2    released, so the defense can prepare for the testimony in the

3    courtroom. And the Court finds that the defendant has not

4    shown any particularized need to produce grand jury

5    transcripts.

6        The next motion is the defendant's motion to compel

7    further -- compel discovery. That is, the -- to produce the

8    names of Government agents present during the September 23rd,

9    2013, interview.

10       Have we clarified that? I believe we discussed that

11    this morning, with who was present and who was not?

12       MS. MARSH: Yes. And defense counsel and I e-mailed

13    back and forth about that as well, prior to the hearing today.

14    So I think it is resolved.

15       But he can speak up, if he feels otherwise.

16       THE COURT: Sir?

17       MR. STEWART: I agree, your Honor. It is resolved.

18    Thank you.

19       THE COURT: All right. The motion is denied as moot.

20       The next motion -- substantive motion is the motion

21    to produce chain-of-custody forms. And photographs of all

22    seizures to be introduced, which Mr. Duren was involved as a

23    special agent.

24       Counsel?

25       MR. STEWART: Your Honor, I have to acknowledge that

the Government made a production, I believe, even yesterday or even actually before, and I have not yet been able to review that most recent production. So if in fact this information is on there, I have not reviewed that.

MS. MARSH: The 6051 forms that are requested or photos are not in the new production. It's the Government's position that we should not have to produce them.

We've produced a bulk of other evidence regarding these seizures. So maybe defense counsel could make his argument, and then I could talk about what we've actually produced and why I don't believe the additional production is necessary.

THE COURT: Okay. Thanks.

MR. STEWART: Your Honor -- under Rule 6, your Honor, the defense is entitled to information that's material to --

THE COURT: 16.

MR. STEWART: 16. I'm sorry, your Honor. Information material to the preparation of its defense. And the Government shouldn't be able to determine whether other information should mean -- that the defense wouldn't need other information that we're requesting that is material to the defense.

You'll note, your Honor, that with regard to the particular seizures that were alleged in the Indictment -- the July 18, 2013; and the March 13, 2014; the photos and the

6051s, they're very relevant.  They're relevant simply because the 6051s are the chain of custody for the money.  The photos are photos of the money.

And so if the Government's going to argue that Mr. Duren stole money from these other seizures, Mr. Duren should be able to say, "Here's the 6051, the chain of custody of the money."  And either it's -- it's fine, it's legitimate.  There are no discrepancies.  Here are the pictures.  There are no discrepancies.  Because the Government, for example, with regard to the March 13, 2014, seizure will be using the pictures to argue that there's discrepancy in the weight of the money that's returned.  And so the bottom line is that there's no way to argue that the 6051s and the pictures are not material to the defense.  No legitimate way to argue that.  And because they are, we're requesting them.  And I made a proffer now, from a defense standpoint, we would like to use that information.

So they're -- they're material.  I've even demonstrated how we would like to use it and how it may come into this case as actual evidence in Mr. Duren's defense.

Now, whether the Government has produced other material, that's great.  We want that material.  Okay?

And we believe that we are entitled to it.  And just by way of demonstration, it's relevant with regard to some of the other seizures at issue in the case.  And so if the

1   Government is going to be able to argue that -- I believe

2   Mr. Duren may have been involved -- actually involved, I

3   believe, in about 22 seizures, or so, as a special agent.  That

4   if the Government's going to argue that some or all of those

5   seizures are at issue, then in all fairness, it -- it is very

6   curious to me that we should not be able to have the main --

7   some of the main forms used for seizures, the 6051 chain of

8   custody for the money, and the pictures to be able to defend

9   against it.

10          Now, these are core documents, your Honor, when it

11  comes to seizures of money.  And they're core documents with

12  regard to the other seizures that are at issue in the case.

13  And, again, in order to be able to even prepare to defend, we

14  want to be able to look at the 6051s.  We may even need to be

15  able to subpoena certain agents who have signed off on 6051s on

16  a chain of custody if we're using that as part of our defense

17  that, hey, Mr. Durham didn't steal any money here.  Here's the

18  chain of custody agent.  Did you sign this chain of custody?

19  Was everything in order?

20          So I don't understand the argument that this limited

21  information is not both material and then that we should not be

22  able to use it for the preparation of our defense.

23          THE COURT:  Okay.  Thank you.  Ma'am?

24          MS. MARSH:  Your Honor, I think maybe what defense

25  counsel is not understanding is that the Government does not

1    intend to present evidence of these 22 other seizures.

2         We have identified two events that we believe are

3    suspicious and that we have sufficient evidence of to prove

4    that money was stolen in those two events.

5         Only one of those was a reported seizure as part of

6    Mr. Duren's legitimate employment.

7         The Government's theory of the case here is not that

8    he stole out of each of these other 22 seizures and that we

9    intend to present evidence that he stole out of these 22 other

10    seizures.  We have reviewed them and don't believe that we can

11    present that type of evidence.

12         We have the one that we've identified as suspicious,

13    and we intend to present that one, the 6051s, the

14    chain-of-custody form and the photos on that San Clemente March

15    13th seizure.

16         As to the other seizures, we don't intend to present

17    such evidence about those seizures.  The Government's theory of

18    the case is that he -- he was committing covert seizures like

19    the rip from Mr. Sanchez, where there will be no 6051, no

20    chain-of-custody form, no photos, no call logs.  None of the

21    other records we've produced when there are legitimate

22    seizures.

23         So I think there are two different ways that

24    Mr. Duren was committing these events:  Skimming or stealing

25    from the seizure that was reported, like the San Clemente

1  seizure; and then doing rips that were completely unreported,

2  like Mr. Sanchez's seizure.

3      We do not have evidence from these other 22 seizures

4  that defense counsel is talking about that we believe we can

5  present to show that he stole money from those seizures.

6  Therefore, the chain of custody forms or photographs from those

7  seizures really aren't going to be presented and aren't

8  relevant to preparing a defense.

9      And I -- I want to make clear on the record what we

10  have produced regarding those seizures.

11      Nearly two years ago, back in 2017, the Government

12  produced a spreadsheet showing all of the different seizures

13  that Mr. Duren was involved in during his time as part of our

14  investigation, the seizures that we looked into.  And as to

15  each of the seizures listed in that spreadsheet, that we

16  produced the reports that were associated with those seizures,

17  which will include agents' names who are involved in the

18  seizures, as defense counsel is seeking, and what's called the

19  SEACATS database report as to all of those seizures.

20      The SEACATS database is the seized assets and case

21  tracking system records, and those reports contain all --

22  nearly all of the information that would be on a 6051 form,

23  short of the actual signature and a box identifying maybe what

24  the -- the bag -- the evidence bags -- like the code number for

25  the evidence bags.

1      But the SEACATS information includes report numbers,

2  summary narratives, location, agencies involved, suspect

3  information, vehicle information, cash seizure amounts, and

4  itemized currency counts, and the names of the seizing officer.

5      So all of that information, as to all of these

6  seizures, has been produced.  It just was not -- it did not

7  include the actual chain of custody form or the photographs of

8  these seizures.  And because we don't intend to allege that

9  there were thefts from these particular seizures, we did not

10  produce those items.

11      THE COURT:  What do you intend to allege relating to

12  those seizures?  Anything at all?

13      MS. MARSH:  I think that we talk about later, in

14  another one of the defense's motions.  But, really, just that

15  the defendant had this job, that he was working on a bulk cash

16  smuggling -- I don't know that it's really a task force.  But

17  that he was doing an operation called Operation Toll Roads that

18  involved bulk cash smuggling.  That he was in charge of the

19  trackers.

20      It really goes to more of his opportunity to commit

21  these offenses and knowledge about bulk cash smuggling and the

22  trackers, the access to the trackers that would allow him to

23  then commit the unreported rips.

24      THE COURT:  All right.  Thank you.

25      MR. STEWART:  Now, your Honor, our motion hearing for

the motion for bill of particulars, the Court ruled that the

Government can get into other seizures that he was involved in.

So if the Government is making the representation

that it does not intend to introduce into this trial in any way

these other seizures in any form, in any shape, then we'll

withdraw our -- our argument as moot.

It's unclear to me if the Government is saying, well,

we just don't intend to discuss them in that way.  Well, if the

Government intends to discuss these other seizures in any way,

we want to be able to show -- to defend against any evidence as

to those seizures.  And the Government, I'm advised, is not

correct that on the report I've been provided, it does not

include the chain of custody.  It only includes the agent who

checked it in, not the chain of who had the money from here, to

here, to here, to here (indicating with hand).

So that all of the information that's on the 6051 has

not been produced, and so I want to make that point clear.

And then the photos, the Government is not

representing that they produced them.  So those haven't been

produced either.

So we don't know the Government's case.  So if the

Government's saying it's not introducing any evidence and

making arguments as to those other seizures, then we would

agree that our argument here is moot.  We just don't know if

that's the case.

1           But if that's the case, we would agree it's moot.  If

2      that's not the case, then we would simply want to be able to --

3      to address those other seizures in the way that we see fit,

4      based on our defense, which is to show that with regard to

5      those other seizures everything was done properly.  Here is the

6      chain of custody.  It went from this person to this person to

7      this person.  Nobody's identified an issue with it.  And here

8      were the photos with the seizure.

9           So that's our position, if the Government is seeking

10     to introduce any evidence with regard to those other seizures.

11          THE COURT:  All right.  Anything else?

12          MS. MARSH:  I would just like to clarify that I am

13     representing that we don't intend to single out any seizure and

14     say we believe money was stolen from that seizure.  But as I

15     just summarized for the Court, we are not agreeing to be

16     limited to -- or precluded from saying he was involved in other

17     procedures or he was in charge of these trackers.

18          THE COURT:  Okay.  But it's not your intention to use

19     the list of other seizures as inferences that maybe he skimmed

20     off of those too?

21          MS. MARSH:  Correct.

22          THE COURT:  Unless you have some evidence of that?

23          MS. MARSH:  No.  Correct.  We will not use it for

24     that purpose.  I just want to be careful that I'm not agreeing

25     to limit our case to not present his job or the fact that he

was involved in seizures.  There's actually a PowerPoint that he did himself about different seizures and Operation Toll Roads.  We are not going to argue anything from the PowerPoint to say this is when we believe he stole money from.  But we would seek to introduce, look, he's holding himself out to be an expert in bulk cash smuggling.

THE COURT:  All right.  Anything else?

MR. STEWART:  Your Honor, I would contend that there's nothing lost.  There's only the preservation of Rule 16 gained by requiring the production.  Because, again, Rule 16, in its most basic form, really goes to what aids the defense in its preparation.

And in a case like this, where there may be evidence about different seizures or his role in a variety of seizures, then what we're asking for aids the defense in its preparation. And the Government's -- exactly what the Government's going to introduce -- the Government -- it sounds like the Government may discuss these seizures but not to make that point.  Well, if the Government's not willing to say that it's not going to discuss these seizures, then we're saying that we would like this information with regard to those seizures.  And we think that's a very reasonable approach.

The Government loses nothing, but it puts us in the position, then, to respond in the way that we see fit with the evidence that we see fit, to anything related to those

seizures.

THE COURT:  Anything else?

MS. MARSH:  No, your Honor.

THE COURT:  All right.  Counsel, this was a drug smuggling case, importation case.  And the Government presented evidence of TECS records that the person crossed the border 20 times in five days before the event.

Wouldn't you give those crossings to the defendant, if you want to use it as inextricably intertwined?

MS. MARSH:  Yes, certainly.  And we did present that type of evidence regarding the seizures already.  The SEACATS report is very similar to TECS records about the crossings.

THE COURT:  The agent --

MS. MARSH:  So defense counsel has that.  What they're asking for is just an additional piece of evidence related to -- we've given them a bulk of information already. And they're asking for one -- well, two additional pieces of those -- each of those case files.

THE COURT:  Yes.

MS. MARSH:  And so I guess I would argue that we really have.  In the analogy of a crossing history, we have produced those records, like -- like TEC records of the crossing history.

THE COURT:  But if there was a secondary inspection, then there will be reports about the secondary inspections.

1   Right?  If they were negative or they found a compartment

2   without any drugs or any money, that would be produced also?

3            MS. MARSH:  Yes.  And I would say that we have given

4   reports on each of -- so there's the SEACATS report and the

5   actual reports about the seizures have already been produced.

6            THE COURT:  But in -- in the -- I mean, in the

7   importation case, those reports would -- would also indicate

8   who was involved in the stop, who was -- who was involved in

9   secondary; in case the defense wanted to call some witnesses to

10  clarify.

11           But here, as I understand it from the defendant, you

12  are -- the information in this -- in this report doesn't show

13  who was involved or who was the other agent involved.

14           MS. MARSH:  It does, your Honor.

15           THE COURT:  It does?

16           MS. MARSH:  Yes.

17           THE COURT:  Everyone involved from the initial

18  seizure is contained in that document?

19           MS. MARSH:  I think that it certainly has the

20  location, the other -- and the reports themselves, separate

21  from the SEACATS, which is the more computerized records.  It's

22  more like a TECS record.  The reports themselves should name

23  the other individuals who were involved, like at the Border

24  Patrol seizure that is at issue, the checkpoint seizure that is

25  at issue here.

1          And what -- I think what defense counsel is getting

2     at is that it just doesn't have the signatures, which may more

3     specifically identify -- I mean, I do believe that there may be

4     certain people who were involved in the seizure that are not

5     identified in those reports.  But most of the people involved

6     are identified in the reports that have been produced.

7          What defense counsel is asking for is on the 6051

8     form, the chain-of-custody form, has the signatures of each of

9     those individuals that would have been involved in that chain

10    of custody.  That may or may not be listed in each of these

11    reports for each of these 22 seizures.  Certainly, in going

12    through and comparing the SEACATS reports -- which I did in

13    preparation for this motion -- as I looked at the 6051 and I

14    looked at a SEACATS report for the same thing, I could check

15    off almost every item.

16         The things that did not -- that were not contained in

17    the report, that were on the chain-of-custody form, were the

18    evidence bag numbers and the signatures that I will -- I will

19    agree, could have been signatures identifying an agent who was

20    involved in the chain of custody.  But the primary

21    investigating agents -- like if it were a court case, the agent

22    who was involved in secondary, I do believe, would have been

23    identified in those reports.

24         THE COURT:  So is -- is there identification in the

25    reports you provided -- I take it that two persons are involved

1  in a seizure?  That's the protocol, right?

2          MS. MARSH:  At least.  Sometimes I think there is a

3  third, depending on --

4          THE COURT:  It could be more.

5          And that more than one person would count the money.

6  Right?

7          MS. MARSH:  It's typically transported to Brinks for

8  accounting.

9          THE COURT:  For accounting.  All right.

10          It will identify who at Brinks counts it?

11          MS. MARSH:  There is a receipt number that is in the

12  SEACATS report about the counting at Brinks.

13          THE COURT:  So are all three of those persons who are

14  entities contained in the report you provided?

15          MS. MARSH:  I think it depends, case to case.

16          I think there are seizures in these 22 seizures that

17  may not identify every single person who touched the money in

18  the chain of custody.

19          THE COURT:  So one person could be the agent who

20  seized it, but the partner doesn't sign it, or isn't

21  acknowledged?

22          MS. MARSH:  Yes.  Or someone at a Border Patrol

23  checkpoint or involved in a traffic stop who might be on the

24  6051 may not be identified in the reporting of the SEACATS

25  entry.

1       The SEACATS is like a computer system where things

2   get entered in from the 6051 and from the other reporting

3   system, is my understanding; or from the other reports that are

4   generated, the narratives.

5       THE COURT:  So the people would touch the money; if

6   it's not within your agency, within the -- within your -- your

7   client's agency, would touch the money, and all of that, and

8   have access to it and possession of it before the duty agent

9   arrives to collect it?

10      MS. MARSH:  Right.  And I would -- I would -- in what

11  I looked at, those people were listed, I think, but not maybe

12  every person who was at the Border Patrol checkpoint or at the

13  stop.

14      I do concede that there is a possibility there will

15  be an individual who was involved in the seizure who would not

16  be listed in the report or the SEACATS entry.  And that there

17  may be a case where that person could be a signatory or listed

18  on the 6051.

19      I think it's unusual.  I think that the 6051 is

20  inputted into the SEACATS system.  So those people should be

21  identified there.  If their names are not included in the

22  SEACATS entry, their station is and the time of the seizure.

23  Other information that could lead to their names, certainly, is

24  included.

25      THE COURT:  All right.  Thank you.

1          MR. STEWART:  Your Honor, just to be clear, in the

2     SEACATS, it does not include everyone involved in the chain of

3     custody of the money.

4          And we want everyone involved in the chain of the

5     custody of the money.  Right?  Who touched the money?  Because

6     it's a money case.  So we would like to know everyone involved

7     in the custody of the money.

8          Also the photos of the money are not contained in the

9     SEACATS.  So there are two things that we're asking for are not

10    completely contained.  That -- they're not contained at all.

11    And then the chain of custody, it only has, my understanding,

12    the final individual.

13          Is that correct?

14          The first and the final.  But there are people who

15    take custody in between, and it doesn't have those individuals.

16          And that's information that we believe that we should

17    have.  And we don't even understand what the issue is with

18    regard to us having it.  If we think that is necessary for us

19    to call someone or get -- get into that, if there's a relevant

20    purpose in preparing our defense, under Rule 16 we believe that

21    we should have that.

22          And so the Government is saying, well, we're giving

23    most of the information.  But we've requested some specific

24    information that's only -- it's one form, a 6051, and then some

25    photos.  So it's not even burdensome from that standpoint, in

terms of the universe of information, for us to have.  So we believe the requests seem to be quite reasonable.

THE COURT:  I'm going to take it under submission. My idea is to -- I just want to go back and reflect a little bit.  Not to string this out for a week or two, Counsel, because I know you need to prepare for trial on both of those issues.

MS. MARSH:  Understood.  Thank you, your Honor.

THE COURT:  All right.  I would like to see if I can get through some of these others -- let's move on to the motions in limine.  See if we can move some of these behind us. See where we are.

I have -- are the parties here for the next case?  Is everyone here?

UNIDENTIFIED SPEAKER:  Yes, your Honor. Mr. Gutierrez's case.

UNIDENTIFIED SPEAKER:  I believe Mr. Arguello is not here.

THE COURT:  All right.  Well, I'm not ready at this point, Marshal.  Not ready at this point.

Okay.  Just to move through some of these issues that are not as contentious, just to get them off the record -- yes?

MR. STEWART:  I'm sorry.  One last -- just so the Court can also know where the defense is coming from, if the Government, you know, is going to get into seizures that it

believes may have happened, that were never reported, in all
fairness I would argue that in our case-in-chief, if we wanted
to, we should be able to get into the history of all of these
solid seizures so we could -- we're talking about inferential
evidence. Right? Whether or not there are all of these other
off the books.

And so I think that that information and our ability
to present that, you know, is very relevant in our ability to
defend these ghost seizures. One way to defend against ghost
seizures is to put real seizures and say, no, when we were
involved in this seizure, we reported it. And here it is, and
here's the history of us doing that.

And, you know, and you can use that history when
you -- and weigh it against the Government's claims that maybe
there are -- are others.

So I think that there's another valid point that we
can use this, in terms of our case-in-chief.

I just wanted to add that thought. I'm sorry, your
Honor.

THE COURT: Any thought on that point?

MS. MARSH: I think I've really made -- made my
argument. Thank you, your Honor.

THE COURT: Thank you very much.

I would like to move on to the defendant's motions in
limine.

         There's a motion to exclude out-of-state testimony or
hearsay statements made by Sanchez and Aragon.

         The Government responds that it does not intend to
admit statements by Aragon.  The motion is granted.

         There is a motion to exclude post-arrest statements
and trial testimony of the wife under marital privilege.  The
Government responds it does not intend to call the wife.  The
motion is granted.

         There's a motion to exclude defendant's mug shots as
irrelevant and unduly prejudicial under 402 and 403.  The
Government responds that it does not intend to admit such
evidence.  The motion is granted.

         MR. STEWART:  Your Honor, I'm sorry to interrupt.  My
understanding, based on the Government's response, is they want
to introduce his driver's license and other social media.

         We would want to extend that motion, certainly, as
well, to the driver's license that we believe is similarly
irrelevant.

         That it has kind of a mean, grimacing-looking mug,
and there's no probative value of -- of -- of using this
equivalent of a mug shot from his driver's license.  It would
simply be an end-around to do almost the same thing.

         And so we would like to extend our motion, since we
limit it to mug shots.  Then the Government came up with
essentially the driver's license version, to take it outside of

the motion in limine.  And so we would like to enlarge the
motion in limine to include this -- this driver's license
photo, and quickly.  If the Court would allow it, I could hand
it to your clerk, your CRD, if you want to peruse what I'm
talking about.

      THE COURT:  All right.  Counsel?

      MS. MARSH:  The --

      THE COURT:  I would like to take a look at it.

      MS. MARSH:  That -- I have no objection.

      THE COURT:  All right.  I hate to look at my driver's
license mug shot.

      (Judge handed item.)

      THE COURT:  Anything else you would like to say on --
on the form of identity?

      MS. MARSH:  So the Government's purpose for
introducing these photos is really to identity and to aid the
jury in understanding who's who when we're talking about people
in the case.  So we have lots of people's DMV photos, actually,
sort of stored to use in PowerPoints or to use before someone
testifies, to identify them with the -- to the jury.  Because
over a case that lasts four to six weeks, people may forget
what people look like.  And we've been taking pictures of
witnesses when they come in to be interviewed, so we can save
them to use in our PowerPoint at closing, so that -- so that
the jury can identify who we're talking about.  So it's really

1   for identity, and then to aid the jury.

2          There are additional photos from social media that I

3   think may be probative to prove travel, and some other things

4   that are alleged in the case about expenditures of money, that

5   include both the defendant and -- and his wife.  So that's our

6   purpose for offering it.

7          The Government's position is that his driver's

8   license photo is not prejudicial because he didn't smile.  It's

9   just a photo of him that helps with identity.

10         MR. STEWART:  Your Honor, his identify is not at

11  issue and it's hard for the jury to forget who he is, when he's

12  sitting here every day at trial the entire time that they're

13  sitting there.  So in terms of identity, this is not the case

14  with regards to the defendant.  There's no identity issue that

15  I'm aware of, whatsoever.  And in terms of the jury forgetting

16  the defendant, that's not an identity issue because they see

17  the defendant sitting at counsel's table.  So we would argue,

18  your Honor, that -- that there's absolutely no value to the use

19  of that picture and potentially because it does display him in

20  kind of a -- a -- a meaner fashion.  And it is, essentially, a

21  mug-type shot -- shot-type -- a mug shot-type photo.  And so we

22  think that that view and having it taken back to the jury, we

23  think that that would be prejudicial when there's absolutely no

24  value to the --

25         THE COURT:  So your position is that your client was

at the scene of the crime?

MR. STEWART:  Well, I don't think -- well, but that photo, your Honor --

THE COURT:  You said identity is not at issue.

MR. STEWART:  Well, I don't -- it's not an issue of -- well, let me make sure.  Hang on one second, your Honor.

If -- well, hold on one second.

(Pause, Mr. Stewart and the defendant conferring.)

MR. STEWART:  Your Honor, the -- oh, I'm sorry.

One sec.

(Pause, conferring.)

THE COURT:  I'm sorry, sir.

MR. STEWART:  Your Honor, my understanding is that the only potential witness that there would be -- two, Sanchez, and Aragon -- that Sanchez has already identified Mr. Duren, both at his deposition, previously to the Government, and obviously he'll be here in court to do an in-court identification.

And then if the other witness materializes, the -- Aragon, that we believe that -- that the same thing would apply.  So I don't think that the driver's license photo really adds anything.

If the idea from the Government is that an in-person identification, as a backstop, if the witness is unable to do an in-person identification, that the driver's license would be

1    another way for the witness to identify the defendant.  If

2    that's the case, your Honor, then if it gets to that, I would

3    understand if that's what needs to happen.

4         But if the idea simply is for the witness to identify

5    Mr. -- Mr. Duren, Sanchez has already identified Mr. Duren.

6    The Government has represented that Aragon is in the wind and

7    has no expectations of him participating.

8         Then that leaves no one else, from what I understand,

9    to identify Mr. Duren.  And, again, if there is an identity

10   issue, he'll be sitting right here at counsel's table.

11        So I -- maybe I'm kind of missing -- missing

12   something.

13        THE COURT:  I'll just ask:  So are you backing away

14   from your statement that identity is not at issue?

15        MR. STEWART:  Oh.  Oh, your Honor, I don't --

16        (Pause, conferring.)

17        MR. STEWART:  Well, right.  Right.

18        Your Honor, I don't -- I don't think it's an issue

19   such that the photo -- that the driver's license solves it.

20   What it potentially does, your Honor, is -- and I don't know

21   the Government's plan.  Is it continuously gives them this

22   almost-mug-shot-type photo to continue flashing to the jury,

23   you know, periodically throughout the case.  And we think if

24   that's the intent, that that is prejudicial as opposed to truly

25   an identification issue.

1        If the issue is a witness needs it to identify

2   Mr. Duren, then -- then I would understand the value; although

3   he's sitting right here.

4        But if it's outside of truly identifying Mr. Duren

5   but it's simply to continue flashing to the jury Mr. Duren's

6   face, aligned with other claimed allegations, we think that

7   that would be prejudicial.

8        THE COURT:  All right.  Yes.

9        MS. MARSH:  Just very briefly, your Honor.  His DMV

10  photo is what was used in the lineup that Mr. Sanchez used to

11  identify him.  So, really, it's just the photo that is already

12  part of the evidence that is the photo we would intend to use

13        THE COURT:  All right.  With respect to the Court

14  will -- grants the motion with the following provisos:

15        If the witness cannot identify the defendant, then

16  prong two is to go to the next way to attempt an

17  identification, where you can bring up the six-pack.  Okay?

18        But with respect to the Government's PowerPoint, the

19  Government can simply put in a block "defendant" or "Duren."

20  You don't need his photograph for that purpose.  Okay?

21        If we get to a threshold beyond that, we can discuss

22  it at sidebar, and see where we are.

23        MR. STEWART:  Thank you, your Honor.

24        THE COURT:  All right.

25        THE CLERK:  Is that granted?

1          THE COURT:  I need to take a break.

2      3:30?

3          MS. MARSH:  That's fine, your Honor.  My flight is at

4  5:15.

5          THE COURT:  All right.  You have someone to take you

6  to the airport?

7          MS. MARSH:  I do.

8          THE COURT:  All right.  Okay.

9      (Recess taken at 2:55 p.m.)

10      (Court resumes at 3:30 p.m.)

11          THE CLERK:  All right.  We're back on the record with

12  Mr. Duren.

13          MS. MARSH:  Your Honor, I was able to reschedule my

14  flight, so we can stay as long as you need.

15          THE COURT:  Thank you, ma'am.

16          MS. MARSH:  My flight is about 7:30.

17          THE COURT:  The last one out?

18          MS. MARSH:  Yes.

19          THE COURT:  I'm sure the U.S. Attorney's Office

20  hasn't a suite in the hotel across the street for you.

21          MR. STEWART:  Hey, when we go to Arizona, we have to

22  drive.  Flight?

23          MS. MARSH:  Southwest.

24      (Laughter.)

25      (Off-the-record discussion.)

1    THE COURT:  The record should reflect the parties are

2  present.

3    The next motion in limine filed by the defendant is

4  to preclude Sanchez from speculating that there may have been a

5  GPS on his van.

6    Two-minute argument.  Why so, sir?

7    MR. STEWART:  Your Honor, I believe in the

8  Government's Superseding Indictment I cited in my paperwork, it

9  basically uses that language that Sanchez would surmise.  The

10  Government used the word "surmise."  That Sanchez surmised that

11  there was a GPS tracker because he contended that Mr. Duren

12  went up there -- he believes that Mr. Duren took something out.

13    And so if Mr. Sanchez doesn't know or have fact --

14  you know, a firm factual basis, then we believe they would

15  speculate.  When the Government used the term "surmise," we

16  think that is very indicative of speculating.

17    I understand that Sanchez can testify as to what he

18  saw or observed.  But to reach this conclusion through

19  surmising, we believe, is speculative.

20    THE COURT:  Anything else, ma'am?

21    MS. MARSH:  We only intend to elicit statements

22  regarding what he actually observed.

23    THE COURT:  The Government does not intend to elicit

24  any statements from Sanchez with respect to speculation.  The

25  motion is granted.

1          The Government should advise Mr. Sanchez not to spit

2     it out about his speculation.  Talk about what he knows.  Okay?

3          MS. MARSH:  Understood.

4          THE COURT:  The defendant moves to exclude evidence

5     that he owned firearms under 401 and 403.

6          The Government does not intend to admit any firearms

7     evidence.  The motion is granted.

8          The defendant moves to preclude unnoticed expert

9     testimony.  The Government indicates that it may not refer to

10    unrelated photos the Government does not intend to -- to admit.

11    The motion is granted.

12         The defendant moves to preclude unnoticed 404(b) and

13    609 evidence.

14         Is there any 609?

15         MS. MARSH:  No.

16         THE COURT:  The motion is granted as to 609.

17         We're still in the process -- in the throes of

18    discussing 404(b).  We'll come back to that.

19         The defendant moves to exclude the Indictment from

20    going to the jury room.  The Government agrees.  The motion is

21    granted.

22         The defendant moves to preclude evidence of other

23    seizures that do not meet the requirements of 404(b).  That's

24    part and parcel, I think, of our last discussion.  I'll --

25    I'll -- I will accept some supplemental argument, if any, on

1   that motion.

2          But, to move on, the defendant moves to exclude

3   evidence of the civil case filed by the defendant's business

4   partner as irrelevant under 404(b) and 403, I would like to

5   hear more on that.

6          And the defendant moves to preclude evidence about

7   suspicious seizures by Agent Renner?  Is it -- is that right?

8          MS. MARSH:  Renner.

9          THE COURT:  Renner?  Thank you.

10          I would like to hear discussion on that.

11          So let's back up to -- any further discussion on any

12   further seizures?  Motion to preclude evidence of other

13   seizures?

14          MR. STEWART:  Only, your Honor, that I believe that

15   we covered -- well, seizures that Mr. Duren was involved in, we

16   would argue, should be excluded.

17          I don't know if the Court's ruling on the motion for

18   bill of particulars may already address that, but we wanted to

19   make sure that we included that in there, just in case.

20          With regard to possible unreported seizures, we

21   would -- it's tricky.  But we would argue that -- it puts us

22   into the position, in argument today, to -- the right to argue

23   that something that the Government is not necessarily saying

24   for -- specifically happened, if it should come in or not.

25          And so it's hard for us to be in a position to argue

1    against it because we don't know exactly what -- what they are
2    suggesting.

3            If they're going to suggest that there was another
4    seizure, that we would argue, then, that that seizure should be
5    judged from a 404(b) standpoint.

6            So even if that seizure was one that was not
7    reported, we would argue that it should be judged from a 404(b)
8    standpoint and that they should have to meet that test before
9    the Court simply allows it in based on their representation or
10   their urging.

11           We can't argue any further than that because we don't
12   know the specifics of what they would be seeking to introduce.
13   But if they are seeking to introduce any other acts, other
14   seizures, then we would argue that they should meet that 404(b)
15   requirement.

16           THE COURT:  All right.  Ma'am.

17           MS. MARSH:  Your Honor, what we intend to introduce
18   is as discussed earlier, the two seizures:  The covert one and
19   the overt one, or the reported one, where we believe there was
20   a theft.

21           We do intend to introduce evidence of his job, of his
22   role working, doing bulk cash seizure -- bulk cash smuggling
23   investigations, placing trackers, and the fact that he was
24   involved in other seizures.  But we are not using that to argue
25   that he stole money as part of those seizures.  Because as --

1        THE COURT:  Not that he ripped off other drug dealers

2   or couriers?

3        MS. MARSH:  We do intend to offer as evidence that he

4   had the opportunity to rip off other drug dealers with his --

5   his job.  So I guess that it's parsing out whether we're really

6   getting into the underlying conduct involved in each of these

7   other 22 seizures versus his opportunity, his access to the

8   trackers, his knowledge and sophistication in bulk cash

9   smuggling as an investigator.

10       We do intend to argue that there is circumstantial

11  evidence in the form of all of the money being deposited into

12  his accounts, either in money laundering or structuring methods

13  or the international money laundering count, that that is the

14  proceeds of other rips.  But we don't have a specific other rip

15  to point to other than Mr. Sanchez's.

16       But I will say that I do think that they're -- it is

17  relevant to this ongoing conspiracy.  This is part of the

18  conspiracy.  This is part of the timeline of the conspiracy and

19  his role and his job, and the fact that he did have this

20  expertise and was involved in bulk cash smuggling is certainly

21  inextricably intertwined with proving that conspiracy.

22       THE COURT:  You know, I had some hesitancy at our

23  last hearing.  I don't know if you picked it up.  I had our

24  hesitancy in the last -- during the last hearing.  And my

25  thought was whether or not this was a quantum leap to say --

leap to say that he must have done other things, when there

is -- I didn't hear there was circumstantial evidence that he

might have; as opposed to just an argument.

Because generally we hear from the Government --

generally we hear from the defendant, with all respect.

They'll throw things against the wall to see what sticks.  And

if what I'm hearing is the Government saying, Well, he must

have done this before because he knows how to do these things,

without any evidence, concerns me.

MS. MARSH:  Well, I do sense your hesitancy, your

Honor, but I want to address it head-on.

THE COURT:  Um-hmm.

MS. MARSH:  We are not trying to throw things at the

wall and see if they stick.  But we do have the circumstantial

evidence that he is having access and -- and stealing cash from

other bulk cash smugglers, other drugs dealers in these rips,

the unreported seizure.  It is the cash itself that is being

deposited into the account.  And --

THE COURT:  Into what account?

MS. MARSH:  Into the series of different accounts.  I

mean, into all of the accounts that he's depositing money into.

He has a number of accounts.  There are multiple

deposits, as described in the Superseding Indictment.  The

structuring acts, all of those things are very related.  And

his training and experience and access to trackers -- a lot of

1   it goes to the trackers, your Honor, because he has access to

2   these trackers and he has Agent Renner, who is his intel agent,

3   who is telling him, "Oh, this car is going right there right

4   now.  This one just went up to L.A.  It must be coming south

5   with a load."  Similar to what happened with Mr. Sanchez.

6           If we cannot admit evidence that he has this job and

7   is involved in these type of seizures -- sorry.  Do you want me

8   to stop?

9           THE COURT:  No.  Go ahead.

10          MS. MARSH:  Sorry.

11          If we can't -- if we're limited in -- in presenting

12  circumstantial evidence of his access to this money, then we're

13  limited in presenting our case.

14          Yes, we are asking the jury to make an inference.  We

15  are asking to make -- but not a quantum leap.  A reasonable

16  inference that because he has access and he's depositing money

17  in a money laundering scheme and in structured ways and he's

18  receiving training in money laundering and structuring and

19  holding himself out to be an expert in money laundering and

20  structuring, there is no real way to limit that.  Or if we are

21  limited, then we're limited in presenting the circumstantial

22  evidence that proves up the source of this money.

23          Because a million dollars -- or more than a million

24  dollars -- I don't know the exact amount -- went through his

25  accounts.  So he had to get it somewhere.

1          THE COURT:  All right.

2          MS. MARSH:  And we have -- we are presenting that as

3    certain -- the circumstantial evidence of these -- not that he

4    ripped from other -- or skimmed from other seizures, but I

5    think we absolutely intend to present the inference that he did

6    make other rips.

7          THE COURT:  All right.  Now, you -- you proffered,

8    earlier, that with the GPS evidence, you can -- you knew where

9    he was at a particular time that Sanchez says he was there.

10         MS. MARSH:  Yes.  No, his phone -- it's cell phone

11   data that puts him there.

12         THE COURT:  Not the GPS?

13         MS. MARSH:  The GPS tracking information is on

14   Sanchez's vehicle.  The tracker is on Sanchez's vehicle.  And

15   then it's the defendant's phone -- personal and work cell phone

16   data that puts him where Sanchez was when the rip occurred.

17         THE COURT:  But the -- I took it to mean that the GPS

18   tracker on the van placed that van in that spot.

19         MS. MARSH:  Yes.

20         THE COURT:  Do you have circumstantial evidence that

21   whenever Renner called him out to -- about a deal, the GPS

22   stopped for ten or 30 minutes and nothing was reported as

23   happening, as circumstantial evidence that something occurred?

24         MS. MARSH:  I think that Agent Renner will testify

25   that there were contacts or calls between the two -- they were

1  constantly texting and calling each other back and forth.  And

2  the defendant was responsible for many trackers, some of which

3  he placed himself and some of which were placed by other

4  agents.

5          THE COURT:  Um-hmm.

6          MS. MARSH:  I believe that Agent Renner will be able

7  to testify that they were in communication during these stops.

8  And I don't know that I can point directly to it.  I believe

9  there probably is evidence, if we go through all of the tracker

10  data, that there were times where vehicles stopped moving.

11          But I'm not sure the vehicle stopped moving means

12  that there was a rip happening.  I mean, there -- there --

13  there's a lot of tracker GPS data.

14          Right.  And -- well, yes.  And Agent Renner was on

15  the phone with the defendant during Mr. Sanchez's stop, and the

16  defendant was telling him it's empty.  It's an empty load.

17          So certainly, in that instance, we have that type of

18  information.  I think what we're talking about is other

19  instances.

20          THE COURT:  But that's the point.  Is there a link in

21  other incidents of rips where maybe this witness could say

22  there's a report there was nothing there?  There was a stop.

23  There was nothing there.  There's a stop.  There's something

24  here.  The money goes in.  There's another stop.  There's

25  nothing there.

1          MS. MARSH:  Well, Renner is not reporting in that

2     way.  Renner would only -- Renner is an intel agent.  So he's

3     not writing a report every time there is a tracker out.  So I

4     am not sure that Agent Renner could say, "I got a call on this

5     tracker, and he said it was empty."

6          I would have to go back through the discovery to try

7     to point to instances like that, your Honor.  And I'm certainly

8     willing to, if the Court will give me time to do it.  I cannot

9     say right now I can point to six other instances where he told

10    Agent Renner that it was an empty load.

11         THE COURT:  Or that the tracker sat on the side of

12    the road for an hour before it moved again?

13         MS. MARSH:  Right.  And, in this instance, it did sit

14    on the side of the road for an hour.

15         THE COURT:  In this circumstance?

16         MS. MARSH:  In Mr. Sanchez's instance.

17         I don't know that it would take that long to commit a

18    rip every time.  I mean, I don't know that it would need to be

19    that long for a rip to have been able to occur.

20         But it's the Government's position that it's really

21    more the fact that he had control and access to all of these

22    trackers and all of this information that is really imperative

23    to present as circumstance evidence of the source of the money.

24         THE COURT:  All right.  Thank you.

25         MR. STEWART:  Your Honor, the Government just went in

circles in answering your question.  The Government tried to answer the question about other seizures by going back constantly to this one that they've alleged involving Mr. Sanchez.  That suggests that the Government does not have the information that you're asking for, that there was evidence that the tracker stopped for a period of time or that someone was reporting that there was nothing there.

They don't have that evidence.  That's been part of what we've been trying to -- the challenging part from the defense standpoint is the Government wants to simply argue because he was an agent that did this for his job and had the ability and knowledge how to do this, then he must have engaged in other rips; and therein lies the problem.

Because, your Honor, under 404(b), you know, where it sets off the four-prong test, when the Government is trying to get in information about motive or opportunity, intent, preparation, planning, knowledge, identity, or absent mistake, there is a four-prong test that under *Rendon Duarte* (phonetic), that the Government must meet.

One, that the prior -- that the prior act evidence must prove a material element.

Two, that it must be similar to the charged conduct.

But, three, that proof of the prior conduct must be based on sufficient evidence.

And then, four, not too remote in time.  This three

1    one is really significant.  That the Government is really

2    telling you that -- and it doesn't want to admit it, but that

3    it doesn't really have much evidence other than he must have.

4          And that's quite challenging because now the

5    Government's able to produce all of this evidence to the jury

6    based off -- and encourage the jury, necessarily, to engage in

7    speculation with it.  Speculation and conjecture that, well, he

8    must have since he knew how to do it.

9          And so we're having to fight against -- if the Court

10   allows it in, this "must have"; this speculation which,

11   generally, the law tries to prevent -- to prevent from coming

12   in.

13         And, here, your Honor, if the Government is able to

14   get -- it's so hypothetical that the Government doesn't even

15   have facts to apply to this four-prong test.  That's how

16   hypothetical the Government's contention of other stops are.

17         The Government is not saying that there were five

18   other stops, two other stops, ten other stops, one other stop,

19   50 other stops.  The Government is not making any

20   representation.  The Government's not representing a stop

21   occurred in San Diego, in Chula Vista.  So we're having to

22   argue against the absence of any information.

23         The Government has no information to even apply to

24   this four-prong test but is telling the Court you should allow

25   it in anyway.  You should allow in evidence about stops that

must have occurred in the absence of evidence of stops having occurred. You know. And so we're having to argue against evidence that simply the Government's not making any showing. Not a showing whatsoever about these stops having had occurred.

It's very difficult to put a defendant in the position of arguing against something that the Government's not producing any evidence for. And that clearly encourages the jury to engage in speculation based off his -- you know, his -- his prior -- his prior work.

I mean, it would be different if the Government had other seizures that he engaged in that they could say, okay, there were discrepancies. But, here, the Government doesn't have that. And so the Government, in the absence of evidence, it wants to surmise. And that -- and that begs the question that necessarily is encouraging the jury just to surmise, speculate, guess.

And I know the Court said that perhaps we can deal with it on a Rule 59. That's so prejudicial, though, after the jury sits through a four-week, five-week trial, hearing all of this speculation, all of this suggestion. And then our remedy is after the jury's been indoctrinated for four or five weeks, to then, you know, ask for a Rule 59.

Now, I understand that that would be the Court's prerogative. But if the Court is not inclined, for whatever reason, to -- to sustain a Rule 59, you know, the jury is going

1  into deliberations with all of this speculation, and all of
2  this conjecture.
3          THE COURT:  Rule 29.
4          MR. STEWART:  I'm sorry.  I made a lot of errors
5  today, and I apologize for them.
6          Thank you, your Honor.
7          THE COURT:  Yes, ma'am.  Anything else?
8          MS. MARSH:  Yes, your Honor.  I just think it's
9  really unfair to characterize this as a lack of evidence.
10         We're talking about the time period that the
11  defendant was charged with this money laundering conspiracy.
12  And I -- I guess maybe I need to clarify from defense counsel
13  what they're actually seeking to exclude.
14         Because certainly the evidence of what his job is and
15  that he places trackers and that he works at HSI and he
16  investigates bulk cash smuggling cannot be excluded.  That's
17  part of this -- that's absolutely inextricably intertwined.
18         In their motion, they seek to exclude evidence of the
19  other 22 seizures, which I think maybe is not really what
20  they're seeking to exclude.  It sounds to me as though, in
21  defense counsel's argument, they're seeking to limit evidence
22  regarding his job and his employment, his expertise in bulk
23  cash smuggling.  I guess that I wanted to be clear and limit
24  what we're talking about.
25         And, certainly, the source of these funds must be

proved, and we have an obligation to prove it. And we need to be able to present circumstantial evidence in order to prove it. We have two incidents, and then we really just want to present the fact that he worked in this job during the rest of the time period. That's our theory of the case.

We do believe that a reasonable inference that he had access to that money or stole money during the course of his employment and it was the source of the laundered money is absolutely a reasonable inference to be drawn.

So whether it comes in as inextricably intertwined or part of the conspiracy or comes in as 404(b) evidence, either way it absolutely goes to a number of -- of the 404(b) prongs. It goes to knowledge. It goes to intent. It goes to opportunity. All of those things are satisfied. And there is substantial proof of prior conduct based on the two things we're already presenting, and his job and his access during this time period that absolutely satisfy all of those prongs of 404(b). So I guess that part of what is happening is the defense is arguing why the jury shouldn't believe our circumstantial evidence. But, really, we need to be thinking more narrowly here, about what can be presented or what could be limited.

And I guess I need some clarification or maybe the judge -- you -- will clarify it when you make your ruling, about what, really, the defense is even seeking to limit here.

1    Because it's certainly not reasonable to limit what his job is

2    or that he has access to trackers.

3         MR. STEWART:  Your Honor, in terms of the prongs, the

4    Government was citing when 404(b) is allowed.  But then you

5    have to get to the prongs.  And the prongs are not the motive,

6    intent.  I know the prongs are in order to get evidence in for

7    motive, intent, knowledge, planning, and so forth.  You then

8    get to the prongs.

9         And the prongs are the four that I discussed earlier.

10   And the one that's most at issue here is proof of prior conduct

11   must be -- must be based on sufficient evidence.  And that's

12   the one that's really at issue here.

13        But I want to say this also, your Honor.  My

14   understanding is that we've requested toll data from other

15   prior stops involving -- involving GPS units, so that we can

16   make these arguments and defend against it.  And we've been

17   told that --

18        (Pause, conferring.)

19        MR. STEWART:  And for the cell phone, we've been told

20   that it doesn't exist.  But that would be the information that

21   would be able to place Mr. Duren with that GPS unit.  Right?

22   And they say now it doesn't exist.

23        So they want to argue all of these phantom stops.

24   But the evidence that we use to defend, that was in the

25   Government's possession or ability to get, it no longer exists.

1   And the Government has been investigating this case since --

2   what?  2013?

3          So the Government is trying to have it a couple of

4   different ways.  They want to be able to argue that this must

5   have occurred.  But the evidence that we would want to defend

6   against it, the Government has indicated that no longer exists,

7   so we've been prejudiced in that regard.

8          And we would argue, even on that basis, the Court

9   should be very scrutinizing in terms of letting in the evidence

10  that -- we don't have the evidence, that we could try to fight

11  or refute it, that even the Court asked about.  The Government

12  counsel didn't answer it, but the Court asked about it.  But

13  the Government counsel referred to only that it exists in this

14  situation for this seizure, meaning Sanchez.  But didn't inform

15  the Court that there should have been that evidence for any

16  other phantom seizure; but it no longer exists.

17         So I think that that is very, very relevant with

18  regard to -- with regard to the cell phone.

19         So, your Honor, while I think Government counsel on

20  some level is correct that setting the stage in terms of how we

21  work is one thing, but when it gets into trying to demonstrate

22  circumstantially that there were other stops and seizures, I

23  think at that point I think that 404(b) definitely, I think,

24  comes into play in the sufficiency of the evidence.

25         The last point I'll make is the fact that there was

money -- I'll tell you, because he had plenty of investment properties between 2007 and 2009, the -- his bank statements indicate that there was about $1.89 million. And that's before even -- $1.2 million -- $1.2 million deposit, that's before they even allege a conspiracy.

So that doesn't provide sufficient evidence, the fact that there was money still being deposited, because the money was being deposited well before.

So in terms of the sufficiency of the evidence --

THE COURT: Well, that's -- you know, he may -- the defense may be that he has other money. That doesn't mean that the Government can't have a theory that it came from the violations alleged. Right?

MR. STEWART: I completely agree. So I'm just talking now, though, in terms of how the Court weighs that sufficiency when determining if these 404(b) prongs are met and if there's sufficient evidence for the Government to -- to introduce -- or evidence of these -- I'll call them phantom rips. That, you know, whether or not the Court is persuaded, there's a sufficient evidentiary basis to allow that.

And what we've said on -- so when it comes to the money, the Government has said that that is their basis.

And so I said, well, I've wanted to show that, know that that's not necessarily a solid basis because there's other ways to view that.

1          But asides from that, I've said, okay, well, the

2     Government has not produced evidence of stops occurring here

3     or -- you know, tracking data there, or other evidence that the

4     Court could use to weigh and determine if there's sufficient

5     evidence to allow these to come in.

6          So that's how I'm -- what I'm meaning to argue.  Not

7     simply that that can't be a basis, but in determining a

8     sufficiency of whether to allow it in.  And, of course, looking

9     at what different pieces of circumstantial evidence the

10    Government has that should be scrutinized from that standpoint.

11         I'll submit, your Honor.

12         THE COURT:  All right.  Thank you.

13         MS. MARSH:  I know we need to move on, but I just

14    want to add one more clarification.

15         THE COURT:  Sure.

16         MS. MARSH:  So the defendant deposited the bank

17    records that we have analyzed in our forensic accountants, and

18    the team that analyzed -- will testify that in a two-year

19    period he deposited $1.2 million in cash into his account.

20         Defense counsel is talking about there being $1.9

21    million.  At another time, our analysis of his bank records in

22    those two preceding years do not show $1.9 million.  But that's

23    all evidence that can go before the jury, and they can analyze

24    that as it goes to the defense.  But it is our theory that the

25    source of that money and the reason for those deposits is rips

1    that were not reported.

2            And by the nature of them not being reported, we're

3    not going to know about them and have the type of evidence that

4    the defense is trying to demand right now.

5            So the evidence itself, the circumstantial evidence

6    is the money and the deposits.  And all of the access and the

7    trackers and the defendant's conduct around that during the

8    time period charged in the conspiracy absolutely is relevant to

9    circumstantially prove the source of those funds.

10           THE COURT:  All right.  Thank you.

11           Let's move on to the civil lawsuit.

12           MR. STEWART:  Your Honor, my understanding, I believe

13   in 2011, initially, Mr. Duren sued his business partner.  His

14   business partner countersued Mr. Duren.  My understanding is

15   that there was never a determination --

16           (Pause, conferring.)

17           MR. STEWART:  So my understanding, in terms of both

18   the claim and the lawsuit and the counter-lawsuit is that it

19   was resolved by -- by buyouts.

20           One party bought out some of the properties.  The

21   other party bought out some of the other properties, and then

22   his business partner declared bankruptcy.

23           So from the standpoint of 404(b), the Government, in

24   its papers, has not demonstrated, in terms of the prongs of

25   404(b), how -- well, first, relevant, let alone 404(b).

1    We would argue that all that would occur there is
2  that we would basically be opening the door to potentially
3  litigating another civil case within this criminal case, and
4  that could sidetrack, I think, the jury, the issues, when I
5  think that it really has no direct relevance to the case.
6        THE COURT:  Was there any discovery conducted in that
7  case?  Depositions or requests for admissions, or anything like
8  that?
9        MS. MARSH:  Yes, there are depositions.  Sorry.
10        MR. STEWART:  Oh, I'm sorry.  Yes, your Honor.
11        THE COURT:  All right.  All right.  Thank you.
12        Counsel?
13        MS. MARSH:  Your Honor, the defendant himself puts
14  the civil suit at issue in a number of ways.
15        One, he's facing tax evasion charges, and so his tax
16  returns become significant -- or his failure to file tax
17  returns at all, his tax evasion becomes an issue.  And then
18  now, at this late date, he has filed some tax returns -- or not
19  really filed.  Produced some completed tax returns.
20        And, really, the tax evasion charge raises what was
21  going on in the business because it very much involves the
22  source of the income.  This cash, whether it came from the
23  business or did not come from the business, whether it came
24  from gambling or did not come from gambling, he also made large
25  cash payments to his attorneys in the civil lawsuit, which I

think puts the civil lawsuit -- at least the existence of it -- at issue.

It further goes to his financial strain and his motive to commit the offense. And the Government is not trying to -- seeking to introduce great detail about the civil lawsuit. But it's almost impossible to present the evidence without addressing that there was a lawsuit. That he had a business partner, and that they had a lawsuit and there was some dispute between them.

And some of the money -- some of the cash payments that are part of the money laundering scheme, some of the cash being spent was to pay the attorneys in the civil suit. So it really is inextricably intertwined in that way.

Additionally, defendant puts the civil suit at issue because he says, in his background investigation for his job at HSI, that the reason he hadn't filed taxes -- which goes directly to the tax evasion -- is because he was facing a civil lawsuit.

So the fact that it exists is an admission he's already made that is admissible in the case.

Additionally, it's his potential -- a potential defense -- at least this one we anticipate -- that he may claim that this cash -- this 1.2 million, or the money that's being deposited during the time frame of the conspiracy, is proceeds from the business that's involved in the lawsuit.

1           So for many reasons, the lawsuit really is

2   inextricably intertwined with proving the money laundering

3   conspiracy and the tax evasion charges at the minimum.  So all

4   of these things are really put at issue there.

5           THE COURT:  Were there any -- was there any discovery

6   in the civil case that dealt with admissions or any -- any

7   documents or financial documents shared between the parties

8   during the course of discovery in the civil lawsuit?

9           MS. MARSH:  There were.  In fact, there was a

10  valuation of his business.  So the Granite Hills Property is

11  the name of his business.  And he sought out an accountant to

12  value -- do a valuation of the business as part of the civil

13  lawsuit, to value it in the buyout with his partner.

14          So many of the documents that were recovered in the

15  search warrant here are also part of the civil lawsuit and part

16  of the valuation of his business.  And the valuation of his

17  business goes directly to the tax evasion.  It goes directly to

18  what -- where the source of this unreported income really is --

19  comes from.

20          So I -- yes, there were depositions.  There were

21  financial disclosures.  There was at least a partial forensic

22  analysis by an accountant, which we have then used to compare

23  to our own forensic accounting in our case and to help support

24  it and help explain it.  So it -- it really is very intertwined

25  with our evaluation.

1          What we are required to prove, the elements of the

2    money laundering conspiracy, are very intertwined with the

3    civil suit and the accounting and his businesses with Granite

4    Hill Property.

5          MR. STEWART:  Your Honor, it's unclear.  The -- the

6    money laundering, the Government has alleged specific or

7    specified unlawful activity, which is required by statute.  And

8    they've alleged, you know, the theft of drug money.

9          The Government has not just proffered in its argument

10   here how the business -- or how -- how the lawsuit pertained to

11   the business in any way proves up the money laundering, which

12   apparently comes from -- according to their theory -- the theft

13   of drug money.  So that connection --

14         THE COURT:  Why isn't it -- why is it that it cannot

15   be used to prove the success of the money laundering business?

16   Because all of the -- the valuation placed by your client,

17   which would be an admission against interest, is from your

18   client's interest.  The valuation of the business, which can

19   possibly be -- if there's a link with the Government's experts

20   about how -- why that is -- you know, that valuation is

21   proceeds from the earlier SUAs.

22         MR. STEWART:  I -- I understand that the -- the

23   Court's point that there may be either some argument

24   somewhere -- here's the issue, is that I think we're now

25   running the risk of getting collateral.  Because if we're going

1    to basically open up that case, the civil case into this case,

2    I think now you potentially have two cases operating at once.

3            You have -- now we're going to have to litigate

4    the -- you know, our response or our position as it relates to

5    maybe any claims or contentions that are raised concerning that

6    case.

7            And then potentially it now has a civil case, that

8    wasn't adjudicated, going on inside of a criminal case.  And I

9    just think that that allows potentially for collateral and

10   distraction.  But it -- because if the Government brings it

11   in -- and we certainly will have to fully defend it -- then it

12   runs the potential of having a civil case operating, you know,

13   simultaneous inside of a criminal case.  And that could

14   derail -- or greatly extend the criminal case.

15           So it -- but I understand the Court's point that it's

16   possible.  But it could become, I think, a -- well, not from

17   the Court's standpoint.  But from our standpoint, there's the

18   risk of having significant litigation of -- concerning this

19   civil case within this criminal case.

20           THE COURT:  All right.  Anything else, ma'am?

21           MS. MARSH:  It's a point that I think I addressed in

22   my pleadings, but I want to raise here orally as well.  Also

23   the first -- the allegations of misconduct that began the

24   investigation here into Mr. Duren came almost simultaneously

25   from Mr. Sanchez.  That he had money stolen from him and the

1  defendant's business partner, that he was -- his business

2  partner, Mr. Sanders, said he was stealing from him as well.

3         So our case agent was contacted in the same duty week

4  by the Border Patrol agent saying, "Hey, this guy Sanchez came

5  forward and said an agent ripped money from him."

6         And then within a few days' time, Mr. Sanders

7  contacted OIG and said, "Hey, this agent, Tyrone Duren, he is

8  putting all of this cash into this business, and he's stealing

9  from me and he's embezzling. Here's all of the evidence from

10 my civil lawsuit. I think you need to look into this agent."

11 And so it also is really part of how the investigation began.

12        And the Government is comfortable limiting it. And

13 we don't want to litigate the civil suit. Trust me, we don't

14 want to get into, really, the disputes between Mr. Sanders and

15 Mr. Duren.

16        What we do need to present is all of the things that

17 led to the next steps in the investigation: How Mr. Duren was

18 laundering money into his business, how that prompted the civil

19 lawsuit. It can be narrowly presented, but it certainly is

20 inextricably intertwined and evidence that is relevant to the

21 charges in this case.

22        MR. STEWART: But let me say this, your Honor. It

23 doesn't make sense.

24        If the Government is saying on the one hand Mr. Duren

25 is putting stolen money into the business but the business

1    partner is suing Mr. Duren, alleging that Mr. Duren took his

2    money -- took his investment, took money that he was putting

3    into the business, then those are clearly different -- those

4    would be clearly different moneys.  Right?

5              It wouldn't be that the business partner is suing

6    Mr. Duren for taking -- for stealing his money.

7              No.  So the Government's saying that if Mr. Duren is

8    putting in stolen money, that wouldn't give rise to the civil

9    suit in terms of the partner's claims that Mr. Duren is

10   stealing his money.  Right?  Because his money would have come

11   from him into the business, not money that Mr. Duren put into

12   the business.  So the Government's theory of how that applies

13   doesn't seem to -- to make sense.

14             What they want to do is be able to say, well, if the

15   business partner is saying that Mr. Duren stole his money,

16   that's propensity.  And they want to be able to take Mr. Duren

17   by saying the business partner made these claims against

18   Mr. Duren.  That has nothing to -- as a matter of fact, that's

19   completely different than any claim of the Government that

20   Mr. Duren put money into the business from -- that -- that was

21   from stolen seizures.

22             So -- I think we have to be careful.  So at least

23   what we're asking the Court is not to allow the Government to

24   basically, you know, slander Mr. Duren with unproved charges

25   that Mr. Duren was stealing money from his partner.  That would

not prove up the Government's theory but it would add prejudice to Mr. Duren.  And so, at least in that regard, the Government should not be able to make claims from the partner that Mr. Duren is stealing his money.

Now, if the Government feels that there's other evidence related to the claim that proves, as the Court indicated, Mr. Duren was coming in with money that may have come from there, then I understand the Court's thought process there.  But it sounds like the Government also wants to be able simply to argue that -- that here's a suit by Mr. Duren's business partner, where his business partner claimed that he was stealing from him.  That doesn't prove up the Government's case at all.  It's propensity.  It's not even proved propensity.  And it would prejudice Mr. Duren.  So we would request that the Court preclude the Government from introducing evidence of claims of theft that -- that the partner made, that Mr. Duren stole from him.  That in no way impacts the Government's ability to get into money that Mr. Duren put into the business.

THE COURT:  All right.  Thank you.

MS. MARSH:  I'm sorry.  I don't want to belabor the point.

THE COURT:  Yes.

MS. MARSH:  But Mr. Sanders, the business partner, said that Mr. Duren was putting unexplained cash into the

1    business.  That's part of what was going on.

2         Our understanding is that then Mr. Sanders thought

3    that the business was making a lot of money and he was then not

4    fairly being paid out his fair share of the money.  But our

5    financial analysis proved otherwise.  That the money was coming

6    from an unexplained source, and it -- and it was not being

7    stolen from Sanders in any way.

8         Our theory is that the money was then being

9    funneled -- the money -- the stolen money that was being put

10   into the business as part of the money laundering conspiracy to

11   launder that money, hide the money, and that's what led

12   Mr. Sanders to believe that the business was doing better than

13   it really was and that he should be owed money.

14        MR. STEWART:  Your Honor, I think that this -- that

15   this particular issue -- so the Court has all of the

16   information -- I would encourage and ask the Court to -- if the

17   Court would allow the parties to -- because this issue, I

18   think, is one that would be very difficult for the Court to

19   determine kind of on the fly.

20        The Government is saying, well, here's our

21   understanding of the case.  Well, the case speaks for itself.

22   Right?

23        There's documents in the case.  There's discovery in

24   the case.  And so I think that the parties, if the Government

25   wants to introduce this type of evidence, then the Government

1  needs to -- I would argue -- or request that the Court require

2  the parties present this evidence to the Court well in advance

3  of trial so that we don't have to -- so the Court doesn't have

4  to decide on the fly, in front of the jury, whether the

5  Government's thought about it is in line of the actual evidence

6  after the evidence comes out.  Because it -- and in that way,

7  the Court would be in a position to -- I think, to decide -- if

8  at all -- how it wants to limit the parties getting into this

9  civil case.

10          So I would request that the Court have the parties

11  to -- to -- to brief this issue from the standpoint of

12  providing the information to kind of support how the parties

13  want -- or how the Government wants to use this evidence, what

14  the defense's response is so that the Court can determine if in

15  fact the evidence is probative of a matter in the case.

16          THE COURT:  All right.  Thank you.

17          Allow me to do this.  I would like to look to the

18  Government's motions in limine and see if we can go through

19  those and narrow this playing field a little more before I take

20  a recess to review the bidding here.  Okay?

21          If I leave anything out, let me know, Counsel.  Both

22  sides, if I leave something out.

23          The Government moves to admit business records.

24          The defendant has no objection, as long as the

25  records are properly authenticated.  The motion is granted,

1  provided proper authentication.

2        The Government -- Government moves to admit

3  defendant's statements.  That motion is granted.  The defendant

4  has an issue with respect to statements involving hearsay.

5        MR. KIRBY:  As long as they don't involve hearsay,

6  your Honor, then we don't -- and they are not -- and they

7  are -- and/or they are admissions of the parties opponent, we

8  have no objection.

9        THE COURT:  Any statements are admission of a party

10 opponent.  But what do you mean by "hearsay"?

11       MR. KIRBY:  I'm sorry, your Honor?

12       THE COURT:  In my view, any statement made by a party

13 opponent is admissible if it's relevant.  What do you mean by

14 "hearsay"?

15       MR. KIRBY:  I think I may have misstated there, your

16 Honor.  I have no objection.

17       THE COURT:  I'm sorry?

18       MR. KIRBY:  I have no objection, your Honor.

19       THE COURT:  All right.

20       Are you suggesting he made some hearsay statements in

21 the statements otherwise to some third party or to agents?

22       MR. KIRBY:  No, your Honor.  I'm not.

23       THE COURT:  All right.  The motion's granted.

24       The Government moves to admit material witness, to

25 admit the material witness deposition.  I've ruled on that

1  issue.

2         MR. KIRBY:  Yes.

3         THE COURT:  Granted, with the provisos referred to

4  earlier this morning.

5         The Government wants to use the transcript as an aid,

6  listening to the recorded conversations.  That motion is

7  granted.  But in -- at -- I take it from our last conversations

8  with all of this, your video is going to have subscripts under

9  it?

10        MS. MARSH:  That's correct.  There are other audio

11 recordings that don't have a video, so they're not

12 simultaneously going to play the same way.  So the deposition

13 has the subscript.

14        There are some other recorded phone calls between the

15 defendant and other investigators where we have a transcript

16 that is not sync'd in the same way.

17        THE COURT:  All right.

18        MS. MARSH:  So all of those transcripts have been

19 provided to defense counsel, and we've not received any

20 corrections or changes.  But maybe between now and then defense

21 counsel could review those.

22        THE COURT:  Counsel?

23        MR. KIRBY:  I will do so, your Honor.

24        My -- my only concern here, your Honor, in the past,

25 in my experience, when there's -- I mean, you have the audio.

1   The audio is the evidence.  The transcript is not the evidence,

2   as long as it's in the English language.  And if the jury tends

3   to focus too much on the transcript and not enough on what the

4   real evidence is.

5          THE COURT:  Right.

6          What you should know, both parties, is that in the

7   past, the practice in this district has been to require -- if

8   the jury wanted to rehear an audiotape, they will come back to

9   the courtroom to hear the tape.  Because the idea was that we

10  did not want the jury focusing on one piece of evidence,

11  playing that 50 times and not looking at the other evidence.

12  They would hear it once in the courtroom and go back.

13         Since that time, and in light of the advent of

14  electronic transmissions and electronic courtrooms, we have

15  equipment in the back.  Large screen TV with a device that

16  allows audio or video to be played on it, that has no other

17  outside connections.  You can't get on the Internet with it.

18  It's a cleansed document -- I mean, device.  It only permits

19  projection on a screen.

20         And so the practice is changing in the district with

21  respect to viewing a video evidence as well as audio evidence.

22         MR. KIRBY:  Now, your Honor, just a point of

23  clarification.

24         With audio evidence, that does not have a video

25  connected to it, are the transcripts going to be sent back to

1   the jury room?

2           THE COURT:  Here's the question.  Thank you.  That's

3   a good question.

4           With the audio evidence, is there a transcript that's

5   on audio evidence?  Is it set up where there's a transcription

6   as the people are talking?

7           MS. MARSH:  No, it is not sync'd in that way.  We

8   just have a paper transcript and the audio.

9           If the Court prefers that we try to sync it, I can

10  ask our automated legal people to do that, the ALS division in

11  our office.  It's time-consuming for them to do so.  But if

12  that's the best way to present it or if the Court prefers that,

13  I can see if they can get that done in time.

14          THE COURT:  That is the preferable way because at

15  least they can track as it goes along with the transcript, as

16  opposed to them not listening to the audio and reading the

17  words and they're not listening to the inflection about how

18  things are said or when they're said that -- you know, that's

19  all part of that demeanor evidence from the voices and how

20  information is transferred -- or translated between the two

21  persons speaking.

22          If that is -- if it's sync'd, I'm more comfortable to

23  allow them to review that in -- in -- in the jury room.  But if

24  it's not sync'd, I may -- if they want to rehear that evidence,

25  to bring them back to the courtroom.

1          MS. MARSH:  Understood.  I'll inquire whether we can

2     get it sync'd.  And if we can't, then I would not oppose to

3     bringing them back to the courtroom, obviously, and having it

4     reviewed in that manner.

5          THE COURT:  All right.  All right, ma'am.  Thank you.

6          THE CLERK:  Judge?

7          (Pause, Court and clerk conferring.)

8          THE COURT:  The motion is -- at this point, granted

9     in part.  It's granted with respect to video evidence with the

10    transcript subscript underneath that follows the video.  So

11    that, in that way, the jurors can view the demeanor evidence of

12    the witness while they're listening to the testimony, in case

13    the testimony is not clear.

14         That's important.  All right?

15         I think demeanor evidence is important in audio

16    transcripts as well because the demeanor of how one speaks and

17    their inflection and how -- more than just the words, it's how

18    they speak the words and how they react to the questions or the

19    give and take.  And so that needs to be sync'd or we need to do

20    it out here.  All right?  So it's a one-time play, and they go

21    back.  Not to sit here for 30 minutes to listen to a

22    five-minute telephone call, or whatever the circumstance is,

23    and to replay, replay, replay.

24         So that's the best I can do.  Otherwise, we'll deal

25    with it on the fly, based upon what your office is able to do.

1   The U.S. Attorney's Office here does it all the time.  I don't

2   know much time it takes.  It's doable.  I know it's doable.

3   But -- but there's less than -- there's less than, you know --

4   what?  Five, six weeks to trial.

5         But to the extent that you can do that, it would make

6   things flow more ease -- more easily.  But we'll decide once

7   the trial day starts.  Okay?

8         MS. MARSH:  Our office does it regularly as well.

9   They just always request as much lead time as possible.  So I

10   feel confident they'll be able to do so.  I just need to make

11   sure.

12         THE COURT:  Okay.  Motion to preclude argument and

13   evidence of alleged wrongdoing of lenders.

14         I take this as the proverbial issue of lenders who

15   are involved in law violations that -- the arguments that they

16   were involved in illegal practices themselves or in the market

17   meltdown.  Is that correct?

18         MS. MARSH:  That's correct.  We're just trying to

19   preclude that.

20         MR. KIRBY:  And, your Honor, I have just have one

21   small caveat that came to me.

22         I understand that *Sarno* -- the line of cases, and

23   that that is not a defense.  But I want to make sure that we're

24   clear that the Government still has to establish the -- the

25   requisite mens rea.  I mean, if someone above the defendants

1     changed things without the defendant's knowledge, then that

2     cannot be a basis for mortgage fraud because they don't have

3     the mens rea required for it.

4                THE COURT:  Do you agree?

5                MS. MARSH:  Yes.

6                THE COURT:  All right.  Granted, with the proviso.

7                Motion to preclude self-serving hearsay.  The defense

8     indicates that it will not seek any from any witness.  Motion

9     is granted.

10                Motion to preclude all defense experts and evidence

11    not produced by the defendants prior to trial.

12                Are we clear -- from our last hearing, I understand

13    we're clear with respect to defense expert testimony.  Right?

14                MR. KIRBY:  I believe so, your Honor.

15                MS. MARSH:  I believe so as well.

16                THE COURT:  All right.  Very well.

17                MS. MARSH:  This motion was filed ahead of that

18    hearing.

19                THE COURT:  That's right.

20                The motion is denied as moot.  The motion to exclude

21    improper character evidence, that motion is granted.  The

22    motion to present evidence of lavish spending, that motion is

23    granted.  Lavish spending during the course -- during the

24    relevant period.  Yes, of course.

25                MS. MARSH:  Understood.

1          THE COURT:  With that -- with that, I will get off

2     the bench and review the bidding.  And I would like to give you

3     the rulings today.

4          I think I can handle all of these matters in the next

5     20 minutes.  So by ten minutes to 5:00, I ask you to be close

6     to the courtroom.

7          If I need more time, I'll ask someone to let you

8     know.  But I should be done by that time.  All right?

9          MS. MARSH:  Understood.  Thank you, your Honor.

10          We do -- and I don't know if this -- this moment is

11     not the right time to raise these issues.  But maybe if we have

12     time, at 5:00, we would like to discuss some logistics about

13     trial and maybe set a final pretrial conference date.  But I

14     think we can handle that maybe after the Court rules.

15          THE COURT:  I agree.  Okay.  Okay.

16          I know that everyone else has other business to

17     conduct.  Best complete this business, and we'll be on our way.

18          (Recess taken at 4:25 p.m.)

19          (Court resumes at 5:25 p.m.)

20          THE COURT:  Okay.  The record should reflect the

21     parties are present.

22          MS. MARSH:  Do we need Mr. McDowell?

23          THE COURT:  No.

24          MS. MARSH:  I mean, I think we need Mr. McDowell.

25          THE COURT:  We have a Mr. McDowell stand-in here.

1          MR. STEWART:  Oh, okay.

2          MS. MARSH:  Substitute.

3          THE COURT:  All right.  The Court will start with the

4     follow-up on the motions in limine first.

5          The defendant moves to preclude evidence of other

6     seizures that do not meet the requirements of 404(b).  The

7     Government responds that only -- it only intends to introduce

8     the evidence of two specific seizures, 2013 alleged seizure

9     involved in this case and one covert seizure resulting from --

10    in or about -- on -- considering -- concerning the transfer of

11    money between Brinks and some other Government agency.

12         The Government intends to introduce strong

13    circumstantial evidence of large and structured bank cash

14    deposits starting in or about 2010, just a few years after

15    defendant moved to the Department of Homeland Security.  The

16    Government's argument is that it believes that there were other

17    unknown, unreported seizures that are likely the source of

18    laundered funds.

19         The Government argues that this uncharged misconduct

20    relates closely in time, manner, and character and is

21    inextricably intertwined with the crime charged.

22         For evidence to be inextricably intertwined, it must

23    constitute a part of the transaction that serves as a basis for

24    the charged offense or it was necessary to permit the

25    Government to offer a coherent and comprehensive story or

narrative regarding the crime charged.

It is admissible as direct evidence of the crime charged. It is to be used to flesh out circumstances surrounding a crime charged, to place the evidence in proper context.

In this case, the Government asserts that the defendant's employment provides -- evidence of the defendant's employment provides context in which the crime charged occurred and is necessarily involved conduct that gave the defendant access and knowledge regarding the GPS trackers and investigative tools to help him accomplish his crimes.

The Government asserts that the defendant prepared a PowerPoint presentation lauding his expertise and his detailing of his ongoing activities in Operation Toll Roads, and also evidence of total number of seizures and a total amount of cash seized is -- is informative evidence.

The Government also moves to introduce evidence of a job description and believes that there were other known unreported seizures that were likely the source of laundered funds. The Court -- the Court notes that the Government also argues that even if the evidence is not inextricably intertwined, it's relevant to prove motive, intent, op -- opportunity, and knowledge under 404(b).

The Court finds that evidence is inextricably intertwined and is admissible as direct evidence in two

1  categories of cases.

2          Where the evidence to be admitted constitutes a part

3  of the transaction and serves as a bases for the crime and

4  where the other acts evidence is necessary

5          To do -- to admit in order to permit the prosecutor

6  to offer a coherent and comprehensive narrative regarding the

7  commission of the crime, to explain either the circumstances

8  under which a particular evidence was obtained or the events

9  surrounding the commission of the offense.  The *United States*

10 *versus Loftis*, L-O-F-T-I-S, Ninth Circuit, 2016.

11         In *Loftis*, the Ninth Circuit found that uncharged

12 acts that are part of an overall scheme and/or part of the same

13 transaction as the charged events are inextricably intertwined.

14         In this case, the Court finds that the defendant's

15 employment provides context in which the crime charged occurred

16 and is necessarily involved conduct that gave defendant access

17 and knowledge of GPS systems and trackers and investigative

18 tools to help him accomplish his crimes

19         The Court finds that the PowerPoint presentation

20 allegedly prepared by the defendant to reflect his expertise is

21 evidence that provides context in which the crime charged

22 occurred and is necessarily involved conduct that can give

23 defendant access and knowledge or reflect as access and

24 expertise in -- to help him accomplish the crime.

25         The same with the defendant's job description.  It's

not offered to allege the defendant stole from other seizures but are examples of direct evidence of -- of inextricably intertwined evidence of other crimes charged. The Court finds these facts tend to prove matters at issue and not as circumstantial evidence requiring an inference as to the character of the defendant in the case. However, the Court does not agree that evidence of total number of seizures or total amount of cash seized is inextricably intertwined to the crimes charged.

Here, the Government suggested general evidence that the defendant participated in other seizures without more is insufficient to support a showing that he may have committed the same acts in one or more of other seizures. The Government has evidence -- has evidence to show, for example, that the defendant's telephone and GPS contained in Sanchez's vehicle corroborates Sanchez's statements.

The Government has not presented any proffer the defendant's cell phone data shows that he spent any period of time in any area where a suspected vehicle, equipped with the Government GPS, had stopped and the defendant reported no seizure occurred or compartment was empty. Such evidence, for example, would inform the inference that the defendant may have ripped off other couriers. There must be evidence that there were other rip-offs.

Other evidence could be deposits and expenditures or

unexplained income that may be appropriate evidence.  But to
utilize the number of legitimate seizures and to speculate as
to the possibility of other seizures without some
circumstances -- circumstantial evidence to draw the
connection, the Court finds problematic.

The Court finds that the Government has not shown
that evidence of total number of seizures or the total amount
of cash seized is inextricably intertwined to the crime
charged.

The Government also suggests that if it's not
inextricably intertwined, it is 404(b) evidence.

As the defendant points out, the Ninth Circuit has
made clear that 404(b) evidence must satisfy four elements that
the suspect -- in order to -- for -- for evidence to be in --
to be admitted under 404(b).

Yes, it has to go towards one of the exceptions of
404(b):  opportunity, motive, intent, knowledge, et cetera.
But the four elements must be -- it can't be the argument that
it goes to those four elements.  The -- you know, there has to
be evidence to tend to show that it's only admitted for one of
those -- for one of those enumerated purposes under 404(b).
The suspect element here is sufficiency of the evidence to
support the intended proposition that there must be other
seizures, and it has to be presented without creating a
mini-trial.

1          No. 1, again, there's no proffer as to any

2     circumstantial evidence beyond -- with respect to seizures or

3     stops in that regard.

4          No. 2, any such evidence without full explanation of

5     all the facts and circumstances to the defendant creates a

6     mini-trial.  And even if it was disclosed to the defendant, it

7     creates a mini-trial; it distracts the jury from the principal

8     issues in the case; and it becomes a waste of time.

9          More importantly, the Court finds that even if such

10     evidence was probative under 404, it's -- because of the

11     reasons stated, the probative value is substantially outweighed

12     by undue prejudice as to the defendant.

13          I would next go to -- anyway, so evidence of other

14     seizures.  The motion to exclude evidence of other seizures is

15     granted.  To the extent the motion includes the other -- the

16     other evidence offered by the Government with respect to

17     employment, those other points that I mentioned, is denied.

18          Part and parcel to other evidence -- other acts

19     evidence, other seizure evidence, or the argument in that

20     regard is the motion to preclude evidence about suspicious

21     seizures by the agent, Agent Renner, R-E-N-N-E-R.

22          The Court's ruling with respect to his testimony is

23     the same as -- as I've laid out with respect to -- that I just

24     laid out with to other seizures.

25          To be relevant, Agent Renner would have to point to

1    instances where there has been a following or a stop that has

2    been communicated between he and the defendant and the stop

3    occurred.  And then there's -- there's consideration as to

4    whether or not -- there's communication as to whether or not

5    anything happened or not.  There was no, you know, empty

6    compartment, or no money involved, or the wrong car, or the

7    wrong driver, or whatever the circumstances might be, you know,

8    to suggest that -- that the sufficiency prong of 404(b) is

9    satisfied.

10           At this juncture, it's not.  The Court grants the

11   Government's -- I mean, the defendant's motion to exclude

12   suspicious seizures by Agent Renner.

13           MS. MARSH:  May I be heard briefly, your Honor?

14           THE COURT:  Yes.

15           MS. MARSH:  I just was clarifying with the case agent

16   about some of the statements made to Agent Renner by the

17   defendant.  And there is an instance where the defendant told

18   Agent Renner that there was a seizure that there was no cash --

19   or there was a stop and no cash was recovered.

20           Is that accurate?

21           There was money missing out of a collect -- a seizure

22   in Calexico.  That's disclosed to the defense.  That's in Agent

23   Renner's report.

24           THE COURT:  Okay.  Well, if there's such evidence, I

25   find there's circumstantial evidence where you can make an

1   argument with respect to a seizure like that.

2          MS. MARSH:  Okay.  So -- go ahead.

3          THE COURT:  All right.  But the general argument,

4   there were plenty other seizures without plenty other evidence,

5   you know, that's -- that's an issue.

6          MS. MARSH:  So I think in the motion to preclude

7   statements from Agent Renner, though, the defense may be

8   speaking to that statement, which is really an admission by a

9   party opponent because the defendant is telling Renner there is

10  missing money.

11         MR. STEWART:  Well -- I'm sorry.  I'm sorry.  Go

12  ahead.

13         MS. MARSH:  I mean, that's it.  I think it's

14  admissible as an admission and under -- not as to what Renner

15  suspected about it.

16         THE COURT:  That's true.

17         MS. MARSH:  But as to the statement.

18         So, I mean, I guess I would just ask leave of the

19  Court to more thoroughly look and make sure that there aren't

20  other statements like that to Agent Renner that I'm not seeing

21  right now in the preparation of this motion.  But, at this

22  juncture, that's the one I know of and can think of.

23         MR. STEWART:  And my understanding with that is that

24  Mr. Duren was not involved in that seizure --

25         THE COURT REPORTER:  I'm sorry.  I need you to speak

1  up, please.

2          MR. STEWART:  I'm sorry.

3          THE COURT:  Speak up here, please.

4          MR. STEWART:  My understanding -- my understanding

5  with regard to the seizure the prosecution's just indicated,

6  that Mr. Duren was not involved in any way in that seizure --

7          (Pause, Mr. Stewart and defendant conferring.)

8          MR. STEWART:  You know, what, your Honor, I think

9  what we'll do is I agree with the prosecution that we just need

10  to look into it, the prosecution look into it.  And if they

11  have sufficient evidence of circumstantial, then they'll

12  present it, and we'll deal with it at that time.

13          THE COURT:  My point is what I've been presented with

14  so far doesn't cut it.

15          MR. STEWART:  Okay.

16          THE COURT:  If there's some evidence in that regard,

17  then I think you're closer to the mark.  But the breadth of

18  which -- that would give you some room to argue because you

19  have some circumstantial evidence.  But right now I'm not

20  presented with any.  And I suggest the parties meet and confer

21  with respect to the nature of the evidence you might have,

22  ma'am.

23          MS. MARSH:  Understood.  Thank you, your Honor.

24          THE COURT:  The testimony regarding the lawsuit

25  between the business partners.

1    Defendant moves to exclude such evidence.  The Court

2    grants in part and denies in part the defendant's motion.

3    It's denied with respect to any evidence regarding

4    defendant's evaluation of the businesses; the amounts in his

5    bank account that came up during the course of discovery in

6    that lawsuit; Sander's testimony of unexplained cash in the

7    business, without speculating as to where it may have come

8    from.  Other relevant admissions by the defendant and any other

9    relevant evidence that goes to cash flow or business ventures,

10   the Government deems to be relevant.

11   The motion is granted with respect to the civil

12   lawsuit and the counterclaims filed in the lawsuit, who was

13   right and who was wrong in the lawsuit, or allegations by

14   Sanchez that defendant took any of his share of the business

15   proceeds.  Because there's no final determination of that.

16   Otherwise, we'll be creating a mini-trial as to who was right

17   and wrong in that lawsuit, as counsel suggests.  We'll be

18   trying that case here in front of the jury, when it's a

19   sideline issue.  When we can get to relevant information

20   without getting into the weeds of the dispute between the

21   defendant and his partner.

22   I feel that the motion should be -- should be denied

23   to these matters.

24   There may be some other matters out there that you

25   know from your investigation or from -- from the defendant's

investigation that might be near the borderline between those two issues.  I would suggest that you bring those to my attention before anyone testifies or this witness testifies about those things, and we'll address them at that point in time.

But at this juncture the Court finds on those -- on those lines of questioning or introduction of evidence on which I have granted in part defendant's motion, the Court finds that if there's any probative value on those matters it should be excluded under 403 due to the danger of a mini-trial, distraction of the issues, waste of time, and any other probative value is substantially outweighed by undue prejudice out there.

We go back to the substantive motion.  I believe there's one remaining.  That's Count 35, the severance motion. Is that correct?

MR. STEWART:  Yes, your Honor.

MS. MARSH:  Correct.

THE COURT:  All right.  The defendant moves to sever Count 35, alleging conspiracy to commit bank fraud, from the remaining counts.

The defendant argues that the Government's central theory of the case is money laundering and structuring from cash seizures, the SUAs identified in the objects and the means of the conspiracy.

1    Upon review of the Indictment, the Court finds it has

2    reviewed the relevant entities involved in the count:  GHP,

3    U.S. Holdings.  Although U.S. Holdings had nine properties

4    involved, there's no time period re the purchase of the

5    properties with cash from a home safe.

6    I've considered the purchases prior -- of property

7    prior to 2009.  I've given you my thoughts on that already.

8    There's also a Croatia -- Croatia account -- excuse

9    me -- that was opened in 2015.

10   The Indictment also asserts the defendant's

11   allegations regarding the defendant's income between 2007 and

12   2008 with the California Highway patrol.  The Government cites

13   in the Indictment issues relating to the defendant's filing of

14   federal tax returns he filed a 2008 and 2009 return, and he

15   filed the 2008 and 2009 return for GHP, one of his holdings.

16   No returns were filed between 2010 and 2015.

17   There's a September 2014 interview where the

18   defendant admitted that his net worth was at least a million

19   dollars.  The Indictment also goes into various financial

20   institutions involved and transactions with those institutions.

21   The GP -- the JP Morgan account was opened 2011 and

22   closed in 2015.  The Citibank account was opened in May of 2011

23   and closed in -- in February 2013.

24   Before the events occurred with the seizure in this

25   case, the primary seizure in this case, there were eight

accounts at Wells Fargo. Six were partnership holdings or LLC holdings. One was for the defendant and his wife and another one of the business partners.

Next, Mission Federal Credit Union. There was a -- an account there with -- between the defendant and his wife. It was opened in 2010 and closed in 2015.

There was also a Bank of America account with two business accounts contained in it, relating to the defendant and his wife.

There was the -- is this the Croatia account? The Banka Zagreb?

MS. MARSH: Zagreb, I think. Yes, your Honor.

THE COURT: Zagreb. Thank you. The account is identified -- the first name in the -- in the bank account is P-R-I-V-I-E-D-E-N-A Banka, with an A. "Bank" with an A. And Z-A-G-R-E-B.

This account was opened in 2016 by husband and wife. And the wife had the power of attorney to deal with that account. And also there was an account, Flagstar Bank in Southern California that was involved.

Count 14 lays out the conspiracy between January 2010 to the present. It lays out that the defendants conspired to commit four offenses: Money laundering, avoiding currency transaction reports, international money laundering, and transactional money laundering.

1        The objects of the charged conspiracy were seized

2   money from drug traffickers, the use of the seized money for

3   personal expenditures, and the concealment of the source of

4   seized moneys in various ways.

5        The manner and means lays out how the defendants went

6   about doing that.  It had no relation to bank fraud in the

7   manner and means.  And overt acts -- there are a number of

8   overt acts identified.  Overt act No. 15(f) dealt with an

9   October 2013 deposit of $70,000 in $100 bills in Union Bank.

10  The defendant represented that the cash was from U.S. Holdings.

11       There's no other bank referenced.  No other bank

12  referenced transactions with respect to Union Bank.

13  Thereafter, the substantive counts are alleged in the

14  Indictment, up to Count 35.

15       Count 35 charges conspiracy to commit bank fraud.  It

16  re-alleges all previous allegations.  It alleges that from

17  August 2004 through April 2009 that the object of the

18  conspiracy was to obtain properties by misrepresenting assets,

19  refinancing to use cash out, refinancing to purchase other

20  investment properties, and then to default on the loans.

21       The manner and means alleged was the 2000 -- well,

22  were -- among those manner and means alleged, were -- was the

23  2004 obtaining of a home loan from -- for Monique -- M-O-N-E-T

24  Way.  The property was originally purchased as a vacant lot,

25  apparently, and a construction loan was thereafter apparently

obtained in 2004.

The allegations suggest that there was a misstating of liabilities and financial history, and that there were two or three other refinancings of that property. Cash was pulled out. In February of 2009 the defendants -- this defendant and his wife stopped making payments. And in March of 2009, a month later, the wife purchased Overland property, another real -- a piece of real property, and misrepresented her employment. And once the property was obtained, defaulted on -- on the first home on Monique [sic] Way.

And overt acts alleged began, again, in the 2004 purchase of the land at Monique Way and -- and the obtaining of a $352,000 construction loan. It was refinanced in 2005.

The second mortgage in 2006.

And the proceeds from the second mortgage were utilized to purchase properties; between 2006 and 2007, 12 rental properties in Philadelphia.

In September 2007, there was a refinance on the first and second mortgage on -- I'm saying "Monique." It may be Monet Way, for $620,000. $101,826 were received as a cash out from that refinancing. They paid off -- the couple paid off other loans on personal residences with that refinancing, and in July 2007 failed to disclose two properties on the loan application submitted to Flagstar Bank.

In October 2009 there's a letter to the bank, stating

that the couple was having financial difficulties and requested

a short sale.  In January, the defendants made the last

mortgage payment on Monique -- or Monet Way.  Then there was

foreclosure and the bank lost money.

And, again, in March 2009, the wife purchased -- in

her name only -- the Overland Court property.  And both -- both

defendants moved into the property thereafter.  The wife,

Ms. Jennifer Duren, also is alleged to have misrepresented her

income in the purchase of that property.

Under Rule 8, a charging document -- charging

document may charge in separate counts two or more offenses, if

the offenses are not -- are of the same act or transaction or

in the same series of acts or transactions constituting an

offense or offenses.

There's also Rule 14, which speaks to prejudicial

joinder.  And, here, the Court must consider whether the

joinder for trial appears to prejudice a defendant.  And, if

so, the Court may order separate trials of joint counts.

Count 35 is based upon false statements to banks

between 2004 or 2005 and 2009.

Count 35.  The allegations in Count 35 are not based

upon the same acts or transaction -- transactions as alleged in

Count 1.  The Court finds they are not connected.  They're not

part of a common scheme or plan alleged in Count 1.  The proof

of one does not constitute substantial proof of the other.

1    The Court finds that there's undue prejudice

2    resulting from the damaging spillover by joined counts and that

3    damaging spillover may poison the jurors' mind with respect to

4    the allegations in Count 1.

5    The Court finds, clearly, that the joinder of Counts

6    1 and 35 for trial will create undue prejudice to the

7    defendant.

8    The Government also alleges that -- that the

9    allegations in Count 35 are inextricably intertwined with the

10   evidence to be introduced in Count 1.

11   Count 1 does not state any allegation of bank fraud

12   proceeds utilized in Count 1.  Albeit that there's an

13   allegation in the general allegations.  It's on the bottom of

14   the first page, I believe, or before we get to the conspiracy

15   count, that mentions, you know, bank issues.  The Court finds

16   that some relation to banks -- I left the Indictment in the

17   back, and I can't recite it at this moment.  But the Court

18   finds that reference is insufficient in light of how Count 1 is

19   pled.

20   Count 1 does not state any allegation of bank fraud,

21   proceeds utilized in structuring.  Count 35 is not an object of

22   the conspiracy or the manner and means to commit it or to --

23   related to any of the overt acts in Count 1.  The Government is

24   correct that all overt acts or all means to commit a crime need

25   not be recited in the Indictment.  But, as stated, there is no

1    connection between the two.

2        There's no connection -- there's no link between

3    Count 35 and Count -- Count 1, as I previously indicated.

4        And the Court also notes that bank fraud allegations

5    in Count 35 occurred before the money laundering occurred --

6    alleged to have occurred in Count 1 in the substantive counts.

7        The Court finds the Government has not proffered any

8    link between any of the money to show that -- from the fraud --

9    from the bank fraud was actually structured or utilized in the

10   money laundering scheme.  The Court finds that Exhibit H,

11   produced by the Government, does not draw the requisite link.

12   As -- as stated, the Court finds that any amount of proceeds

13   linked to the 2007 refi or the 2009 alleged false statements

14   are unconnected to and not a part of the transactions within

15   Count 1, the conspiracy count.

16       Even the 2009 event and allegations of not making

17   payments before any act or circumstantial evidence of possible

18   ripoffs of drug proceeds does not support the requisite link.

19       Lastly, the Court finds that the allegations in Count

20   35 do not represent appropriate 404(b) evidence to support

21   Count 1.

22       The events in the scheme alleged in Count 35 and

23   Count 1 do not have the requisite temporal connection.  Even

24   though there's a couple of events that may appear to be

25   overlapping, they're totally separate schemes.

1          It's almost like if this was a RICO and the bank

2    fraud was alleged as another overt act of the RICO, we would be

3    talking about a different situation.  We're talking about

4    simple conspiracies here.  And we're looking at conspiratorial

5    wheels, and the Court finds that that overlap is insignificant

6    for -- you know, for joinder or for admission under 404(b).

7          Importantly, the sufficiency of the evidence is an

8    important consideration under 404(b) because, again, we look to

9    the four elements of 404(b).  Here, as I indicated, we don't

10   have the temporal connection.  It's remote in time from the

11   activities -- the primary activities charged in Count 1.  There

12   are minimal facts to prove -- to prove up the evidence, to draw

13   the requisite connection.

14         And even if -- so in the Court's view, the evidence

15   in Count 35 is irrelevant to the charges in Count 1.  Even if

16   relevant, the Court finds that under 403 it would create a

17   mini-trial as to all the issues identified in Count 35.  The

18   defense would have to confront those issues.  It creates

19   propensity relating to character and guilt.  It will distract

20   the jurors from the primary issues involved in Count 1.  And,

21   for those reasons, the probative value will be substantially

22   outweighed due to prejudicial spillover of that evidence being

23   introduced as part of the evidence in Count 1.

24         Now, Count 35 is supported by more than basic

25   probable cause to believe that the crime was committed but

there is insufficient evidence to suggest that they're part of the same conspiracy. Or, as I indicated, they have the temporal connection or any link sufficient enough, the requisite connection between the offenses to make them admissible. That's the Court's order. Count 35 is severed.

The Government has the option to decide what trial to proceed with first.

Count 35 or the balance of the charges.

MS. MARSH: The balance of the charges, your Honor.

THE COURT: That's your decision, ma'am.

Okay. I believe I've handled all of the issues.

MS. MARSH: Did the Court have an order regarding the production of the six-fifty-ones?

THE COURT: Ah, yes, I do.

With -- with respect specifically to the 6051s, these are the reports of seizure order or change of custody of seizures that occur -- that occurred by the defendant. The proffer is that there were 22 seizures that he conducted as a special agent. The Court finds this evidence would be material. Why?

Unlike just TECS records, bare-bone TECS records, the allegations here are -- involve seizures by the defendant, unbeknownst to the Government, when no one else is around, and they're unreported and unexplained and unexplained wealth therefrom. Okay?

1          The Court finds that in the event there's evidence of

2    22 seizures, the Government must inform the defendant and

3    produce the 6051s so it might inform the defendant of its

4    theory of the case or whether or not it should be modified or

5    how it can -- it can be used by the defendant to defend any

6    general thoughts about what he did about general seizures.  And

7    that -- to dispel an issue with respect to there may be

8    other -- with other evidence coming in, that there may be

9    circumstantial evidence that some were not reported.  So he

10   could utilize that in any way he deems appropriate, that the

11   Court finds is admissible.  But for investigative purposes, I

12   think it's material.  This change-of-custody documentation, it

13   should reflect who was with him at the time of the seizure or

14   who had the money before he had it.

15         And one suggested area of defense would be, well,

16   whether or not he had anybody with him at other times when he

17   stopped the car that the Government alleges, that there --

18   the -- the possible use is left to the imagination of the

19   defense.  But I can't shortchange that by denying that motion.

20         So that motion is granted to -- if -- if the

21   defendant is -- if the Government decides to introduce it, it's

22   granted.  If you decide not to introduce it, no harm, no foul.

23         MS. MARSH:  Well, we never intended to introduce that

24   evidence.

25         And now the Court has ruled that evidence of the 22

seizures -- or the Government producing in our case-in-chief --
or presenting evidence that he did 22 seizures has now also
been precluded.

THE COURT:  In the case-in-chief.

MS. MARSH:  In the case-in-chief.  Understood.

So the defense is requesting both the
chain-of-custody forms and photographs from all 22 seizures he
was involved in.  And if the Court is ordering that we produce
those, we will produce those.

We will go -- it's going to be a matter of going to
the case files and going back through all of the case files;
which is fine, we'll do that.

THE COURT:  It's not computerized?  It's not
computerized?  It's not scanned?

MS. MARSH:  No.  I think these are paper case files
that are at the Oceanside office.  That's my understanding,
from speaking to the investigators.

So we -- in our efforts to produce the photos in the
other seizure that we do intend to present, the San Clemente
checkpoint seizure, we had to go to a lot of different places
to sort of find all of these pieces of the case file.  But I
think that we are capable of doing it, and we will do so.  But
I just want to clarify the Court's order.

I think that the defendant does have information
about who else was there.  I think the 6051, the custody form

1   may have additional names, which I concede.

2         THE COURT:  With the two seizures?  With the two

3   money instances?  With all of them?

4         Oh, yes, with your -- your record of seized cash you

5   referred to earlier.

6         MS. MARSH:  Right.  So we have produced the 6051s and

7   the photos as to the San Clemente seizure.  That's been

8   produced a long time ago.  They're asking for it on every other

9   seizure he was ever involved in.  And as to the other seizures

10   he was involved in, based on our information -- the reported

11   seizures, we have produced the reports, those SEACAT records,

12   which are actually more than a TECS records.  They're similar

13   because they're computerized.  But it's not scanned in, it's

14   typed in.  And a spreadsheet, you know, listing all of those

15   seizures and case numbers.

16         What the defense is seeking is on all 22 other

17   seizures that have now been excluded in our case-in-chief, the

18   chain-of-custody form and all of the photographs from those

19   seizures as well.

20         Essentially, they're requesting the whole case file

21   in all 22 seizures.  So I just want to clarify that even though

22   that's been excluded from the Government's presentation, the

23   Court is still ordering, for purposes of preparation of the

24   defense, that we produce all of the -- the 60 -- the

25   chain-of-custody forms and the photos from all of those

1    remaining 22 seizures.

2          THE COURT:  All right.

3          MR. STEWART:  And if I may, your Honor, there are two

4    different issues on the Rule 16.  Right?  And the Court has

5    already ordered -- or indicated that -- through an order that

6    the Government, that it is precluded.  But then the other

7    portions of Rule 16 allow the defendants to, you know --

8          THE COURT:  Talk to me, sir.

9          MR. STEWART:  Then the other portion of Rule 16

10   allows the defense to introduce evidence in its case-in-chief.

11   And one of the theories that we want to be able to produce is

12   that Mr. Duren has been involved in many seizures and has done

13   quite well in many seizures.  There were some seizures where

14   other agents didn't know about them.  He called them, reported

15   them, and -- because we believe that that could weigh against

16   this idea that maybe Mr. Duren was not being honest with regard

17   to handling seizures.

18          So we're not requesting the entire file.  We are

19   simply just requesting, as the Court indicated, the 6051

20   because it has the complete chain of the money.  And we just --

21   that way we can track and explain who touched the money, so

22   there's clarification there.  And if we do need to subpoena an

23   agent based on the chain of custody, we will have that

24   information, which does not -- is not contained in the -- in

25   the -- in the SEACATS.  And then just the photos.

1        So we're not asking for the entire -- the entire

2   file.  We're just asking for those two pieces of the file.

3   That's it.

4        MS. MARSH:  And if that's the Court's order, we will

5   happily produce that.  I just wanted to clarify because you

6   didn't address the photos specifically.

7        THE COURT:  That's true.  Yeah.  And to further

8   clarify, if the Government intends to produce evidence of --

9   even circumstantial evidence to argue unexplained stops and

10  where the money came from, the defense has a right to try to

11  show that he has always done it the right way.  Okay?

12       MS. MARSH:  Understood.

13       THE COURT:  All right.  Anything else, except

14  housekeeping matters?

15       MR. STEWART:  Your Honor, didn't the Court -- I just

16  wanted to be clear, your Honor.  With regard to seizures --

17  that these, quote/unquote, kind of anonymous seizures that may

18  have occurred, our understanding is that the Court has

19  indicated that if the Government wishes to introduce evidence

20  of that, that they need to come with some type of -- of other

21  circumstantial evidence to kind of support that claim.

22       Is that correct or is that not --

23       THE COURT:  404(b) requires that.  It has to be

24  sufficient evidence, and it has go to be -- it can't be like

25  another mini-trial.  It can't be five witnesses.  You know, it

1    has got to be succinct evidence that is probative of the point

2    that's presented.

3           And I won't know that until I hear it.  Okay?

4           MR. STEWART:  Thank you.

5           THE COURT:  But the Government has mentioned at least

6    one circumstance it may have that might meet that -- meet the

7    404(b) test.  And that's why I suggest the two of you can meet

8    and confer on that because you would have to disclose anyway.

9    All right?

10          The Government has to disclose it anyway.  And if

11   there's some issue with that, we can have another discussion on

12   the morning of trial or early in the trial.

13          And also with respect to the 6021s [sic], those

14   should be produced as soon as possible.  Because then the

15   defense has -- I don't know how long the trial is going to be

16   now, in light of the severance.  But the defense will at least

17   have another, you know, week or two after the trial starts to

18   continue its investigation in how it wants to approach those

19   things.  So the sooner they're presented, the better.

20          My thinking is to give the Government two weeks to do

21   that.  Okay?  It may be a lot of work, but the Government has a

22   lot of resources.  The defendant does not.  The defendant can't

23   go through the files himself to -- to look for what he's

24   looking for.

25          So the Government has two weeks out.  Give me a date,

1    or -- I have my calendar here.  18th of April.  Excuse me.

2           Housekeeping matters?

3           MS. MARSH:  Yes, I have a list, your Honor.

4           I want to inquire what hours the Court intends to be

5    in trial.

6           THE COURT:  Um-hmm.

7           MS. MARSH:  And then some certain dates.  I think

8    we've already talked about one, May 9th.

9           I also wanted to inquire whether --

10          THE COURT:  Excuse me.  Go ahead.

11          MS. MARSH:  Sorry.  I don't know if you want me to

12   ask the list of questions or --

13          THE COURT:  Yeah, let's have the list.  No, let's

14   have the list.

15          MS. MARSH:  So what are our hours of trial?

16          THE COURT:  And days of trial.

17          MS. MARSH:  What's that?

18          THE COURT:  And days of trial.

19          MS. MARSH:  And days of trial.

20          Will we be in session May 28th, specifically?  Which

21   is the day following Memorial Day.  So it's a Tuesday.  We

22   typically would be in session, I think.  But I didn't know if

23   that would change because the Court needed to handle other

24   matters that weren't handled on Monday.

25          THE COURT:  All right.  That's a good question.

1   Let's stop there for a minute.  The timing of the trial.

2          I've mentioned, already, May 9th.  And I'm not

3   comfortable with it because we're just getting out of the

4   blocks with the trial.  I hate to have that interruption.  But

5   we have that court administration matter that the Court must

6   participate in.

7          The next question, then, is that -- do we come back

8   at 1:30 with the jury and -- and work possibly to 5:00, instead

9   of losing the entire day?  Or could it be a day for further

10  preparation by the parties?

11         I have -- we have time blocked off.  And -- and,

12  Counsel, once your team gets together to meet, you can let me

13  know on the morning of trial how long you expect the first

14  phase of trial will take, now that certain evidence is cut out,

15  so I can inform the jury about that.  Especially we have some

16  jurors who are picked up off the street at the last minute

17  without any notice of the lift.  I can share a more realistic

18  aspect of how long the trial will take.

19         So would -- for May 9th, would it be your desire to

20  come back, come in at 1:30, or so, on the 9th of May, after my

21  business, or to take the rest of the afternoon off and have the

22  jury come back the following day?

23         MS. MARSH:  I think it is our desire to come back for

24  the afternoon.  I think that we anticipate -- I guess we don't

25  for sure where we'll be, how long jury selection will take, how

1   long opening statements will take.  In our discussions on the

2   break, we anticipated it might be that we might just be at

3   opening or with our first witness.

4          THE COURT:  Okay.

5          MS. MARSH:  We do have Mr. Sanchez traveling from

6   Mexico, being brought in, paroled in.  And so we want to make

7   sure that we are timing his testimony effectively, which may --

8   he's likely to take longer than the afternoon of the 9th.

9          So I think as we schedule our order of witnesses,

10  it's possible our answer will change.  But right at this

11  juncture we think we would like to be in session that

12  afternoon.

13         THE COURT:  Okay.  And I -- you know, I have a

14  generally fluid concept with these matters.  If we need to take

15  somebody out of order or if we have a witness on the stand and

16  someone needs to leave town, we can -- we can postpone the

17  balance of someone's testimony to put someone else on.  I'm

18  flexible with that.

19         MS. MARSH:  Okay.

20         THE COURT:  Okay?  With the timing and the

21  convenience of witnesses in that regard.

22         There being no objection, let's have in mind to come

23  back at 1:30 on the 9th of May.  We should have completed our

24  business by that time.

25         Days of trial.  I have two models for trial time per

1  day.  One is a shortened lunch break, where my thinking is that

2  a jury can absorb no more than five or so hours of trial a day.

3  To extend it beyond that, you are going to lose them as they

4  sit there.

5          One second.

6          (Pause.)

7          THE COURT:  They're not much different.  But 9:00

8  p.m. [sic] to 4:00 p.m. each day with 45-minute snack lunch

9  break.  And I will give the jury that instruction ahead of

10  time, so they can prepare.  There's a refrigerator in the jury

11  deliberation room that they can use or downstairs in the jury

12  administration area, so they aren't wandering around town.

13          Or the traditional schedule would be 9:00 to 4:45, or

14  so, with the hour -- with an hour to hour-and-15-minute break.

15  Some lawyers would prefer to leave here earlier to prepare for

16  the next day.  But there is some inconvenience to the jury in

17  that regard, with the shorter lunch break.  But I'm prepared to

18  let the jury know in advance.

19          So the first day of trial, we may have a full

20  lunch -- a full hour and a half.  But after that, after they

21  learn their way around town, they find some places close, or

22  whatever, then have a shortened lunch after that point.

23          MS. MARSH:  Our preference is the shortened schedule.

24          MR. KIRBY:  As is the defense's.

25          THE COURT:  All right.  9:00 to 4:00, with a

1   45-minute lunch.

2           There will be a short break in the mornings.  And I

3   gauge that by what's going on with the jury, whether or not

4   they seem to be antsy.  And a short break after lunch,

5   sometimes, is important, just because they're sitting there,

6   after eating, and they need to stretch.

7           I'll also allow the jury to stretch during the course

8   of a trial if they need to, you know, stand up and do so.

9           So does that -- that handles that -- that portion of

10  your admin concerns?

11          MS. MARSH:  Days of trial.

12          THE COURT:  Days.  I will need to handle some

13  calendars in there.  And allow me to work with my staff to

14  identify where they are.  I have some calendar dates already

15  set.  I usually have two calendars a week.  That will not work

16  for this trial.

17          There may be occasion, and I'll communicate with

18  you -- to both of you through Mr. McDowell as to whether or not

19  I'll take one day every two weeks to try to do this and then

20  maybe start a half an hour, or so, on other days.  Just pull in

21  one or two matters before the jury comes in.  We'll see if we

22  can work it where there's no disruption.

23          I would rather we try to go four to five days -- I

24  would rather get out of the blocks with as many -- well, at

25  least four or five days for the first week except for that --

1   four days for the first week, including -- including the jury

2   selection and possibly a full or near full week the second week

3   to get most of the evidence in, to get us on a roll, if you

4   will, before I take extended breaks with -- with the full

5   days -- day of calendar.

6         I have to work with my staff more, you know, to

7   project that, based upon what's on the calendar already, to

8   make sure nothing else is placed on my calendar during that

9   period.  But for a four- to six-week period, I have a number of

10   matters I'll have to address during the course of this trial.

11   I will do my best to limit them to at least a half a day a

12   week, if possible and -- but not a full day.  But I have to --

13   but, hopefully, I can give you sufficient time so you can plan

14   your witnesses in that regard.

15         MS. MARSH:  Understood, your Honor.

16         The practice in Phoenix -- and I think we were

17   anticipating this, which is part of why I wanted to raise the

18   issue, is we -- we -- we actually are typically only in trial

19   Tuesday through Friday in Phoenix.  Mondays are almost always

20   blocked out as calendar days.  So if you anticipate

21   differently, which it sounds like you do -- I mean, we're

22   amenable to that, if that works for the Court --

23         THE COURT:  I would love to do Tuesday through

24   Fridays because, you know, that -- that takes the load off the

25   court for -- for judicial efficiency, as well, with respect to

1  other matters and other persons who need to be heard.  Okay?

2  But I also think there's a benefit to have a five-day period

3  just to have evidence.

4        So I'll let you know.  I appreciate that

5  consideration, ma'am.  Okay?

6        MS. MARSH:  Okay.

7        MR. STEWART:  And, your Honor, just on our side, if

8  the Court decides to do the Tuesday through Friday, that could

9  work for the defense just because it gives us an extra day to

10 kind of prepare for that week.  But, of course, we defer to the

11 Court.

12        THE COURT:  Well, let's do it then.

13        MS. MARSH:  We all promise we'll work really hard on

14 the four days.

15        THE COURT:  All right.  Tuesday through Friday.

16        All right.  Anything else?

17        MS. MARSH:  Yes.  Just a moment.  Sorry.

18        And I think the Court actually addressed this a

19 little bit in our earlier discussion.

20        Agent Weaver is intended to be our case agent, sit at

21 counsel table with us.  And we would like to propose maybe

22 putting her in as a utility witness to sort of fill the gaps

23 when people are missing.  So I just wanted to raise that with

24 the Court now and see how the Court felt about that.

25        THE COURT:  I'm comfortable with that if -- yeah, I'm

1    comfortable with that, ma'am.  And we can explain that to the

2    jury before she testifies or whenever she's taken off.

3              MS. MARSH:  Thank you.  Just for the sake of

4    efficiency.

5              THE COURT:  Sure.

6              MS. MARSH:  I do also want to inquire about exhibits.

7    The Court mentioned that there is a viewing system in the back

8    that's contained.

9              I think we talked before about this a little bit in

10   Arizona -- District of Arizona, we have JERS, is what it's

11   called.  J-E-R-S is the acronym for it, that is similar to what

12   you're describing, where it's all contained -- the -- the

13   exhibits come in electronically and it allows the jury to

14   manipulate it in a back room.  I don't know if that's the same

15   system that the Court has here.

16             THE COURT:  I don't -- I don't know what the system

17   is called.  But on the day of jury selection, before -- after

18   closing arguments, before we have an opportunity to -- to get

19   into the exhibits, we'll have someone from IT here, from the

20   clerk's office, to share with both parties how the system

21   works, so you can anticipate.  Okay?  And the -- and the medium

22   it's going to need in order to show the data.  All right?

23             MS. MARSH:  So we have over 560 exhibits prepared, at

24   this point.  They are prepared electronically in a PDF.  But if

25   they need it in a different format, we will work to accommodate

1  that, of course.  But my question, at this point, for purposes

2  of preparation, is does the Court want paper copies of each of

3  those exhibits in file folders or in binders, or can we somehow

4  present those electronically?

5         We have an electronic presentation system that will

6  hook to our computer, that will display the exhibits on the

7  screen.  But I wanted to know if the Court also wanted a

8  printed out paper copy in an individual folder of each exhibit.

9         THE COURT:  Would you have a paper copy?

10        MS. MARSH:  Well, I prefer not to have multiple paper

11  copies.

12        THE COURT:  I mean, we do have one?

13        My thinking is if we need to have a sidebar and I

14  need to look at the document at sidebar, I need a paper copy.

15  I don't need a set up here.  But if there's going to be at

16  least one paper copy somewhere, that I can look at sidebar, if

17  we're discussing a particular exhibit.  Because, otherwise, I'm

18  coming back and forth to take a look at it up here.  That would

19  be helpful, ma'am.  But I don't need a set for the Court.

20        MS. MARSH:  Okay.  Or I would maybe propose that we

21  do a set for the Court and then we all have it electronically,

22  and that the Court can then look at that; however.  But my hope

23  would be that we just only have to produce one set.

24        THE COURT:  All right.  I don't have a problem with

25  that.  Any problem on the defense side?

1       MR. STEWART:  No, your Honor.  So then the question

2  for in turn of the jury, does the jury have the electronic

3  system back there, where they see the exhibits if they want to

4  review them?  Or is there a paper -- do they get the paper

5  copy?

6       THE COURT:  I believe the system in the back has a

7  way.  If it's -- there's a table of contents where they can

8  click on something and go to a particular exhibit that works.

9  But I would also like to have -- maybe my copy can go into the

10 jury room.  I won't draw on it.  The copy I have can go in the

11 jury room in case -- because what I anticipate -- I think I

12 mentioned this the last time.  Even if some jurors are looking

13 at everything on the screen, another juror may want to take

14 another look at a different exhibit and a hard-tab copy could

15 be back there for that purpose, to make it more efficient in

16 the back.

17      So I'm free to utilize -- I'm comfortable utilizing

18 the copy that's given to me to go into the jury room; one set.

19 Okay?

20      MR. STEWART:  Okay, your Honor.  And we'll make sure

21 we provide a Court with a copy as well.

22      THE COURT:  Of the defense exhibits?

23      MR. STEWART:  Yes, your Honor.

24      And then the other question I have -- it's been a

25 while since we've tried a case in federal court with the

 1   current electronic system.

 2        Is it possible for us -- will we need to just

 3   coordinate with Mr. McDowell?  Or if we want to be able to come

 4   in and just kind of make sure that the software that we're

 5   using, the trial software is compatible, would we just

 6   coordinate that with Mr. McDowell?  Or is there someone else

 7   IT-wise from the court that we could talk to?

 8        THE COURT:  Yes.  Mr. McDowell will accommodate both

 9   parties personally or bring in someone from IT to show you how

10   to work the equipment.  How to switch it back and forth from

11   one side of the aisle to the other.  For example, if you have

12   your exhibits electronically, you have to switch on that little

13   monitor there, where your exhibits show, as opposed to the

14   Government's exhibits.

15        He can explain all of that to you.  He call also

16   explain to you about how to draw on the screen, and how you can

17   instruct witnesses to write on the screen.

18        Also importantly, this equipment -- I don't recall if

19   I mentioned it last time.  But this equipment is -- is capable

20   of capturing markings by a witness.

21        So if you want to say to Mr. Sanchez, for example,

22   you have a picture of a car.  Where was the compartment

23   located?  Then he can draw on it, and you can ask it be

24   captured.  And say that's Exhibit 100.  Mr. McDowell can press

25   a button, and it will capture that colored image.  And it can

1  be Exhibit 100A, a subexhibit of the main exhibit.  So that it

2  can be explained to the jury and doesn't get lost in the throes

3  of things.

4          So any time a witness draws on an exhibit on the

5  screen, we don't need to have that -- you know, the -- the

6  easel paper and all of that to deal with that.

7          You can capture that exhibit, and we can mark it as a

8  subexhibit to that particular exhibit number.  Okay?

9          But you have to give Mr. McDowell notice, and he

10 prints it out right here, at his desk, and it's there, and it

11 goes in as evidence with the other evidence in the case.

12         MS. MARSH:  There are also two outstanding filings.

13 We filed a set of proposed jury instructions and a proposed

14 verdict form under document 112 and 115.

15         I don't think we've had any input or discussion with

16 defense counsel about those since we filed them.  So I guess I

17 just want to raise it and make sure that we are all on the same

18 page.  Now they are going to need to be altered because we've

19 severed a count and dismissed a count.  So we'll have to make

20 some changes.  But I think we probably need to meet and confer.

21         MR. STEWART:  Right.

22         THE COURT:  What exhibit numbers again?

23         MS. MARSH:  Oh, they're not exhibits.

24         THE COURT:  I mean, docket numbers.  Right?

25         MS. MARSH:  112 and 115, the jury instructions and

1   verdict form.  They were filed back in April of 2018.

2          THE COURT:  Yes.  Okay.  No, I have -- it's been a

3   while.  I have not reviewed those, lately, because the trial

4   was continued.

5          MS. MARSH:  Sure.

6          THE COURT:  Okay.

7          MR. STEWART:  And I know normally here -- at least it

8   used to be my experience that we would do the -- the jury

9   instructions at the close of -- of evidence.  So does the Court

10  want the jury instructions at least -- well, normally the Court

11  would give us its general jury instructions.  And then we may

12  have -- we'll discuss it, and we may have others that we would

13  propose.  But my experience has been normally that happens at

14  the close of cases -- of the evidence.  Does the Court want to

15  do it differently?

16         THE COURT:  Well, the general practice, in this

17  district, is for the Government to present a -- a -- a trial

18  memorandum laying out the evidence, laying out the history of

19  the case, laying out -- if you anticipate, at that juncture,

20  some problem evidence that may need to come in; you can lay out

21  some Ps and As there; your witnesses your -- you intend to

22  call; and -- and also the proposed jury instructions.

23         Because I do give to the jury, during the preliminary

24  instructions, the elements of the charges.  And with the number

25  of -- of charges here, they won't have a copy of them.  But I'm

1   going to give them to them so they can try to track the
2   evidence.

3           So we'll have an opportunity, near the end of the
4   trial, to deal with more specific fact-related instructions
5   before we get to closing argument.

6           And we'll -- we'll begin that Rule 30 conference
7   before we get to all the -- the end of the evidence.  So I'll
8   give you a time frame to have any other instructions in.

9           But I would like to have your basic take on the
10  preliminary instructions on the elements of each crime.  Okay?
11  And if -- and -- so the Government should share that with
12  defense counsel.  If there's any objection, we can talk about
13  it on the first day of trial as well.  Because I would like to
14  clear that up before I give preliminary instructions.

15          MS. MARSH:  Understood.

16          So, at this point, I think we need to update them
17  based on the Court's rulings.  But they have been filed, so
18  defense counsel, maybe in the meantime, could look at what
19  we've already proposed.

20          The practice in the District of Arizona is not to
21  combine it into a trial memorandum, as the Court is describing
22  here.

23          THE COURT:  It would be -- it would be a separate
24  document, but it's not in the trial memorandum -- well, here,
25  generally, if it's a single-count trial, it's in the trial

1    memorandum.

2         MS. MARSH:  Sure.

3         THE COURT:  But with the number of counts, you know,

4    just proposed instructions -- you know, you can make them

5    proposed preliminary instructions.

6         I normally go by the Ninth Circuit model jury

7    instructions, but I like to have that from the Government, as

8    to what you propose or plan for prelim --

9         MS. MARSH:  And that's what's already been filed.

10         THE COURT:  Yes.  All right.  Okay.  Then you need

11    not do anything more.  We can --

12         MS. MARSH:  I will amend --

13         THE COURT:  -- determine what's appropriate for the

14    first trial and what's not, without your filing something in

15    that regard.  Okay?

16         MS. MARSH:  Okay.  Or we can file an amended version

17    because of the rulings.  I mean, some of them will change

18    because of the Court's rulings.

19         THE COURT:  You may do that, ma'am.  Okay.

20         MS. MARSH:  And then my final question is I don't

21    think we have, like, a final pretrial conference date on the

22    calendar.  Could we set one?

23         I know, Mr. McDowell is gone.  I don't know if we

24    want --

25         THE COURT:  Oh, no, we'll take care of the order.

1   Everything's being transcribed.  We'll handle this.  Don't

2   worry.

3          Generally, I don't have a prior -- a final pretrial

4   conference in criminal cases.

5          We can have a status conference the day before.

6          MS. MARSH:  Okay.

7          THE COURT:  But I do have time -- hold it.  I don't

8   have a trial the first week I'm back.

9          Any objection to telephonic for a status?

10         MS. MARSH:  We'll be here.  Oh, you want -- do you

11  want it to be telephonic?  We'll be here starting a week before

12  the trial.

13         I think April 24th is when we'll both be here.

14         THE COURT:  Okay.

15         MS. MARSH:  Week and a half.

16         THE COURT:  April 30th, 1:30.

17         MS. MARSH:  Thank you.

18         THE COURT:  All right.  As indicated this morning,

19  the Court will review the noes that we've received so far, to

20  determine whether or not I will accept the noes.

21         And I'll instruct the jury administrator to order

22  those -- if I've disagreed, order those persons to come in.

23  And we'll get a full plate as to what's available next week in

24  that regard.

25         And I'll review the noes -- while I'm away, I'll

1   review any other noes and coordinate with the jury

2   instructor -- the jury administrator in that regard.

3           And if there's any other update that you'll need

4   beyond what you receive from the jury administrator, the Court

5   will ask Mr. McDowell to text -- to e-mail both parties, to

6   keep you up to date, instead of waiting simply to April 30th.

7           All right.

8           MS. MARSH:  Thank you, your Honor.

9           THE COURT:  We need to leave.

10          MS. MARSH:  That answers all of my questions, and I

11  need to go to the airport.

12          THE COURT:  I discussed some time ago about my

13  protocol for jury selection.  If there's an issue, we can

14  discuss again on the 30th of April.

15          MS. MARSH:  Thank you, your Honor.

16          THE COURT:  Thank you.

17          MR. STEWART:  Thank you, your Honor.

18          THE COURT:  You're welcome.  We're in recess.

19          (Conclusion of proceedings.)

20

21                      -0-

22

23

24

25

1

2                                    --oOo--

3    I certify, by signing below, that the foregoing is a correct

4    stenographic transcript of the oral proceedings had in the

5    above-entitled matter this 13th day of April, 2019.  A

6    transcript without an original signature or conformed signature

7    is not certified.  I further certify that the transcript fees

8    and format comply with those prescribed by the Court and the

9    Judicial Conference of the United States.

10

             /S/ Amanda M. LeGore
11           _____

12           AMANDA M. LeGORE, RDR, CRR, CRC, FCRR, CACSR 14290

13

14

15

16

17

18

19

20

21

22

23

24

25